619 A.2d 1208
STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JOHN MARTINI, SR., DEFENDANT–APPELLANT.

Argued May 5, 1992—Decided February 9, 1993.

184

*Mark H. Friedman* and *William B. Smith,* Assistant Deputy Public Defenders, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney).

*Craig V. Zwillman,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

In December 1990, a jury convicted defendant, John Martini, Sr., of the capital murder of Irving Flax committed in the

course of a kidnapping. Following a penalty-phase proceeding on the capital-murder conviction, the court sentenced defendant to death. He appeals directly to this Court as of right. See *Rule* 2:2–1(a)(3). We affirm defendant's conviction for murder and his sentence of death.

I

On May 9, 1989, defendant was indicted for purposeful or knowing murder by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1) and (2) (count one); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3) (count two); possession of a handgun with intent to use it unlawfully against another, contrary to *N.J.S.A.* 2C:39–4a (count three); kidnapping, contrary to *N.J.S.A.* 2C:13–1a (count four); and possession of a handgun without a permit, contrary to *N.J.S.A.* 2C:39–5b (count five).

Subsequently, the State served notice of its intent to prove two aggravating factors: that the murder of Irving Flax had been committed for the purpose of escaping detection, apprehension, trial, punishment, or confinement for the crime of kidnapping committed by the defendant, *N.J.S.A.* 2C:11–3c(4)(f), and that the murder of Irving Flax had been committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of kidnapping, *N.J.S.A.* 2C:11–3c(4)(g).

The jury found Martini guilty on all counts and sentenced him to death. Martini did not dispute that he had kidnapped and murdered Irving Flax, but he asserted that his severe and continuing drug-abuse problem had vitiated his capacity purposely and knowingly to commit the crimes of which he was accused. Martini's oral and signed statements confessing to the crimes were virtually uncontested at trial, and were the primary source of most of the State's evidence. The following is an account of the essentially-undisputed facts surrounding this case.

A. *Events preceding the murder, the crimes and the investigation*

In November 1988, defendant, a former long-time resident of New Jersey, travelled to New York City from Arizona with twenty-nine-year old Therese Afdahl, with whom he had been romantically involved for the previous ten years. In 1989, Martini, fifty-eight, had divorced his wife of thirty-nine years because of his relationship with Afdahl. A few days after his arrival, defendant and Afdahl met with Victor Picardi, a friend of defendant, and Picardi's wife, Joyce, in their Bronxville, New York home. Defendant asked to borrow Victor Picardi's credit card, claiming that he had lost his wallet. Picardi complied.

Shortly thereafter, defendant and Afdahl moved to New Jersey, where they stayed in various hotels, including the Days Inn in Fort Lee, before renting an apartment in Fairview under the names Victor and Joyce Picardi. On December 12, 1988, and January 9, 1989, defendant, using the name Victor Picardi, visited the office of Dr. Anthony P. Nicosia in Cliffside Park for treatment of anxiety, nervousness, gastritis and a runny nose. During that visit, Dr. Nicosia did not observe any indication of drug use by defendant.

After moving to New Jersey, defendant communicated with a long-time friend, John Doorhy. Doorhy, who lived in Westwood, agreed to meet defendant at the Forum Diner in Paramus. During their meeting, defendant told Doorhy that he was short of funds, and asked if he knew of a way to make some money quickly. Doorhy gave defendant a $6,000 loan and then suggested that defendant kidnap Irving Flax, a Fair Lawn businessman, with whom defendant had been acquainted for some thirty years. Doorhy informed defendant that while working recently at the Flax home, he had noticed a large amount of cash as well as several bankbooks, one of which showed a balance of at least $100,000. Doorhy also told defendant the morning schedules of the Flax family, informing him

that Irving Flax usually left for work between 9:30 and 10:00 each morning.

Defendant agreed to give Doorhy a percentage of the proceeds of the kidnapping. In return, Doorhy drove defendant to the Flax residence and provided him with written directions to return there. Afterwards, the two men returned to Doorhy's house where Doorhy gave defendant a .32 caliber revolver that defendant had purchased in Arizona a few years earlier and that Doorhy had been holding for him.

Sometime later, defendant, accompanied by Doorhy, met a third party who had obtained fraudulent New Jersey driver's licenses for defendant and Afdahl in return for $1,000. On another date, defendant purchased an additional .32 caliber revolver in Jersey City for $100.

On the morning of January 23, 1989, defendant and Afdahl drove defendant's blue Buick to a location near the Flax residence from which he would have an unobstructed view of anyone leaving the premises. At approximately 9:30, Flax left the house and approached his car. Afdahl drove the Buick to the front of the house, where defendant alighted from his car and approached Flax's vehicle. Defendant called Flax by a nickname he had known him to use during their earlier acquaintance. Defendant asked Flax if he recognized him. When Flax showed some recognition of defendant, Martini suggested that the two go to a diner in Flax's car for a cup of coffee. Flax agreed.

As Flax began to drive, defendant pulled out the revolver he had recently purchased and pointed it at Flax. Defendant informed him of the kidnapping and directed Flax to drive to the Garden State Plaza parking lot adjacent to Route 17 in Paramus. Afdahl followed behind in defendant's car. Once parked, Flax was ordered to get into defendant's vehicle, which had been parked next to Flax's automobile. Defendant then drove Flax and Afdahl to the Fairview apartment.

At approximately 10:00 a.m. Flax was instructed to call his wife, Marilyn. Mrs. Flax had stayed home from work that day in order to take care of her youngest son, who was sick. Mrs. Flax sensed that something was wrong with her husband despite his protestations to the contrary. During the conversation, Irving Flax told his wife that he needed her to stay home and that he would call again in fifteen or twenty minutes. After that call defendant took Flax into a bedroom and bound his ankles with tape and his wrists with both tape and an extension cord.

Thirty minutes later, defendant telephoned Mrs. Flax and told her "I have your husband * * *. [I]f you want to see him alive, I want $100,000." Defendant ordered Marilyn Flax not to communicate with the police, and told her that if she called the police, both she and her husband would be dead. Some fifteen minutes later, Irving Flax again telephoned his wife and told her not to call police and to "give them this money."

Mrs. Flax telephoned the Fair Lawn police to report the kidnapping. Taps were placed on two of her telephones at about 1 p.m. Before the taps were installed, however, defendant again telephoned Mrs. Flax, this time from a pay phone. After identifying himself as "Tony," defendant asked if Mrs. Flax had obtained the ransom money. In reply to Marilyn Flax's statement that she could not raise that much cash, defendant asked her if she could get $25,000. She responded that she would try. He told her he would call back at 6:00 p.m. to see if she had obtained the money. According to Mrs. Flax's testimony, throughout that conversation "over and over he kept threatening [her] life and [her] husband's" if she did not get the money or if she called the police.

A Special Agent from the Federal Bureau of Investigation, who had been notified by Fair Lawn police, arrived at the Flax residence. Mrs. Flax went to her bank and withdrew $25,000. FBI agents recorded the serial numbers of the $25,000 in

ransom money. The money was packaged and placed in a brown-paper bag.

At approximately 5:30 p.m., defendant telephoned Mrs. Flax and conducted a ten-minute conversation that was taped by the FBI. After Mrs. Flax told him she had the money, defendant instructed her to drive to the back of the Forum Diner in Paramus where he would meet her at 7:30. He described what clothing he would be wearing and stated that when Mrs. Flax saw him wave both hands in the air, she was to open her car door and leave the money in a paper bag on the ground next to her car. Defendant told Mrs. Flax that her husband would call her by the time that she returned from the diner. During that conversation, Martini also told her that if she or Flax arranged to have him arrested at any time, "someone else will come, maybe in two days, kill the two of ya's [because] I can't take a chance that you're going to do this to me." Shortly after that call, Mrs. Flax received a call from her husband, who "said to me, honey, give * * * them the money, he was screaming and crying."

At about 6:40 p.m., defendant left Afdahl in charge of Flax at the Fairview apartment and drove to the Garden State Plaza. He exchanged his car for Flax's and drove to the arranged meeting point. Equipped with a bullet-proof vest and accompanied by a hidden FBI agent, Mrs. Flax arrived at the diner. Defendant gave the previously-discussed signal; Mrs. Flax dropped the ransom money and returned home.

Defendant picked up the money and left the diner. He was followed by FBI agents who had been conducting an undercover surveillance near the rendezvous point. According to defendant, he stopped at the Days Inn because he "had hallucinated that there was a bug in the bag" of money. Defendant threw away the original box and bag holding the cash and put the money in a new container. Concerned that he was being followed, defendant drove across the George Washington Bridge and into the Bronx. He drove around the Bronx for

approximately one hour in order to lose anyone who might have been trailing him. He was successful. Police officers lost him in traffic.

Eventually, defendant returned to the Fairview apartment. After packing a suitcase and untying the victim, defendant left the apartment with Afdahl and Flax, whom he instructed to drive. Afdahl occupied the front passenger seat, while defendant sat in the rear directly behind Flax. At approximately 8:45 or 9:00 p.m. the three arrived at the Garden State Plaza parking lot.

Defendant claims that when they got to the parking lot, he "saw Irving's door open, and his foot get out, and it looked like he was going to run away [so I] shot, and I shot him in the head." Flax was shot three times in the back of the head with the revolver defendant had purchased in Jersey City. Leaving the victim's body in the vehicle, defendant got out of Flax's car with Afdahl, keeping the keys, and took his suitcase out of the trunk. Defendant and Afdahl drove back to the Fairview apartment. According to defendant, he and Afdahl ingested cocaine on their return.

In order to dispose of the murder weapon and the keys to Flax's car, defendant and Afdahl drove to the Staten Island Ferry. According to defendant, he went to the upper deck of the boat to dispose of the evidence. However, once there, he "forgot what [he] was doing" and purchased two hot dogs. After eating one of the frankfurters, defendant remembered his mission and walked to the lower deck. However, Martini threw the remaining hot dog in the water instead of the gun and "couldn't understand why it didn't sink." Eventually, defendant regained his composure and tossed the gun and car keys into New York Harbor.

Soon thereafter, defendant disposed of his car in the Bronx. Victor Picardi then drove defendant and Afdahl back to the Days Inn in Fort Lee. Picardi described defendant as "mum-

bling and not with it, you know, sort of—I don't know maybe drugged up."

At 9:45 a.m. on January 24, a security guard at the Garden State Plaza grew suspicious of Flax's vehicle, which was parked in a remote corner of the lot. On approaching the car, he discovered Flax's body. Flax was seated in the driver's seat with his legs extended toward the pedals and his head tilted back against the head rest. He was wearing a gold chain, wedding ring, wrist chain, and watch. Blood was splattered on the back rest of the driver's seat, the driver's-side rear window, and the rear passenger-side window.

Later that day, Bruce Chamberlain, a long-time acquaintance of Martini, listened to the taped telephone conversation between Mrs. Flax and defendant at the FBI office in Paramus. He identified the male voice as that of defendant.

Earlier that day, a flyer had been distributed to police departments throughout Bergen County indicating that defendant and Afdahl were wanted in connection with a double homicide in Arizona. Armed with that information, two Fort Lee police detectives began a check of local motels. In the course of their investigation they observed defendant and Afdahl leave the Days Inn in Fort Lee and walk to a telephone booth at an adjacent gas station. Defendant was carrying a black-canvas bag, which he gave to Afdahl as he entered the phone booth.

A number of police cars arrived in response to the detectives' request for assistance, but remained at a distance. A taxi subsequently approached the booth and both defendant and Afdahl got into it. By that point defendant had retrieved the black bag from Afdahl. Police surrounded the cab and took both suspects into custody. The taxi driver heard defendant say "baby, this is it." In addition, as he was being handcuffed, defendant said, "you're the FBI, right?" and "you got me."

The canvas bag was searched. It contained $29,960, including $23,760 with serial numbers that matched those on the ransom money, a camera containing a roll of film, a vial of

prescription pills, Victor Picardi's credit card, a driver's license in the name of Gettys Johnson, as well as a fully-loaded .32–caliber revolver. In addition, at the time of his arrest defendant was in possession of a shopping bag, which contained a sterno burner, rubber bands, aluminum foil, and a disposable lighter. A key to Room 211 of the Days Inn was found in defendant's coat pocket.

Using the room key found on defendant, six Fort Lee police officers entered the room approximately-ten minutes after defendant had been arrested to ensure that no third person was there. Finding the room empty, they secured it.

At the time of his arrest, defendant was given *Miranda* warnings. In response, he stated that he did not wish to say anything. Defendant was taken to Fort Lee Police Headquarters where he was given another set of *Miranda* warnings. A strip search of defendant revealed no track marks on his arms. The police officers did not test defendant's urine or pupils for signs of drug use. However, they testified that they did not observe any outward indications of drug-related intoxication.

Defendant was given a third and fourth set of *Miranda* warnings a short time later. In both instances, defendant signed a waiver form. A final set of *Miranda* warnings was given to defendant by two officers, Sergeant Michael Trahey of the Bergen County Prosecutor's Office and Special Agent Edwin Petersen of the FBI, at 12:35 a.m. on January 26. Defendant began an exchange with the officers by asking "what [they] had against him." Officer Trahey responded by saying that "it was a two-way street if it was going to be anything," and that he would not "lay out [their] entire case" unless defendant agreed to talk to them. Defendant agreed to "lay out his entire involvement in the case" if he could speak to Afdahl first. Officer Trahey testified that defendant stated that he wanted to tell Afdahl "that he was going to cooperate with [the police] and that he was going to tell [them] what had happened and that he wanted her to be aware of that fact."

Defendant contends that he also told her "that he was going to cooperate and that she should tell the truth of exactly what happened." The two suspects were allowed to converse for about two or three minutes.

After speaking with Afdahl, a five-and-one-half-hour interview with Officers Trahey and Petersen ensued. Defendant was not given any further *Miranda* warnings that day. Defendant was described by Trahey as being "alert but tired," and not appearing to be under the influence of drugs. Defendant gave the officers an oral and written statement as well as a written consent to search the Fairview apartment and rooms 211 and 215 of the Days Inn. In addition, defendant consented to the release of telephone toll records for the Fairview apartment.

Police carried out a search of the apartment on January 26th. They confiscated a glass vial that tested positive for trace amounts of cocaine, an unused glass cocaine pipe with the price tag still attached, a package of rubber bands, a number of prescription vials, a box for the revolver recovered from the black-canvas bag, as well as a number of papers from a nightstand. No drugs were found in the apartment.

That same day, officers searched Room 211 at the Days Inn and confiscated, among other things, a number of rubber bands and a jar of Beechnut Bartlett Pear baby food. The searching officer saw no cocaine nor other illegal drugs nor any drug paraphernalia in the hotel room. Room 215 had been cleaned by hotel personnel, eliminating any evidence.

On January 27, 1989, defendant gave an additional oral and signed written statement concerning the role of Doorhy in the kidnapping and how he had obtained the false drivers' licenses. That statement was preceded by another set of *Miranda* warnings.

## B. *The Trial*

Defendant made numerous pre-trial motions. Of significance were the motions to dismiss the indictment, to strike the aggra-

vating factors, and to suppress defendant's statements, wire recordings, and physical evidence, all of which were denied by the trial court.

On October 2, 1990, the trial court commenced the *voir dire* of 209 venirepersons, which lasted for seventeen days. The *voir dire* consisted of fifty-five qualified jurors being selected. The details of the questioning are presented below with our discussion of defendant's various challenges to the *voir dire*. *Infra* at 207–221, 619 *A*.2d at 1223–1230. Neither side exhausted its peremptory challenges.

### 1. State Guilt Phase Case

The State's case at the guilt phase of the trial consisted primarily of experts in forensic pathology testifying about how Flax had been murdered, Mrs. Flax relating the events that had occurred on the day of the kidnapping, and Sergeant Trahey reading defendant's transcribed statements into the record and relating other admissions of defendant. The taped telephone conversations between Mrs. Flax and defendant also were admitted into evidence.

Initially, Dr. Apovian, a medical examiner, testified about the autopsy he had performed on the victim's body. The procedure uncovered three bullet wounds to the head, any of which could have been the cause of death. Dr. Apovian concluded that powder burns surrounding at least two of the wounds indicated that they had been inflicted at close range with the gun no more than twelve to eighteen inches away.

Dr. Vincent DiMaio, an expert in forensic pathology, testified that Flax had died of multiple gunshot wounds to the back of the head. He stated that with respect to two of the three wounds, the muzzle of the gun had been in contact with the scalp of the victim at the time of discharge. With respect to the third wound, the expert testified that the gun had been held either very loosely against the head or at a maximum of a quarter-of-an-inch away when it was discharged. Thus, Dr.

DiMaio concluded that the pattern of blood splatter and the absence of "tattooing" around the wounds meant that the shots had to have been fired at close range and not in the manner described by defendant (i.e., after Flax had opened the car door, turned toward the door, and placed a foot on the ground). He concluded that defendant must have been sitting directly behind the victim at the time that the gun was fired and that the car door was closed at the time of the shooting.

Also appearing for the State as an expert witness was Cynthia McSweeney, a senior forensic scientist with the New Jersey State Police. She testified that a human-blood stain found on a pair of defendant's pants contained a genetic marker also contained in the victim's blood. The marker is found in approximately 10.6 percent of the Caucasian population and 4.6 percent of the black population.

Sergeant Anthony LaPlaca of the Bergen County Prosecutor's Officer, who appeared as an expert witness, testified that the bullets that had caused Flax's death had not been discharged from the revolver seized from defendant at his arrest, but that the seized revolver was operable.

Mrs. Flax testified about what had happened on January 23, 1989, the day of the kidnapping. She related all of her telephone conversations with defendant and her husband and her delivery of the ransom in accordance with Martini's instructions. Her testimony agreed substantially with defendant's recollection, as set forth in his written statement of January 26th. Defense counsel did not object to her testimony. However, on appeal defendant claims Mrs. Flax's testimony was improper and a ploy to emphasize the impact of the crime on the victim and his family. Mrs. Flax's testimony is more fully described elsewhere in this opinion. See *infra* at 242–250, 619 *A*.2d at 1241–1245.

Sergeant Trahey read to the jury the comprehensive oral and written statements that defendant had made on January 26th and 27th.

The State also elicited testimony concerning the extent of Martini's cocaine use. The State called Dr. Nicosia, the physician whom Martini, using the name Victor Picardi, had consulted on December 12, 1988. Dr. Nicosia testified that during his examination of defendant, he did not observe any signs of cocaine use.

2. Defense Guilt Phase Case

Defendant, who elected not to testify, did not dispute that he and Afdahl had abducted Flax or that he had fired the three shots that killed him. Instead, defendant sought to establish that a continuing cocaine addiction had diminished his capacity to commit those crimes purposely or knowingly.

The defense relied on defendant's signed statements to show that defendant's life had changed when he began his affair with Afdahl, then a nineteen-year-old prostitute and drug addict; that Afdahl had encouraged him to use drugs and would inject cocaine into his arm; and that he and Afdahl had developed a cocaine habit that cost them $400 to $500 per day.

Alice Martini, defendant's former wife, testified that she had divorced defendant in 1989 because he had been engaged in a ten-year relationship with Afdahl and because he had developed a drug addiction. She testified, however, that prior to his relationship with Afdahl, he was a good husband and father. According to Mrs. Martini, when defendant used drugs, his personality would change drastically. He would become violent and unpredictable. For example, she stated that he was "completely changed * * * like one day he was like a regular husband and father and the next day he was like a Dr. Jecky [sic] and Hyde," that is, "very angry * * * fidgety and pacing back and forth. He'd pick a fight at anything you did." Mrs. Martini also testified that defendant had overdosed on two occasions and that she had seen scars indicative of drug use on the back of defendant's right hand and arm from the wrist to the elbow.

Some medical records indicating drug use by defendant were entered into evidence. A 1987 handwritten note by an Arizona doctor stated that Martini was on heroin four times a month, had swelling on his arm from injections, and should consider a detoxification program. Hospital records reported two incidents of defendant being treated for cocaine overdoses on September 14 and 19, 1988.

The principle witness in support of defendant's diminished-capacity defense, however, was Dr. Daniel Greenfield, a psychiatrist and expert in addiction medicine. Dr. Greenfield had examined defendant on two occasions and had sat in during one of defendant's interviews with the State's expert witness. During his interviews, Dr. Greenfield observed two track marks on Martini's right hand and forearm. He also reviewed defendant's medical records and written confessions.

Dr. Greenfield had defendant complete three psychological tests, including the Minnesota Multiphasic Personality Inventory (MMPI), a true/false questionnaire designed to give a personality profile and to uncover evidence of psychiatric or psychological disorders, the Michigan Alcohol Screening Test (MAST), and the Drug Abuse Screening Test (DAST). Dr. Greenfield testified that defendant had scored extremely high on the paranoia and schizophrenia scales of the MMPI test. Dr. Greenfield reported that defendant's personality was disorganized and chaotic.

According to the expert, the other tests revealed that Martini had a "real severe drug problem." Dr. Greenfield also said that his examination of defendant's written confession had revealed several indications of the binging and crashing cycle that is common among cocaine addicts. Explaining that crashing symptoms include depression, slowness, and confusion, the doctor observed that Martini had said in his written statements, "I'm just going to pass out. I'm coming all the way down." In addition, the expert found in the statement indications of paranoid and delusional behavior as well as erratic behavior incon-

sistent with knowing and purposeful crimes. Phrases such as "I lost you" indicated that Martini had lapses of memory; statements that he had seen Flax running before he shot him and that he had hallucinated that there were bugs in the ransom money indicated paranoid and delusional behavior; and the fact that Martini had left money and valuables behind after shooting Flax showed erratic behavior that was inconsistent with the kind of planning normally accompanying purposeful or knowing crimes.

In response to a hypothetical question, Dr. Greenfield stated his opinion that defendant "unquestionably [had been] under the influence of cocaine at the time" of the shooting and that as a result he had labored under "cognitive dysfunction, forgetfulness an inability to concentrate [and] experienc[ed] some acute degree of delirium." In arriving at that conclusion, Dr. Greenfield considered significant the baby-food jar found in Martini's hotel room because it constituted cocaine paraphernalia. On cross-examination, Dr. Greenfield was presented with the jar, which still contained bartlett pears. He conceded that because the jar had contained food when it was confiscated, it could not have been used for smoking cocaine and did not support his opinion that defendant had been using the drug at the time of the incident. Dr. Greenfield, therefore, concluded it impossible to determine within a reasonable degree of medical probability whether defendant had acted purposefully or knowingly during the shooting.

In rebuttal, the State presented Dr. Stanley Kern, a psychiatrist who had examined defendant twice. Dr. Kern's opinion was that defendant had been suffering from cocaine dependence and abuse. He had found no indication of any medical disease or disorder. Dr. Kern testified that even if defendant had been using cocaine at the time of the crimes, within a reasonable degree of medical probability defendant had acted knowingly and purposefully during the kidnapping and murder of his victim.

The jury returned a verdict of guilty on all counts.

### 3. Penalty Phase

During the penalty phase, the State sought to establish the two aggravating factors of which it had previously served notice on defendant: c(4)(f) (murder for the purpose of escaping detection) and c(4)(g) (murder in the course of a kidnapping). Defendant moved to dismiss factor c(4)(f), arguing that the record contained insufficient evidence for its support. The court denied that motion. Initially, the State did not call any witnesses for the penalty-phase proceeding, instead relying on the evidence adduced during the guilt phase to support the aggravating factors.

Defendant sought to establish five mitigating factors: c(5)(a) (extreme mental or emotional disturbance insufficient to constitute a defense to prosecution); c(5)(c) (age of defendant); c(5)(d) (diminished capacity due to mental disease or defect, or intoxication); c(5)(g) (defendant gave substantial assistance to the State in prosecuting another person for murder); c(5)(h) (catch-all mitigating factor). The court granted the State's motion to strike mitigating factor c(5)(g).

Defendant first called as an expert Diana Aviv, a psychiatric social worker. She had previously interviewed defendant and his former wife, Alice. Ms. Aviv's testimony consisted primarily of what the two had told her and related mostly to the Martinis' early life together and the circumstances that had driven them apart. She concluded that Martini's involvement with Afdahl, a younger woman with a drug problem, and his own drug addiction had "destroyed his marriage," "ruined his relationships with his children," and "produced the kind of behavior that resulted in his killing Mr. Flax."

The defense then produced Harvey Musikoff as an expert witness in psychology. Dr. Musikoff had administered psychological tests to defendant to determine if any mitigating factors existed that would have contributed to the crimes committed by Martini. Dr. Musikoff had interviewed defendant on two occasions, during which he had administered a battery of psycholog-

ical tests to determine if any mitigating psychological factors existed that would have contributed to the crimes. He also reviewed the same discovery materials and tests that had been available to Dr. Greenfield and the written reports prepared by Drs. Greenfield and Kern. In Dr. Musikoff's opinion, defendant "is a man who basically is a substance abuser, who's turned to substances as a way of dealing with feelings," a "self-defeating" personality type with "serious feelings of unworthiness and inadequacy that permeate his life." In general, defendant struck him as "in despair * * * expressionless, emotionless, sort of without any hope for the future." He diagnosed Martini as a substance abuser, a self-defeating personality type, and as suffering from dysthymia, a form of chronic depression that may go back more than ten years with occasional brief periods of remission.

Although the State did not present evidence initially, it did offer rebuttal evidence. An investigator for the prosecutor testified to his interview with Eileen Metzgroff concerning her relationship with Martini. Metzgroff had told the investigator that she had had drinks, dinner, and sexual relations with Martini on January 14, 1989. To corroborate, the State called a hotel clerk, who testified that Metzgroff and another adult had registered at the Days Inn in Fort Lee on that night. Finally, the State re-called Sergeant Trahey, who testified that in his confession Martini had described Ms. Metzgroff to Trahey as a "friend, girlfriend." Additionally, Trahey testified that Martini had misstated his age during an interrogation, indicating that he was three years younger than was true.

During the jury's deliberations on the appropriate sentence, the jury sent a written inquiry to the trial court.

After receiving the court's response, the jury continued its deliberations. The contents of the note and the reply to it are discussed more fully below at 250–252, 619 A.2d 1245–1246.

The jury unanimously found beyond a reasonable doubt that both aggravating factors existed. None of the jurors found

that mitigating factor c(5)(a), (defendant was under the influence of extreme mental or emotional disturbance), or mitigating factor c(5)(d), (defendant's capacity to appreciate his wrongfulness of his conduct to the law was significantly impaired as a result of mental disease or defect) existed. Six jurors found that the remaining two mitigating factors, c(5)(c) (defendant's age) and c(5)(h) (catch-all) existed; six found that they did not. Subsequently, the jury unanimously found beyond a reasonable doubt that each aggravating factor, together or individually, outweighed the mitigating factors. Thereafter, the court sentenced defendant to death for the purposeful and knowing murder of Irving Flax by his own conduct, count one.

After denying defendant's motion for a new trial, the trial court sentenced defendant to life imprisonment, with a thirty-year period of parole ineligibility on count two, felony murder (which was merged into the sentence on count one); a consecutive term of life imprisonment with a twenty-five-year period of parole ineligibility for count four, kidnapping; and concurrent four-year terms of imprisonment on counts three and five, the weapons charges.

## II

### *Voir Dire*

Defendant contends that the jury *voir dire* was so inadequate that he was denied his right to a fair trial by an impartial jury. Specifically, he claims that the failure of the trial court, *sua sponte*, to inform the prospective jurors of the two alleged aggravating factors resulted in none of the jurors being adequately questioned on whether knowledge of those aggravating factors would have impaired substantially his or her ability to consider and weigh the mitigating factors. Defendant further alleges that the trial court improperly excused three jurors for cause.

## A. Questions Concerning Relevant Aggravating Factors

Defendant argues that the trial court committed reversible error during the death-qualification phase of *voir dire* by failing, *sua sponte*, to question potential jurors about the aggravating factors the State would seek to establish during the penalty phase. Although the jurors were questioned about their views on the death penalty in general, the trial court did not ascertain whether the jurors could weigh evidence in mitigation if it was established that defendant was guilty of a murder committed during a kidnapping or for the purpose of escaping detection. Thus, defendant argues that he was denied the opportunity to intelligently challenge jurors who, with the knowledge of those aggravating factors, would automatically impose a death sentence.

Potential jurors were aware of the nature of the allegations against defendant as well as the existence and purpose of statutory aggravating factors. After completing a lengthy questionnaire, the court read the indictment to all of the prospective jurors. Thus, the potential jurors knew that the State would seek to prove that defendant had kidnapped Flax and then had murdered him in the course of that kidnapping. The potential jurors, however, did not know from the indictment that the State also alleged that the murder had been committed to escape detection.

Additionally, the trial court explained to the potential jurors the structure of the New Jersey Capital Punishment Act (the "Act"), *N.J.S.A.* 2C:11-3, and the bifurcated jury determinations regarding guilt and sentencing. The court also delineated the aggravating and mitigating factors, and explained the purpose of both such factors. During individual *voir dire,* the court alluded to examples of aggravating factors enumerated in the death-penalty statute:

> By way of example of an aggravating factor; one, that the murder was outrageously or wantonly cruel or, two, that the defendant committed the murder for the purpose of escaping detection. Those are only two examples.

The court did not inform the potential jurors, however, which aggravating factors the State was seeking to prove against defendant.

Moreover, following the initial questioning by the court, defense counsel was afforded an unrestricted opportunity to pose questions to the venirepersons. Indeed, defense counsel used that opportunity to explore the "kidnapping" aggravating factor with some of the potential jurors, although not all. He did not discuss the "escaping detection" factor except for a brief mention with one prospective juror.

In capital proceedings, "The court in conducting the *voir dire* should be particularly responsive to the requests of counsel regarding the examination of prospective jurors as to potential bias." *State v. Williams*, 93 *N.J.* 39, 68, 459 *A.*2d 641 (1983) (*Williams* I) (footnote omitted). Although the fact is not dispositive, defendant made no request for *voir dire* questions concerning the "kidnapping" or "escaping detection" aggravating factors. In both *State v. Williams*, 113 *N.J.* 393, 550 *A.*2d 1172 (1988) (*Williams* II), and *State v. Biegenwald*, 126 *N.J.* 1, 594 *A.*2d 172 (1991) (*Biegenwald* IV), the trial court denied defense-counsel requests to query potential jurors on the effect of the relevant aggravating factors.

We recognize that a demonstrated reticence to pursue questions concerning the alleged aggravating factors can be demonstrative of a "well-considered strategic attempt to limit juror exposure to questions concerning capital punishment" on the part of defense counsel. *State v. Marshall*, 123 *N.J.* 1, 93, 586 *A.*2d 85 (1991) (*Marshall* I). Counsel may very well "neither [seek] nor believe[ ] in an exhaustive *voir dire* process, seeming to wish that the court not overemphasize the qualification process." *State v. Dixon*, 125 *N.J.* 223, 247, 593 *A.*2d 266 (1991). To the extent that defense counsel makes strategic decisions to avoid particular aggravating aspects of the case during *voir dire*, the trial court should not interfere by conducting extensive examinations regarding those facts. Because

defense counsel here did pursue the "kidnapping" aspect of this case with some jurors, we do not find that he evidenced a strategic decision to avoid that aggravating factor.

■ The purpose of *voir dire* is to ensure an impartial jury and a fair trial, a right that is heightened when a defendant faces the death penalty. *State v. Perry*, 124 *N.J.* 128, 155, 590 *A.*2d 624 (1991); *State v. Hunt*, 115 *N.J.* 330, 363, 558 *A.*2d 1259 (1989); *State v. Ramseur*, 106 *N.J.* 123, 324 n. 84, 524 *A.*2d 188 (1987). The *"voir dire* in a capital cause should probe the minds of the prospective jurors to ascertain whether they hold biases that would interfere with their ability to decide the case fairly and impartially." *State v. Erazo*, 126 *N.J.* 112, 129, 594 *A.*2d 232 (1991).

■ Accordingly, any juror whose position on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" is disqualified from serving on a penalty-phase jury. *Adams v. Texas*, 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2526, 65 *L.Ed.*2d 581, 589 (1980); *Ramseur, supra*, 106 *N.J.* at 255–56, 524 *A.*2d 188.

■ Because the sentencing authority " 'has a constitutional obligation to evaluate the unique circumstances of the individual defendant,' " *State v. Biegenwald*, 106 *N.J.* 13, 48, 524 *A.*2d 130 (1987) (*Biegenwald* II) (quoting *Spaziano v. Florida*, 468 *U.S.* 447, 459, 104 *S.Ct.* 3154, 3161, 82 *L.Ed.*2d 340, 351 (1984)), prospective jurors should, in certain circumstances, be questioned about the effect that relevant aggravating factors will have on their penalty-phase deliberations.

In *Williams* II, *supra*, we found that the trial court had abused its discretion when it denied defense counsel's request to ask prospective jurors whether they automatically would impose the death penalty on defendants who had committed murder during a rape. 113 *N.J.* at 417, 550 *A.*2d 1172. We concluded that "the failure to inquire into whether any juror

could consider the mitigation evidence if it was established that defendant was guilty of rape and murder denied counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role * * *." *Ibid.*

The trial court's refusal to question jurors was a "serious error" and "a significant component of the deficiencies," which resulted in reversal of that defendant's sentence and conviction. *Ibid.* However, because of the poor quality of the overall *voir dire* we did not decide whether the error with respect to the alleged aggravating factors, standing alone, warranted reversal. *Ibid.*

Likewise, in *Biegenwald* IV, we determined that a trial court that refused to allow defense counsel to question potential jurors during *voir dire* about their ability to consider mitigating evidence should the State establish aggravating factor c(4)(a), that the defendant had two prior murder convictions, had committed serious error. As in *Williams* II, we did not hold that such an error standing alone automatically warranted reversal. Nor did we establish a *per se* rule that prospective jurors had to be questioned about the potential effect of each alleged aggravating factor on their penalty-phase deliberations. As we explained:

> In *Williams* II, we recognized that the brutality of a rape and murder could blind venirepersons in the performance of their duties as jurors. Similarly, we are convinced that knowing a defendant had killed before could cause an otherwise fair-minded person to disregard evidence offered in support of mitigating factors.
>
> [*Biegenwald* IV, *supra*, 126 *N.J.* at 31, 594 *A.*2d 172.]

Therefore, we concluded that *voir dire* "should include questioning about evidence of aggravating factors that will be presented [and that] may with reasonable likelihood" have the effect of rendering that juror substantially impaired in his or her ability to deliberate fairly during the penalty phase. *Id.* at 32, 594 *A.*2d 172. We conclude that such a likelihood exists with respect to murders committed during the course of a kidnapping.

A kidnap/murder is often a sensational crime, partly because of its infrequency. Unlike the situation with other murders, the FBI is often involved, especially when, as in the present case, the kidnapping was conducted for ransom. More importantly, the victimization in a kidnap/murder can endure for an extended period of time and, by design, involves terrorization of the victim's family. Thus, the kidnap/murder aggravating factor can cause "excessive, and deserved, sympathy for the victim," and should be delved into during *voir dire. See Biegenwald* IV, *supra,* 126 *N.J.* at 93, 594 *A.*2d 172 (Garibaldi, J., dissenting). Thus, the pool of prospective jurors should have been questioned on the effect that the "kidnapping" aggravating factor would have on their deliberations.

The same cannot be said of murders committed to escape detection. Although such circumstances undoubtedly aggravate the criminal conduct, see *State v. Hightower,* 120 *N.J.* 378, 577 *A.*2d 99 (1990), that statutory factor simply does not have the capacity to enflame otherwise reasonable jurors. Although it may be better practice for trial courts to question jurors about all the aggravating factors at issue, subject to possible defense-counsel strategic objections, the trial court's failure to question the jurors about the "escaping detection" factor did not constitute error.

 Nonetheless, even assuming that the trial court should have questioned the potential jurors about both factors, "such error * * * is not irremediable. [A] defendant's sentence may be upheld if the *voir dire* was otherwise so thorough and probing as to ensure that the jurors empaneled had the 'capacity to credit the evidence in mitigation.'" *Biegenwald* IV, *supra,* 126 *N.J.* at 34, 594 *A.*2d 172 (quoting *State v. Bey,* 112 *N.J.* 123, 154, 548 *A.*2d 887 (1988) (*Bey* II)). After reviewing the jury-selection process as a whole, we conclude that it was not constitutionally flawed. The *voir dire* of defendant's potential jurors was sufficiently probing to uncover potential biases and overcome any error associated with the failure to

question prospective jurors about both of the aggravating factors.

Defendant also alleges that defense counsel's failure to question the potential jurors about the aggravating factors constitutes ineffective assistance of counsel. Defendant's claim is discussed with his other allegations concerning his counsel's alleged ineffective assistance, *infra* at 322–323, 619 *A*.2d at 1284–1285.

### B. *Adequacy of Overall Voir Dire*

Jury selection took place over a seventeen-day period. The trial court and counsel individually questioned two-hundred and nine venirepersons. The *voir dire* resulted in fifty-five qualified jurors being selected. Neither side exhausted its peremptory challenges.

We have previously outlined what we consider to be effective means of carrying out a capital-cause *voir dire*. In *State v. Erazo, supra*, 126 *N.J.* at 128–29, 594 *A*.2d 232, we summarized that *voir dire* in a capital cause should be open-ended, thorough and searching, sensitive to attorney participation, and designed to elicit a potential juror's views, biases, and inclinations. Here, the trial court fulfilled all those requirements. It asked open-ended, thorough and searching questions designed to elicit a juror's biases and allowed defense counsel to participate extensively.

"An important ingredient in *voir dire* inquiry is the use of open-ended questions, which in our opinion are most likely to provide counsel and the court with insight into jurors' opinions and biases." *Williams* II, *supra*, 113 *N.J.* at 413, 550 *A*.2d 1172. The trial court employed that technique extensively during *voir dire*. Typical of the court's approach is the following colloquy the court engaged in with prospective-juror Robert J. Salemo, using open-ended questions to elicit his thoughts on the death penalty.

Q. Would you tell me if you have any personal opinions, beliefs or feelings about the death penalty?

A. I have a lot of conflicting personal opinions.

Q. Why don't you tell us about them. We want you to be free.

A. On the one hand I think it's a very cruel issue but on the other hand—and I guess at the same time people who are proponents of it often refer to it as a deterrent. I don't necessarily view it as a deterrent but I can accept it as a law. I can accept the implementation of it as a law for those crimes for which it is a law.

Q. And do you believe there are appropriate—as a result do you believe there are appropriate crimes that are appropriate for the death penalty?

A. Yes, I do.

Q. Can you tell us what they are?

A. I think that crimes of major violence, particularly where there may be a situation of repeated history of convictions of some sort. I think that major problems perhaps in drug related cases would be appropriate. I think those are really the only ones that immediately come to mind where I think it would be appropriate.

Q. You mean other than murder?

A. Well, I think that there would have to be a certain set of circumstances that at least from where I sit, that would make you feel that capital punishment would be appropriate in the case. I think there are perhaps some cases where a murder would be committed where I wouldn't necessarily think the circumstances warranted capital punishment but there would be others where I would think it would be.

Unlike the deficient *voir dire* in *Biegenwald* IV, in the *voir dire* here the trial court did not "suggest[ ] * * * that there is a 'correct' answer to the open-ended question 'what are your views on the death penalty?' " See 126 *N.J.* at 39, 594 *A.*2d 172. Instead, the court allowed prospective jurors to elaborate on their beliefs without prodding or suggestive comments. Here,

[t]he trial court did not employ a rigid slot-defining format such as that described in [*Williams* II, *supra*, 113 *N.J.* at 414, 550 *A.*2d 1172] (automatic life, automatic death, all others), but very often asked a completely open-ended question of jurors focusing on whether they had any attitudes or opinions at all concerning the imposition of the death penalty. It did not attempt to force the jurors into any mode.

[*State v. Dixon, supra*, 125 *N.J.* at 246, 593 *A.*2d 266.]

Furthermore, unlike the *voir dire* in *Biegenwald* IV, not only did the trial court here "assure itself that the potential juror[s] would remain open to the option of life imprisonment," 126 *N.J.*

at 40, 594 *A.*2d 172, defense counsel also stressed that issue during his examination of the prospective jurors. The *voir dire* also adequately "educate[d] the potential jurors concerning the laws of New Jersey relative to murder and capital punishment." *Id.* at 42, 594 *A.*2d 172.

Moreover, "in capital cases trial courts should be especially sensitive to permitting attorneys to conduct some *voir dire.*" *Biegenwald* II, *supra,* 106 *N.J.* at 30, 524 *A.*2d 130; *accord Erazo, supra,* 126 *N.J.* at 129, 594 *A.*2d 232 ("[a]s long as counsel acts reasonably and responsibly, as counsel did here, *voir dire* should proceed uninhibited by" artificial time limits on questioning). Defense counsel was given ample opportunity to question prospective jurors in an unrestricted manner. Defense counsel explored several relevant areas of inquiry including reactions to drug abuse and psychiatric testimony, the latter of which constituted defendant's major defense in both the guilt and penalty phase of his trial. He engaged prospective juror Romilda Bryden in the following dialogue about drug use, the essential component of the defense theory:

> Q. Can I ask you in general your feelings about illegal drug usage? I'm talking about cocaine basically. Do you think people who have a cocaine problem should be punished or should be helped?
>
> A. I think they should be put in a place where they can be helped because punishing, I don't think, really helps them get rid of their problems. If they have to be institutionalized to be helped, I agree with that.

Similarly, defense counsel was able to elicit information on prospective juror Doris Fisher's opinion on drug use.

> Q. Mrs. Fisher, I do have a question for you. It deals with your basic thinking on people who take illicit drugs, whether it be heroin or cocaine which are basically illegal drugs. Do you think people who take those should be assisted and counseled or should be punished?
>
> A. If they're only taking them themselves, then they should be assisted and counseled.
>
> Q. You'd have difficult with people who deal in drugs, I guess?
>
> A. Right.

As previously mentioned, counsel also questioned some jurors about the kidnapping aspect of the crime. Prospective juror

Paul Edson and defense counsel engaged in the following dialogue:

Q. * * * The first is to determine whether or not John Martini did anything at all illegal, you understand that?

A. Right.

Q. The State hopes to prove the content of the indictment, do you understand that?

A. Right.

 \* \* \* \* \* \* \* \*

Q. All right. You know from the indictment at least * * * [y]ou heard there was a kidnap situation and a murder, do you understand that?

A. From what I understand from Tuesday, yes.

Q. Okay. Now, you know that before you get to the penalty stage, Mr. Edson, you have to decide John did this thing, do you understand that?

A. Right.

Q. You have to determine among your fellow jurors that John did murder this kidnapped victim, do you understand that?

A. Yes.

Defense counsel asked similar questions of prospective juror Loretta Olsommer.

Q. That this is a kidnap-murder case. Do you remember that?

A. Right.

Q. Had you read anything about the case at all?

A. No, not at all, no.

Q. Does the fact that it's a kidnap-murder case, and that's pretty much all you know about because I think Judge Gaeta read the indictment to you—

A. I know what he said.

 \* \* \* \* \* \* \* \*

Q. All right. Now, let's assume that that exactly has happened, that I think the Judge told you this is a kidnap-murder case, right?

A. Right.

Q. So let's assume the jury comes back with a guilty verdict that Mr. Martini did it.

A. Right.

Q. Would you be swayed toward death before you thought any further about it?

A. No, not really.

The overall quality of the *voir dire* of Martini's prospective jurors suffered from none of the shortcomings that were pres-

ent in *Biegenwald* IV and *Williams* II. The similarities be-
tween the deficiencies in the overall *voir dire* in those two
cases were "plentiful, obvious and disturbing." *Biegenwald*
IV, *supra,* 126 *N.J.* at 30, 594 *A.2d* 172. We are convinced that,
as a whole, the *voir dire* in this case was sufficiently probing
"to weed out any prospective jurors who indicated through
their answers that the facts of this case might impair their
ability" to determine the proper sentence. No *voir dire* is
perfect, but we are satisfied that defendant had sufficient
opportunity to explore the biases of the potential jurors. *Dix-
on, supra,* 125 *N.J.* at 244, 593 *A.2d* 266. In view of the
sufficiently-probing nature of the *voir dire,* any potential harm
caused by the failure of the trial court and counsel to question
prospective jurors on their views of kidnap-murders and murder
to escape detection was harmless.

## C. *Exclusion of Three Jurors for Cause*

Defendant also contends that the *voir dire* was inadequate
because the trial court incorrectly excluded three members of
the prospective-juror pool. Defendant contends that those ju-
rors did not express views about the death penalty that "would
prevent or substantially impair the performance of [their]
duties as [jurors] in accordance with [their] instructions and
oath" as described in *Adams, supra,* 448 *U.S.* at 45, 100 *S.Ct.*
at 2526, 65 *L.Ed.*2d at 589.

### 1. Timothy Wedeen

■ Defendant contends that the court incorrectly excused
prospective-juror Timothy Wedeen from the jury pool. Accord-
ing to defendant, Mr. Wedeen did not articulate personal opin-
ions that would prevent him from carrying out his oath as a
juror. We disagree.

■ Mr. Wedeen expressed significant doubts about his abili-
ty to impose a death sentence under any circumstances.

Q. What are your feelings about the death penalty?

A. I don't agree with it. Capital punishment is barbaric.

Q. Are there any crimes that you think it is appropriate to impose the death penalty?

A. No, I do not.

Q. None at all?

A. Not really, no. I feel life without parole is a more appropriate measure.

Q. Well, you understand that you'd be placed under oath and you would have a duty to perform, that would be to listen to the evidence, accept the legal principles as the Court explains them to you. Do you understand that?

A. Yes, I do.

Q. And once having taken such an oath, if the facts warrant it and the principles warrant it, those combined, they warranted the imposition of the death penalty, would you be able to impose the death penalty?

A. I would find it difficult. My judgment would be affected by my personal feelings. I could not say that it wouldn't.

We recognize that Mr. Wedeen stated in response to questions from defense counsel that he could follow his oath as a juror and vote for a death sentence if the evidence warranted such a finding. However, the prospective juror immediately expressed reluctance in response to questions from the prosecutor.

Q. * * * What we're trying to find out is whether or not you would be able to follow what the Court is going to be asking you to do should this matter reach the penalty phase. Now, do you understand what I'm talking about.

 * * * * * * * *

A. * * * The answer to your question, if I'm picked for jury duty and the law says I have to make a fair decision, I will.

Q. Would you be able to make that decision based on the facts in the case putting aside your personal feelings?

A. I don't know. I honestly do not know. I feel very strongly about this issue.

Finally, in response to an inquiry from the trial court, Mr. Wedeen related that his judgment would be impaired by his beliefs regarding capital punishment.

Q. * * * We're just trying to find out your honest views so that we have a jury who will listen to the evidence and make the decision based on the evidence and the proofs posed. I know it's difficult when you have strong feelings one way or another about a certain case.

A. My judgment would be impaired by my feelings, yes. I have to be honest and say yes, it would when it comes to that issue. I wish I could say otherwise but that's how I feel.

Over the objection of defense counsel, the trial court excused Mr. Wedeen. Concerning Mr. Wedeen's responses the court concluded: "If he is not telling us that his ability to impose the death penalty may be impaired by his beliefs, he's at least telling us, 'I don't know.'" Mr. Wedeen's response was like that of the prospective juror in *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990), who stated that if the law conflicted with her conscience, she would follow conscience. *Id.* at 589, 575 *A.*2d 816. We found no error in her excusal. *Ibid.* The trial court is afforded substantial deference in its determinations concerning the qualification of prospective jurors. *State v. Hunt, supra,* 115 *N.J.* at 362, 558 *A.*2d 1259. Because Mr. Wedeen indicated that his emotions would control his penalty-phase deliberations, his excusal for cause was well within the trial court's discretion.

### 2. Ronald Vladyka

■■■ Defendant similarly challenges the exclusion of prospective juror Ronald Vladyka. Mr. Vladyka expressed ambivalence about the possibility of voting for a death sentence.

Q. Do you have any feelings or beliefs about the death penalty?

A. I don't believe in it.

Q. Under any circumstances?

A. Well, I just—I don't know. I just don't believe in it. I really can't give a reason why.

Q. Do you think there are any crimes where the death penalty is an appropriate penalty?

A. Well—no.

Q. None at all?

A. No, not really.

In response to rehabilitating questions from defense counsel, Mr. Vladyka indicated, with significant reluctance, that he could follow his oath as a juror and vote for a death sentence: "I guess if everything was in place and I believed in it, I mean, you know it is hard to say yes or no." The court excused Mr. Vladyka after the following question and answer in which he

expressed his inability to announce a sentence of death in open court:

> Q. If maybe you are the Foreperson, would you be able to announce that verdict in open Court?
>
> A. No.

Again, the trial court was within its discretion to excuse Mr. Vladyka. "[A] juror's bias for or against capital punishment need not be shown with 'unmistakable clarity.' " *Pennington, supra,* 119 *N.J.* at 588, 575 *A.*2d 816 (quoting *Ramseur, supra,* 106 *N.J.* at 256, 524 *A.*2d 188). The prospective juror in this instance indicated an inability to fairly weigh the mitigating and aggravating factors prior to reaching a decision on sentence.

### 3. Florence Zappala

Defendant also challenges the exclusion of prospective juror Florence Zappala, arguing that she was excluded because of her stated reticence about voting for a death sentence. However, Mrs. Zappala also indicated her inability properly to evaluate the testimony of police officers.

> Q. You were asked if you would believe the testimony of a police officer just because the party testifying was a police officer, and you said yes. Why is that?
>
> A. I think I would. I mean, I would be inclined to.
>
> Q. Do you think you would give more weight to the testimony of a police officer just because it's a police officer and you had a civilian telling you one thing and a police officer telling you something else?
>
> A. I think I would have to think about that a while. It's all according to the person, I think, too.
>
> Q. You can't have jurors who come in and say, "Well, anything a police officer tells me I'm going to believe." We want jurors who will listen to the evidence and fairly evaluate the evidence?
>
> A. Balance.
>
> Q. Now, based on your answer to the question, we don't know if you can do that. Only you can tell us.
>
> A. I don't know. I mean, it would be a question I would think about, I'd be inclined to believe a police officer, but I don't know. You know, I should think he'd be telling the truth.

The trial court stated its reasons for excusing prospective juror Zappala:

"The reason for excusing the juror is basically based upon her answers concerning the police officer. At several times she was asked and still in the final analysis she may just give a little more weight to that testimony of a police officer only because it was a police officer, and the reason I didn't look up to you for your objection earlier is because people spend as much time as they have here, I don't want to ask them one question and send them on their way.

The trial court was certainly within its discretion in excusing Mrs. Zappala based on her remarks concerning the veracity of police officers.

To summarize our findings about the adequacy of the *voir dire*, the trial court should have questioned the potential jurors about the effect that aggravating factor c(4)(g) (murder committed in the course of a kidnapping) would have had on their ability to impose the death penalty. However, given the otherwise-adequate scope of *voir dire*, we are satisfied that the trial court conducted a sufficiently-thorough questioning to probe into the potential biases of the prospective jurors. The trial court's questioning of the jurors was "sufficiently calculated to produce a fair and unbiased jury." *Dixon, supra,* 125 *N.J.* at 247, 593 *A.*2d 266. We further conclude that the trial court properly exercised its discretion in excusing the three prospective jurors for cause.

## III

### *Guilt Phase*

A. *Constitutionality of the Act*

Defendant argues that the death-penalty statute violates the prohibition against cruel and unusual punishment contained in the Eighth Amendment of the federal constitution by failing adequately to narrow the class of defendants eligible for death and by failing to provide for sufficient appellate review. We have repeatedly rejected similar arguments, see, *e.g., State v. Purnell,* 126 *N.J.* 518, 546, 601 *A.*2d 175 (1992); *Marshall* I, *supra,* 123 *N.J.* at 169, 586 *A.*2d 85; *State v. Moore,* 122 *N.J.* 420, 486, 585 *A.*2d 864 (1991); *Ramseur,*

*supra,* 106 *N.J.* at 182–90, 524 *A.*2d 188, and continue to reject them today.

B. *Necessity of Including Alleged Aggravating Factors in Indictment*

For the first time defendant contends on appeal that *N.J.S.A.* 2C:11–3c(2)(e), that portion of the Act that requires the prosecuting attorney to give notice of the statutory aggravating factors he or she intends to prove at the penalty-phase proceeding violates the New Jersey Constitution. Defendant contends that the aggravating factors established in c(2)(e) amount to elements of the crime of "capital murder" and, as such, must be presented to a grand jury and included in the murder indictment before a defendant may face a death-penalty trial. We disagree.

Capital-murder prosecutions begin with a grand-jury indictment for knowing and purposeful murder. Subsequently, the prosecutor, acting under guidelines in effect throughout the State, determines if the State has sufficient evidence to establish any of the statutory aggravating factors that make a murder eligible for a capital sentence. *See State v. Koedatich,* 112 *N.J.* 225, 548 *A.*2d 939 (1988), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989). If that determination is made in the affirmative, a Notice of Aggravating Factors, indicating the State's intention to seek a capital sentence, is served on the defendant pursuant to *N.J.S.A.* 2C:11–c(2)(e). That provision states:

> Prior to the commencement of the sentencing proceeding, or at such time as he has knowledge of the existence of an aggravating factor, the prosecuting attorney shall give notice to the defendant of the aggravating factors which he intends to prove in the proceeding.

Defendant contends that that process is defective. He argues that the death-penalty statute actually creates two separate crimes: murder and capital murder. Under defendant's theory, the aggravating factors are the functional equivalent of elements of the crime of capital murder, thereby necessitating

their presentment to a grand jury and inclusion in an indictment. The State asserts that the statutory aggravating factors affect only the sentence for knowing and purposeful murder and need not be included in the indictment.

Defendant's argument rests on two separate but interrelated provisions of the Constitution. Article I, Paragraph 8 provides:

No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases now prosecuted without indictment, or arising in the army or navy or in the militia, when in actual service in time of war or public danger.

Paragraph 10 of Article I provides:

In all criminal prosecutions the accused shall have the right * * * to be informed of the nature and cause of the accusation * * *.

To satisfy constitutional mandates, an indictment must first " 'inform the defendant of the offense charged against him, so that he may adequately prepare his defense * * *.' " *State v. LeFurge*, 101 *N.J.* 404, 415, 502 *A.*2d 35 (1986) (quoting *State v. LeFante*, 12 *N.J.* 505, 509, 97 *A.*2d 472 (1953)). "Second, the indictment must be sufficiently specific to enable the defendant to avoid a subsequent prosecution for the same offense. Finally, the indictment must be sufficiently specific 'to preclude the substitution by a trial jury of an offense which the grand jury did not in fact consider or charge.' " *LeFurge, supra,* 101 *N.J.* at 415, 502 *A.*2d 35 (quoting *State v. Boratto,* 80 *N.J.* 506, 519, 404 *A.*2d 604 (1979) (citations omitted)).

The Constitution insures, as a matter of fairness, that defendants will be adequately informed of the alleged elements of the crimes with which they are charged so that they may mount an informed defense. In addition, the indictment prevents the prosecution of unfounded charges of criminal behavior. Those concerns are not raised, however, by factors that affect only the severity of the sentence that a convicted defendant faces.

In *State v. Washington,* 47 *N.J.* 244, 220 *A.*2d 185 (1966), we held that the Constitution does not require a grand jury presentment before a convicted defendant may receive an enhanced sentence based on his status as a habitual offender. In *Wash-*

*ington*, the defendant was convicted of breaking, entry, and larceny. *Id.* at 246, 220 *A*.2d 185. A short time thereafter, the prosecutor, acting pursuant to statute, prepared an accusation charging the defendant with being a four-time offender. The defendant pleaded guilty to the accusation and, as a result, was sentenced to an extended term of imprisonment. *Id.* at 247, 220 *A*.2d 185.

The defendant challenged his sentence, arguing that his status as a repeat offender was an integral and inseparable part of the underlying criminal charge and should have been included in the original indictment as a matter of constitutional mandate. *Ibid.* We disagreed. The critical distinction in our analysis was that the statute in question did "not create a new substantive crime, but rather impose[d] a greater penalty for the particular crime for which the defendant [had been] convicted." *Id.* at 248, 220 *A*.2d 185. Thus, we concluded that the repetitive nature of defendant's convictions did not have to be included in the indictment. *Ibid.;* accord *Buckley v. Butler*, 825 *F*.2d 895, 902–03 (5th Cir.1987), *cert. denied*, 486 *U.S.* 1009, 108 *S.Ct.* 1738, 100 *L.Ed.*2d 201 (1988) (repeat-offender status "relates only to the *sentence* for the new crime of which defendant has been convicted").

The Act defines criminal homicide as having just two elements, a mental state of purposeful or knowing, and causation. Both of those elements must be presented to a grand jury and included in the murder indictment. The aggravating factors, on the other hand, merely enlarge the available sentencing options for certain defendants.

That distinction was recognized in *State v. Price*, 195 *N.J.Super.* 285, 300, 478 *A*.2d 1249 (Law Div.1984), in which the trial court in a capital-punishment proceeding found that the state constitutional provisions relied on by defendant here "relate[ ] to indictment by Grand Jury of the *offense* charged not the particular sentence or punishment," and held that the statutory

aggravating factors were not indispensable components of a capital-cause indictment.

The United States Supreme Court reached a similar conclusion in *Poland v. Arizona*, 476 *U.S.* 147, 106 *S.Ct.* 1749, 90 *L.Ed.*2d 123 (1986), in which it examined the double-jeopardy implications of a trial court's erroneous conclusion regarding the existence of aggravating factors during the penalty-phase proceeding. The Court stated that "[a]ggravating circumstances are not separate penalties or offenses, but are 'standards to guide the making of [the] choice' between the alternative verdicts of death and life imprisonment." *Id.* 476 *U.S.* at 156, 106 *S.Ct.* at 1755, 90 *L.Ed.* at 132 (quoting *Bullington v. Missouri*, 451 *U.S.* 430, 438, 101 *S.Ct.* 1852, 1858, 68 *L.Ed.*2d 270, 278 (1981)).

In recent years, however, we have recognized "the functional similarity of aggravating factors * * * to the traditional proof of 'elements of an offense' " when determining the State's burden of proof with respect to the weighing of such elements. *Biegenwald* II, *supra*, 106 *N.J.* at 59, 524 *A.*2d 130. In *Biegenwald* II we stated:

> Technically, of course, the death penalty is imposed as part of the sentencing proceeding, and under ordinary analysis, the State need not prove its contentions at the sentencing proceeding beyond a reasonable doubt, even those that are statutorily prescribed. Here, however, the sentencing proceeding calls for a different treatment because death is 'profoundly different,' *Lockett v. Ohio*, 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978) (plurality opinion), both in terms of its consequences and because it is a procedurally unique sentencing scheme * * *.

[*Id.* 106 *N.J.* at 59–60, 524 *A.*2d 130 (citations omitted).]

In another context, in *Ramseur, supra*, we noted that

> "[i]t its clear to us, however, that functionally, the aggravating factors in the Act are indistinguishable, for this purpose, from the elements of the crime. For example, no more or less than premeditation under our prior law, proof of an

aggravating factor could mark the difference between imprisonment and death."

[106 *N.J.* at 201 n. 27, 524 *A.*2d 188.]

Recently, in *Purnell, supra,* we held that when the State sought to establish, as an aggravating factor, that a murder was committed in the course of a felony, the defendant was entitled to have the jury consider the non-capital verdict of felony-murder during the guilt-phase deliberations. 126 *N.J.* at 534, 601 *A.*2d 175. Thus, we concluded that in such circumstances, a charge of felony murder must be presented to the grand jury and included in the murder indictment. *Ibid.*

Martini, of course, was charged in the indictment with felony murder and the crime of kidnapping, the basis of aggravating factor c(4)(g) (killing while engaged in the commission of a kidnapping). With respect to the other asserted aggravating factor, c(4)(f) (killing to escape detection), we stated in *Purnell* that

[o]bviously, our Legislature did not intend, nor does constitutional principle require, that every aggravating factor under *N.J.S.A.* 2C:11–3c that renders a murder death-eligible be the subject of an indictment and a guilt-phase verdict. For example, although factors c(4)(f), killing to escape detection, and factor c(4)(h), killing a police officer, can constitute separate criminal offenses, neither principles of constitutional law nor of fundamental fairness require that the factors be tried as separate indictable offenses in the guilt phase. If proper notice were given, the sentencing-phase jury could make its unanimous finding of such a factor without a prior guilty verdict and without unfairness in the trial.

[126 *N.J.* at 533, 601 *A.*2d 175.]

We reaffirm that reasoning today. The Legislature clearly did not intend for each alleged aggravating factor to be included in the murder indictment. Unlike the statutes in other states, our Act does not expressly require that the State allege the aggravating factors in the indictment. For example, the Alabama and Indiana statutes create such a requirement. Ala. Code § 13A–5–40; Ind.Code § 35–50–2–9 (1985). Furthermore, in some instances, inclusion of alleged aggravating factors in the indictment would create the unwanted situation of having the factors read to the jury at the start of trial. For example,

if the State were seeking to establish aggravating factor c(4)(a), that defendant had previously been convicted of murder, a reading of the indictment to the jury during the guilt phase could substantially prejudice the trial's outcome. *See Washington, supra,* 47 *N.J.* at 249, 220 *A.*2d 185.

The Act also adequately ensures that capital-cause defendants are afforded both of the protections contemplated by the Constitution: adequate notice and well-founded prosecutions. As previously stated, a defendant facing the death penalty is served with a Notice of Aggravating Factors during the initial stages of prosecution. The defense is put on notice of the State's intentions and is given ample opportunity to prepare a rebuttal of the aggravating factors alleged.

Furthermore, defendants have the opportunity to challenge the sufficiency of any alleged aggravating factors. We permitted judicial scrutiny of prosecutorial charging decisions at the pretrial level in *State v. McCrary,* 97 *N.J.* 132, 478 *A.*2d 339 (1984). In that opinion we held that defendants who had been served with a notice of an aggravating factors could, through summary proceedings before the trial court, challenge the sufficiency of the evidence to support those factors. *Id.* at 142, 478 *A.*2d 339. The review established in *McCrary* has resulted in the nullification of a defendant's exposure to capital sentencing in at least one case in which the prosecutor had originally sought a death sentence. See *State v. Matulewicz,* 115 *N.J.* 191, 557 *A.*2d 1001 (1989).

Nor does our holding run afoul of the dictates of *Mullaney v. Wilber,* 421 *U.S.* 684, 698, 95 *S.Ct.* 1881, 1889, 44 *L.Ed.*2d 508, 519 (1975). In *Mullaney,* the United States Supreme Court held that fundamental fairness prevented a State from requiring that a defendant prove by a preponderance that he or she killed in the heat of passion on sudden provocation in order to be convicted of manslaughter instead of murder. *Ibid.* The Court accepted the State's argument that murder and manslaughter were not distinct crimes but rather different degrees of the generic offense of felonious homicide, and that provoca-

tion, if established, concerned only the sentence that a defendant would receive. *Id.* at 688, 95 *S.Ct.* at 1884, 44 *L.Ed.*2d at 513. However, the Court found that "[t]he fact remains that the consequences resulting from a verdict of murder, as compared with a verdict of manslaughter, differ significantly." *Id.* at 698, 95 *S.Ct.* at 1889, 44 *L.Ed.*2d at 519. Thus, applying reasoning that favors "substance rather than * * * formalism[,]" the Court concluded that the burden of proof could not be shifted to the defendant. *Id.* at 699, 95 *S.Ct.* at 1890, 44 *L.Ed.*2d at 519–20. In so doing, the Court warned that States may not "redefine the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment." *Id.* at 698, 95 *S.Ct.* at 1889, 44 *L.Ed.*2d at 519.

No such concerns are raised by our statute. Section c(2) expressly provides that the State has "the burden of establishing beyond a reasonable doubt the existence of any aggravating factors." Thus, the burden of proof does not switch to the defendant at any time, and the prohibition articulated in *Mullaney* is not circumvented.

We conclude that Section c(2)(e) is constitutional; that defendant was properly charged with kidnapping (the underlying felony supporting aggravating factor c(4)(g)) in the indictment; and that to charge aggravating factor c(4)(f), (murder to escape detection) in the indictment was not necessary.

### C. *Admissibility of Defendant's Confessions*

Defendant argues that his oral and written confessions should have been suppressed by the trial court because they were obtained in violation of his federal-constitutional and New Jersey common-law right to remain silent. Defendant contends that his request to speak to Afdahl before giving a statement to police amounted to an invocation of his right to remain silent as recognized in *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Thereafter, defendant asserts, investigating officers failed scrupulously to honor his right by initiat-

ing interrogation without reciting a fresh set of *Miranda* warnings. Defendant also argues that all of the items seized from his apartment and hotel rooms should also have been suppressed as fruits of the illegally-obtained statement. We reject defendant's arguments.

Martini was first informed of his *Miranda* rights by Detective Thomas Dalton of the Fort Lee Police Department when he was first arrested, at about 8:00 p.m. on January 25, 1989. Dalton asked defendant if he wished to talk. After declining to make a statement, defendant said "[y]ou're the FBI. I know you're the FBI. I'm John Martini. You got me, but you already know that." He was next read *Miranda* warnings at 10 o'clock that evening in Fort Lee Police Headquarters. He was read *Miranda* rights again at 11:34 p.m., signing a form produced by the Fort Lee police. The same type of form was used at 11:39 p.m. by Sergeant Michael Carlino of the Bergen County Prosecutor's Office. When defendant was asked to read and sign the form, however, he said that he could not "see a * * * thing without my eyeglasses." Defendant signed the form after his glasses were given to him.

At least two law-enforcement officers were present at each reading of the *Miranda* rights. Although Martini refused to make a statement to Detective Dalton, he signed waiver forms after each subsequent issuance of the *Miranda* warnings indicating that he was willing to make a statement.

At 12:35 a.m. on January 26, 1989, Sergeant Michael Trahey of the Bergen County Prosecutor's Office and FBI Special Agent Edwin Petersen gave defendant his fifth set of *Miranda* warnings that night. Defendant again indicated that he understood his rights and that he would speak to them. The interview began with Martini asking Trahey and Peterson what they "had against him." Trahey responded that it was a "two-way street" and that he would not lay out the entire case unless Martini agreed to talk. Martini agreed to describe his complete involvement in the case but asked to speak first with Afdahl,

who apparently wished to speak to defendant at that time as well. At the pretrial hearing, Trahey testified that defendant had stated that "once he was allowed to speak with Therese * * * he would freely talk with us about the entire matter." He further testified that Martini had stated that he wanted to tell Afdahl "that he was going to cooperate with us and that he was going to tell us what had happened and that he wanted her to be aware of that fact." At the pretrial hearing Peterson testified that Martini had said he wanted to tell Afdahl that he was going to tell the truth and that she should tell "the whole truth" to the officers. The investigators agreed to let Martini speak with Afdahl, and the two met for three minutes. Trahey, the only law-enforcement officer at the meeting, testified at the pretrial hearing that Martini had told Afdahl, "Theresa, I'm now going to cooperate with them and I'm going to tell them what happened."

After that meeting, Martini was not given any further *Miranda* warnings that evening. Subsequent to the meeting, he signed two forms giving his consent to search his apartment and hotel rooms. He then was questioned by Trahey and Petersen, from approximately 1:30 to 4:15 a.m., about the specifics of the kidnapping and murder of Irving Flax. At 4:15 a.m. defendant signed a form consenting to the telephone company's release of telephone toll information with respect to the telephone in his apartment. He then agreed to make a sworn statement, which was transcribed from 5:02 a.m. to 5:42 a.m. At 6:15 a.m., he signed a form consenting to the telephone company's release of telephone toll information with respect to the telephones in the hotel rooms that he and Afdahl had occupied.

In *State v. Hartley*, 103 *N.J.* 252, 511 *A.*2d 80 (1986), we adopted the prevailing federal standard that once a defendant asserts the right to remain silent, "law-enforcement authorities must, at a minimum, readminister the *Miranda* warnings" before initiating interrogations. *Id.* at 256, 511 *A.*2d 80. The defendant in *Hartley* was given *Miranda* warnings at the time

of his arrest and immediately "asserted in clear and unequivocal terms his right to remain silent." *Id.* at 255, 511 *A.*2d 80. At that time, no questions were asked of the defendant. Approximately one hour later, police approached Hartley and, without issuing a new set of *Miranda* warnings, reinitiated interrogation. *Id.* at 258–59, 511 *A.*2d 80. We concluded that the investigator's failure scrupulously to honor the defendant's invocation of the right to remain silent violated both *Miranda*'s prophylactic rules and the accused's privilege against self-incrimination. *Id.* at 256, 511 *A.*2d 80.

In *State v. Harvey*, 121 *N.J.* 407, 581 *A.*2d 483 (1990), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991), we applied the holding in *Hartley* to circumstances in which a defendant's invocation of the right to remain silent was less clear than in the previous case. The defendant in *Harvey* had been in custody for several days during which he expressed his repeated reluctance to talk to police. After receiving a set of *Miranda* warnings the defendant told officers that he would talk to them but that he first wanted to speak to his father. *Id.* 121 *N.J.* at 417, 581 *A.*2d 483. Questioning ceased. More than three hours later, Harvey's father was brought to the jail where his son was being held. After a fifteen-minute meeting, Harvey was returned to the officers. *Ibid.* Interrogation resumed without a new set of *Miranda* warnings and the defendant confessed to murder. When the defendant subsequently was taken to the prosecutor's office to prepare a formal confession, he was issued a new set of *Miranda* warnings. He demanded an attorney and questioning ceased. *Ibid.*

We found that the defendant had invoked his right to remain silent by asking to speak to his father. We began our analysis by noting that the defendant's request precipitated "a significant break in the interrogation," amounting to approximately three-and-one-half hours. *Id.* at 418–19, 581 *A.*2d 483. However, we also declared that "what makes the interruption significant is not its length so much as its nature" because the defendant, "after three days in custody, [asked] for the chance

to consult with a close family member." *Id.* at 419, 581 *A.*2d 483. In addition, we noted that "[d]efendant's conduct during three days of interrogation and his refusal to answer questions" were expressions of his unwillingness to talk with police. Finally, we found important "what happened when police finally did give" Harvey a new set of *Miranda* warnings after his oral confession. "Defendant immediately demanded an attorney before any statement could be reduced to writing. It is no stretch to imagine that defendant would have requested an attorney had the police given him warnings when they first interrogated him after he had met with his father." *Id.* at 420, 581 *A.*2d 483.

Defendant's request to speak to Afdahl prior to talking to officers is materially different from the request made in *Harvey* in several respects. Prior to his request, defendant did not show a continued reluctance to talk to police. To the contrary, Martini signed forms indicating that he waived his right to remain silent. Defendant did not state, " 'I don't believe I want to make a statement at this time[,]' " *Hartley, supra,* 103 *N.J.* at 258, 511 *A.*2d 80, nor did he " 'indicate[ that] he did not want to talk about it * * *.' " *State v. Bey,* 112 *N.J.* 45, 548 *A.*2d 846 (1988) (*Bey* I). Instead, he voluntarily told Trahey and Petersen that if he could speak to Afdahl, he would tell them about his "complete involvement" in the kidnapping and murder of Flax.

Moreover, although defendant argues that his relationship with Afdahl was that of two close family members, we find her status as a participant in the then-alleged crimes to be more significant. This is not a situation in which a defendant created a lengthy gap in an interrogation to seek advice from someone outside of the relevant criminal activity. Afdahl was a major participant in the kidnapping and murder about which defendant was to be questioned. She was not an outside advisor but a likely co-defendant, potential informant, and possible alibi witness. In their two-to-three-minute conversation overheard by Officer Trahey, Afdahl did not consult with defendant.

Indeed, defendant argues that he met with Afdahl not to seek advice but to inform her of his impending confession.

In *State v. Bey*, 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey* II), in which the defendant asked to lie down so that he could think about what had happened prior to resuming interrogation, we found that that request did not constitute an invocation of the right to remain silent. *Id.* at 136, 548 *A.*2d 887. "Law enforcement officials * * * are not obliged to accept any words or conduct, no matter how ambiguous, as a conclusive indication that a suspect desires to terminate questioning." *Id.* at 136–37, 548 *A.*2d 887. Like the defendant in *Bey* II, Martini "did not ask for an attorney or refuse to sign a waiver of his rights. Similarly, he did not refuse to continue the questioning, and did not indicate in any manner that he wanted to end the interrogation." *Id.* at 138, 548 *A.*2d 887.

Defendant's request to speak with Afdahl did not amount to an invocation of his right to remain silent. The record does not indicate that defendant, as the defendants in *Hartley* or *Harvey*, was unwilling to make a statement before talking with Afdahl, and wished her advice. Rather, he merely wished to inform Afdahl of the decision he had already made to give a statement to law-enforcement officers. Nor is there anything in the records, such as a demand for an attorney by defendant before his statement was transcribed, to suggest that "defendant would have requested an attorney had the police given him warnings when they first interrogated him after he had met with" Afdahl. *Harvey, supra*, 121 *N.J.* at 420, 581 *A.*2d 483. We conclude, therefore, that defendant's statements and the fruits thereof, including his consents to the searches conducted by police, were properly obtained and admitted into evidence.

D. *The Trial Court's Comments Concerning Defendant's Incarceration*

▉ Defendant argues that he was deprived of his state- and federal-constitutional rights to a fair trial and the presump-

tion of innocence because the trial court informed prospective jurors that he was incarcerated. We do not agree.

On the first day of jury selection, the trial court informed prospective jurors that defendant was incarcerated in the county jail. The court stated:

> Now, there's one other thing that I must address. On occasion you will see Mr. Martini in the company of Sheriff's Officers. The reason for that, in a capital case such as this where the charge is murder, our law does not provide for bail. The law does not provide for bail, so Mr. Martini is being held in the County Jail. That is the only reason he's being held in the County Jail. The jurors are not to infer that because he is being held, that he is guilty. He is presumed innocent until he's proven guilty beyond a reasonable doubt. You should draw no adverse inference from the fact that he is in custody. He's only in custody at this point because of the law. The Legislature has made it such. They do not allow for bail in a capital case, and that's not to be held against him. No adverse inferences are to be drawn. That's just the way it is.

There was no defense objection to the instruction. A similar instruction was given to the second panel of prospective jurors:

> You may notice during the course of the proceeding that Mr. Martini's accompanied by a Sheriff's officer. The reason for that is because the law in this State states that bail shall not be set where someone is charged with murder where the State is seeking the death penalty. The fact that that is the law and that he is incarcerated should not in any way influence your thinking about his guilt or innocence. No inferences are to be drawn because of that. That is simply the law, and please keep that in mind. I'll address that again later.

Defense counsel objected a short time after the second set of instructions had been given:

> While we're waiting, Judge, I would like to enter an objection for the record about my client being arrested by guards or being surrounded by guards earlier, and I think it would prejudice the entire panel against my client knowing that he is being patrolled by guards and not subject to bail and, consequently, I think that the burden has shifted to the defense to prove his innocence.

The prosecutor responded by suggesting that defense counsel had agreed previously to the charge. The trial court answered:

> Well, I don't know if it was agreed, but I'm sure the argument, if I hadn't instructed the jury and he was seen in the company of the Sheriff's officers, would be that the jury's now going to speculate, and I think the instruction was clear. It was a proper instruction. We'll repeat that and make sure the jury is not to draw any inferences, and that its only because of the Legislature and the law passed that he is in custody and for no other reason.

Defendant argues that the instructions denied him his rights to due process, equal protection, and a fair trial under both the federal and state constitutions.

Defendant makes an analogy to instances in which a defendant is compelled to appear for trial in a prison uniform or handcuffs. The United States Supreme Court condemned that practice in *Estelle v. Williams,* 425 *U.S.* 501, 96 *S.Ct.* 1691, 48 *L.Ed.*2d 126 (1976). In *Estelle,* the defendant appeared at trial in prison garb after his request for civilian clothes had been denied. The Supreme Court noted that "[c]ourts have, with few exceptions, determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system." *Id.* at 504, 96 *S.Ct.* at 1693, 48 *L.Ed.*2d at 130.

The Court held, however, that the error could be harmless. Where a defendant was being tried for an offense committed while in confinement or for an escape, compelled prison attire would be harmless because " '[n]o prejudice can result from seeing that which is already known' " or that would become known in any event. *Id.* at 507, 96 *S.Ct.* at 1694, 48 *L.Ed.*2d at 132 (quoting *United States v. Henderson,* 472 *F.*2d 556, 557 (5th Cir.), *cert. denied,* 411 *U.S.* 971, 93 *S.Ct.* 2166, 36 *L.Ed.*2d 694 (1973)).

The policy of compelling defendants to appear in prison garb was also condemned in *State v. Carrion–Collazo,* 221 *N.J.Super.* 103, 112–13, 534 *A.*2d 21 (App.Div.1987), *certif. denied,* 110 *N.J.* 171, 540 *A.*2d 171 (1988). As in the case of the federal rule, the court held that such an error could be harmless. "[W]e are satisfied that the due process rights of a defendant can be sufficiently safeguarded, * * * even when a defendant's incarceration is apparent to the jury, by a proper *voir dire* of the jurors and a cautionary instruction * * *." *Id.* 221 *N.J.Super.* at 112, 534 *A.*2d 21. In *Carrion–Collazo,* defense counsel requested an instruction warning potential jurors not to draw

any inferences from the defendant's clothing, and the matter was discussed during *voir dire*. *Id.* at 106–07, 534 *A.*2d 21.

In *Holbrook v. Flynn*, 475 *U.S.* 560, 106 *S.Ct.* 1340, 89 *L.Ed.*2d 525 (1986), a defendant seeking reversal of his conviction invoked *Estelle* after he had been compelled to go through trial with four uniformed state troopers sitting in the front row of the spectators' section. The Supreme Court unanimously rejected his claim, holding that not "every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Id.* at 567, 106 *S.Ct.* at 1345, 89 *L.Ed.*2d at 533. The Court recognized "that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance." *Ibid.* "[W]e have never tried," the Court continued, "and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for alleged criminal activity." *Id.* at 567, 106 *S.Ct.* at 1345, 89 *L.Ed.*2d at 533–34.

The Court held that the presence of security officers was not inherently prejudicial because of "the wider range of inferences that a juror might reasonably draw from the officers' presence." *Id.* at 569, 106 *S.Ct.* at 1346, 89 *L.Ed.*2d at 534. Although the presence of guards may be taken as a sign that a defendant is dangerous or culpable, it need not be. "Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." *Id.* at 569, 106 *S.Ct.* at 1346, 89 *L.Ed.*2d at 534–35.

Courts have not been as sensitive to references to a defendant's incarceration as they have been to the forced wearing of prison garb. In *State v. Childs*, 204 *N.J.Super.* 639, 651–52, 499 *A.*2d 1041 (App.Div.1985), the court found no error as a result of a passing reference to a defendant's incarcerated status. On direct examination, the defendant in *Childs* indicated that she kept money hidden in her bra because she had been

robbed since "I have been here." On cross-examination, the prosecutor asked, "[y]ou stated that you started keeping money in your bra because money has been taken since you have been here. You mean in custody?" *Id.* at 651, 499 *A.*2d 1041. The trial court refused to grant a mistrial, finding the error "too insignificant" to warrant a mistrial. *Ibid.*

The Appellate Division affirmed. The court noted that the "reference to custody was fleeting and inadvertent." *Id.* at 651–52, 499 *A.*2d 1041. The court continued, "It cannot have surprised the jury to hear about [the defendant] being in custody because they knew she had been stopped on the road, taken to the police station and searched." *Id.* at 652, 499 *A.*2d 1041. Significantly, the court also noted that the prejudicial effect of the remark must not have been too great, as the defendant was acquitted of the most serious of the charges that she faced. *Ibid.*

Defendant argues that if the courts actively discourage the mere suggestion that a defendant is incarcerated, then specifically telling the jurors that defendant is in jail can never be countenanced, at least not without a waiver from defendant. In addition, defendant asserts that the range of possible inferences that a jury could draw from the presence of Sheriff's officers was negated by the court's instructions, leaving jurors with only one possible inference: that he is both dangerous and guilty. We disagree for several reasons.

The trial court did more than merely alert the potential jurors that defendant was incarcerated. The reason that the court addressed the jurors was to instruct them not to draw any negative inferences from defendant's status. That the trial court concluded that the presence of officers could have undermined the fairness of the trial is clear. Steps were then taken to ensure that no unfairness would ensue. The trial court's instructions were not only permissible, they were the preferable course of action.

We also note that defendant's objection is curious in light of subsequent developments at trial. During direct examination, defense counsel elicited from Dr. Greenfield, one of defendant's expert witnesses, that Martini had been incarcerated since his arrest. Dr. Greenfield testified that he had given defendant three psychological screening tests at the county jail. In addition, during cross-examination of Alice Martini she made an unsolicited reference to her husband's incarceration. Defense counsel did not object.

At any rate, the trial court's instructions did not harm defendant. To the extent that his incarceration was brought to the attention of prospective jurors, it was done for the purpose of ensuring that defendant would not be prejudiced.

### E. *Inclusion of Threats by Defendant Toward Mrs. Flax in Recording of Telephone Conversation*

At trial, the State moved into evidence the tape of the telephone conversation between defendant and Marilyn Flax. That conversation had been taped on January 23, 1989, the day of the kidnapping. In the conversation defendant repeated his demand for ransom for the safe return of her husband and arranged for the delivery of the money. A transcript of the conversation was given to the jurors, who also listened to an audiotape of the conversation.

Prior to trial, defendant moved to excise the portions of the conversation from the transcript and tape in which he had threatened the lives of Mr. and Mrs. Flax, stating that he would have them killed by a third party if the police were notified. Defendant identified himself as "Tony."

[Martini:] I have to emphasize this. When I pick up that money—
[Mrs. Flax:] —What?
[Martini:] And I leave.
[Mrs. Flax:] Yeah.
[Martini:] Okay.
[Mrs. Flax:] Yeah.
[Martini:] I will release your husband

[Mrs. Flax:] Right.

[Martini:] But I'm going to tell you right now.

[Mrs. Flax:] Yeah.

[Martini:] If there are people watching me pick up that money—

[Mrs. Flax:] —Tony—

[Martini:] —I'm going to tell you right now.

[Mrs. Flax:] What?

*([Martini:]* I'm going to tell you right now. You let the police pick me up even later, I'm going to tell you now, someone else will come, maybe in two days, kill the two of ya's.[1]

[Mrs. Flax:] Tony—

[Martini:] —I'm telling you right now.

[Mrs. Flax:] I told you I'm not calling the cops. You told me it was just you, now you have a whole—

[Martini:] I'll have somebody take care of you. I can't—I can't take a chance that you're going to do this to *me.*)

[Mrs. Flax:] All right. So I'll see you at 7:30. All right.

[Martini:] 7:30 back of the Forum.

[Mrs. Flax:] Dark jacket, the back of the Forum, in Paramus, and you'll wave to me.

The portion in parenthesis, commencing with the underlined word "Martini" and concluding with the underlined word "me," is the specific portion of the tape defendant requested be excised.

Defendant contends that the admission of the unredacted transcript violated his federal and state rights to due process and a fair trial. At pretrial, defendant argued that the threat against Mrs. Flax amounted to an incident of uncharged misconduct that was too prejudicial to be admitted into evidence. The State took the position that the threat was admissible either under *Evidence Rule* 55 as evidence of defendant's "intent and * * * state of mind" or independently as part of the *res gestae*—a component of the kidnapping for which defendant was standing trial. The trial court ruled in favor of the State, although it is unclear which argument it adopted:

---

[1] At the pre-trial stage, both the court and counsel addressed only that passage. However, in order to illuminate its context we include a larger portion of the disputed transcript.

That will remain. It's not an admission or evidence of a crime that this defendant may have committed. It's part of the *res gestae*. It goes to show his motive, his intent and will remain.

Defendant now contends that the trial court improperly admitted the evidence under *Rule* 55 as proof of defendant's motive and intent. Defendant also argues that even if the evidence was properly admitted under *Rule* 55, its potential for prejudice substantially outweighed its probative value. Hence, he contends that the evidence was inadmissible under *Evidence Rule* 4. In addition, defendant argues that the evidence should have been accompanied by a limiting instruction.

The State repeats its argument that the threat was admitted as part of the *res gestae*, thereby making the *Rule* 4 weighing process and any limiting instructions unnecessary.

We agree with the State. As evidenced by the statements that defendant made immediately preceding and following the disputed language, the threats defendant made to Mrs. Flax were part and parcel of the crimes for which he was standing trial. As such, *Rule* 55 was inapplicable and the evidentiary admission was entirely proper.

*Rule* 55 states:

Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong *on another specified occasion* but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident. (Emphasis added).

The Rule prohibits the introduction of evidence of past acts of misconduct as a basis for an inference that defendant committed the acts for which he or she is then standing trial. *State v. Stevens*, 115 *N.J.* 289, 299–300, 558 *A.*2d 833 (1989). The purpose of the Rule is " 'to protect defendants from the potentially great prejudice inherent in 'other like crimes' evidence, since the average jury will much more readily accept the belief that one is guilty of the crime charged where it is demonstrated that he has committed a similar crime.' " *State v. Ortiz*, 253 *N.J.Super.* 239, 242–43, 601 *A.*2d 735 (App.Div.)

(quoting *State v. Peltack,* 172 *N.J.Super.* 287, 292, 411 *A.*2d 1156 (App.Div.), *certif. denied,* 84 *N.J.* 474, 475, 420 *A.*2d 1298 (1980)), *certif. denied,* 130 *N.J.* 6, 611 *A.*2d 646 (1992).

However, the Rule does not apply to uncharged acts of misconduct that are components of the crime that is the subject of the trial. "Conduct which is the subject matter of the action being tried cannot be excluded under Rule 55 because the rule is only a consideration with respect to conduct that occurred on other occasions." Richard J. Biunno, *Current N.J.Rules of Evidence,* Comment 1 to *Evid.R.* 55, p. 532.

For example, in *State v. Sease,* 138 *N.J.Super.* 80, 350 *A.*2d 262 (App.Div.1975), the defendant was charged with participating in the armed robbery of six tavern patrons, all of whom were named in the indictment. At trial, the State introduced evidence that the defendant had also reached into the pocket of another patron at the tavern who had not been named in the indictment. *Id.* at 85, 350 *A.*2d 262. Defendant protested, arguing that the evidence was inadmissible as it related to misconduct for which she had not been charged. Finding that the evidence "was part of the total criminal event on the same occasion" as the crimes charged, the Appellate Division approved of its admission. *Ibid.; see also State v. Sinnott,* 24 *N.J.* 408, 413, 132 *A.*2d 298 (1957) ("defendant's declarations and acts are admissible when they are part of the *res gestae* "). The same reasoning applies to the threats made by Martini against Mrs. Flax.

Count four of the indictment charged defendant with kidnapping contrary to *N.J.S.A.* 2C:13–1a. That provision states that "[a] person is guilty of kidnapping if he unlawfully removes another from the place where he is found or if he unlawfully confines another with the purpose of holding that person for ransom or reward * * *." The State's theory of the case was that defendant had intended to ensure receipt of his ransom as well as his escape from detection through threats on the lives of both Irving Flax and his wife. The contested passage, as

part of a conversation in which defendant demanded to know if the ransom had been assembled, supports that theory. Defendant's threats were made to coerce Mrs. Flax into providing the ransom without police interference.

This is not a case in which the State deliberately informed the jury of past criminal acts committed by defendant. *See State v. Pennington, supra,* 119 *N.J.* at 571, 575 *A.*2d 816. Instead, the disputed evidence relates directly to the crimes for which defendant was then standing trial and its admission serves to paint a complete picture of the relevant criminal transaction. *See United States v. Masters,* 622 *F.*2d 83, 86 (4th Cir.1980) (holding other-acts evidence admissible if it " 'furnishes part of the context of the crime' " or "is necessary to a 'full presentation' of the case * * *.").

A defendant may not break apart each component of a criminal act that itself could constitute an offense and prevent it from being admitted at trial. Defendant was not independently charged with stealing Flax's car, but to say that the State could not show that he had driven it to the Forum Diner to pick up his ransom would be ridiculous. The same is true of his threats against Mrs. Flax.

Insofar as the evidence related to the *res gestae,* no limiting instruction was necessary. Admission of the evidence was proper.

### F. *Evidence Concerning Impact of Crime on Victim's Spouse*

Defendant argues that both the guilt and penalty phases of his trial were tainted by irrelevant and highly prejudicial statements concerning the impact of his crimes on Marilyn Flax. Defendant asserts that throughout the trial, the prosecutor made emotionally-charged comments regarding Mrs. Flax's reaction to the kidnapping and murder of her husband. In addition, defendant argues that during her testimony Mrs. Flax compounded the effect of prosecutor's remarks with statements

focusing on her terrorization. As a result, defendant argues, jury deliberations in both phases of the trial were improperly influenced by the effect of defendant's crime on his victim's family.

In support of his argument, defendant points to several instances during the trial.

In her opening statement, the prosecutor stated:

When Marilyn Flax comes in here and tells you what happens [sic] to her, she doesn't leave this courtroom and leave the role behind because you're going to be hearing about what John Martini did to the life of Marilyn Flax and what he did to her husband, Irving Flax, on January 23rd, 1989.

Her statement continued with a description of the home life of the Flaxes:

I'm sure most of you don't even remember what most of you were doing on January 23rd, 1989. It was a Monday. For the Flax family, it started out like any other Monday except that Marilyn Flax, who is known professionally as Marilyn Winters—she runs an employment agency in Fort Lee, New Jersey—she wasn't going to work that day. She normally goes to work on a Monday but her son, Brian, was home sick from school so she stayed home with him. Her husband, Irving, a man in his fifties, was a supervisor of a factory in Secaucus. He left for work that morning and she kissed him good-bye and that was the last time she saw him alive because 10 o'clock that morning things began to change drastically in the life of Marilyn Flax * * *.

The jury was also told that it could not imagine what Mrs. Flax felt like during the kidnapping but that it would hear "her testify as to what she did, how she tried to get her thoughts together, how she wasn't even able to bring herself to the reality of this happening." The prosecutor further remarked:

While she goes to the bank and comes back from the bank, all along terrified because she doesn't know how many people are involved in this, who's watching her, where they are * * *.

\* \* \* \* \* \* \* \*

You will also, and you can draw this conclusion, see the tremendous strain [sic] this woman was able to summon up to keep him in conversation * * *.

\* \* \* \* \* \* \* \*

Now, of course, she's terrified * * *.

\* \* \* \* \* \* \* \*

She's terrified on the phone * * *.

\* \* \* \* \* \* \* \*

The next morning she gets the phone call that she's been dreading * * *.

During her guilt-phase summation, the prosecutor referred to "the chain of events that forever changed the lives of Irving and Marilyn Flax." The prosecutor returned to that theme during her penalty-phase summation when she pointed out that a defense expert's report had not mentioned any regret defendant may have felt for "what happened to Irving Flax or what happened to his family."

During her testimony Marilyn Flax made several references to the fear she had experienced during the kidnapping as well as defendant's threats against the lives of herself and her husband.

And he said, I'm warning you, call the cops you, [sic] better get the money, and you better try to get the money or both of you are dead.

\* \* \* \* \* \* \* \*

I was terrified out of my mind. He told me he was gonna kill me if I called the police. He kept saying it over and over again to me, I was very frightened * * *.

\* \* \* \* \* \* \* \*

From there I called my partner, Barbara Rose, and I told her the call that I got, that a man threatened that he had kidnaped my husband, and he was gonna kill me if I called the police and if I didn't get the money and I said I'm terrified * * *.

\* \* \* \* \* \* \* \*

Over and over and over again he kept threatening my life and my husband's * * *.

\* \* \* \* \* \* \* \*

I also knew that I needed to see him badly, I needed to see the man who threatened me and my husband.

Mrs. Flax also volunteered information concerning her husband's state of mind during his ordeal. During his third telephone call with Mrs. Flax, she testified, "he was screaming and crying."

Finally, when asked to identify the man she saw in the parking lot of the Forum Diner, she said, "One, two, the third man there looking at me right now was the man who killed my husband." The court sustained defense counsel's objection to that remark and gave a curative instruction.

Other than at the time of Mrs. Flax's identification of defendant, defense counsel did not object to any of the disputed testimony. He now argues, however, that Mrs. Flax's state of terror was irrelevant and that the prosecutor's remarks were an attempt to divert the jury from the material facts to the worthiness of the victim and his family. Although defendant admits that some reference to Mrs. Flax had to be made, as she was a prosecution witness who testified to incontestably relevant facts, he contends that the prosecutor's remarks took Mrs. Flax's testimony beyond the point of relevancy.

We are satisfied that the disputed statements are not impermissible victim-impact comments. Mrs. Flax was a key player in the kidnapping. Her testimony and the prosecutor's summation of that testimony reflect the fears and terrors that Mrs. Flax had continually expressed from the inception of the kidnapping. Fears she had expressed, prior to meeting the prosecutor, in her taped telephone conversation of January 23rd with Martini:

[Mrs. Flax:] Why, can I talk to him? You don't know what you put me through, today—

[Martini:] I didn't ask you that.

[Mrs. Flax:] Tony, I'm going through such hell, you don't know.

\* \* \* \* \* \* \* \*

[Mrs. Flax:] Tony, you don't know what I went through. I got some of the money.

[Martini:] What?

[Mrs. Flax:] I got some of the money, Tony, but I'm going crazy. I'm so nervous. I'm sick.

[Martini:] Well, how much—well, where's the money then?

[Mrs. Flax:] What?

[Martini:] Where is the rest of the money?

Mrs. Flax: I got the money you asked me.

[Martini:] Okay. That's all I want to know.

Mrs. Flax: All right. But you don't know what I'm going through. I told you. I'm a sick woman. My son is sick.

 * * * * * * * *

[Mrs. Flax:] But what, Tony, I don't know what you want me to do. I'm just so upset.

[Martini:] I just want the money.

[Mrs. Flax:] What?

[Martini:] I want the money. I'll meet you. Give me the money, and I'll let— I'll take—I'll go back and release him, but if the cops come—

[Mrs. Flax:] —Tony, I promise—Tony, I promised you. I said there'd be no cops. All I want is my husband.

 * * * * * * * *

[Mrs. Flax:] The back of the diner. I don't want to meet you, Tony, I'm like scared. Can I just drop the money some place?

[Martini:] I have no reason to be here. I'll tell you what. I don't know what to tell you.

[Mrs. Flax:] All right.

[Martini:] I'm not going to hurt you. Believe me. I'm not going to hurt him.

[Mrs. Flax:] Can I throw it at you or something out the window, please don't come near me. I'm terrified.

 * * * * * * * *

[Mrs. Flax:] I'm so sick. You don't know what you're putting me through.

[Martini:] Don't call the police.

[Mrs. Flax:] I'm not calling the police. I want my husband. I don't want you to call my house. I want you to leave me alone. I'm not used to these things.

 * * * * * * * *

[Mrs. Flax:] —just don't come near my car, because I'm very nervous.

[Martini:] I won't come near you. I will stay away from you, and when you see me wave, then then I will start walking, and when I see you open the door, put that on the floor, I will just stop there and wait, and you just drive off and go home. As soon as you get home, he will be calling you within five minutes after you're home. INAUDIBLE. I can't—I don't know when you're going to be home.

Mrs. Flax's fears and terrors were not induced by the prosecutor's planning or coaching, but by the defendant in order to secure money for the release of Irving Flax. Her acts and fears were an essential component of the total integrated criminal plan to kidnap the victim. Defendant relied on her

terror to effectuate the kidnapping. Likewise, her husband's "screaming and crying" was intended to make her comply with defendant's instructions and demands. In order to present a complete picture of the crime with which defendant had been charged, Mrs. Flax's testimony was crucial and properly admitted.

We recognized that prosecutorial comments that tend to overemphasize the character of the victim or the impact of the murder on the victim's family are improper in *Williams* II, 113 *N.J.* at 448, 550 *A.*2d 1172, (*Williams* II) and *Pennington, supra,* 119 *N.J.* 547, 575 *A.*2d 816. Such comments, unrelated to the proofs of the case, tend to enflame the jury, creating the possibility that their deliberations will focus not on the guilt or innocence of the defendant but on other impermissible considerations.

Here, however, the prosecutor's comments closely tracked the relevant testimony of Mrs. Flax. They are very different from the prosecutorial comments that painted a glowing picture of the "sterling character" of the victim that we held impermissible in *Williams* II, *supra.* There, the contested testimony concerned extraneous information about, among other things, the marriage plans and church-related activities of a young rape/murder victim. 113 *N.J.* at 446, 550 *A.*2d 1172. For example, the prosecutor "related to the jury that the victim had 'so much to live for,' that she was 'beautiful, educated, religious, a member of her church choir.' " *Id.* at 453, 550 *A.*2d 1172. In her concluding remarks the prosecutor stated " '[s]he didn't deserve to die as she did, naked, ravaged, in agony, and calling to Jesus for help. Jesus help me, Jesus help me.' " *Ibid.*

We held that "our law does not regard a crime committed against a particularly virtuous person as more heinous than one committed against a victim whose moral qualities are perhaps less noteworthy or apparent. The law exists to protect all persons equally." *Id.* at 450, 550 *A.*2d 1172. Because the

contested passage "contain[ed] nothing that would aid the jury in determining the defendant's guilt or innocence," we determined that its admission was improper. *Id.* at 452, 550 *A.*2d 1172.

Similarly, in *Pennington, supra,* the prosecutor "consistently emphasized the character and background of the victim, as well as the impact of her death on her family." 119 *N.J.* at 566, 575 *A.*2d 816. The disputed testimony included an account by the victim's daughter of the time she spent with her mother on the day of the shooting. We likewise found those comments to be improper. *Id.* at 570, 575 *A.*2d 816; *see also State v. Hightower, supra,* 120 *N.J.* at 411, 577 *A.*2d 99 (holding prosecutor's comment that "[h]ad it not been for [the defendant], ladies and gentlemen, [the victim] would be twenty-seven years old today. Today is her birthday" to be improper).

However, the proscription against victim-impact statements is not absolute. In *Marshall* I, *supra,* the prosecutor commented on the victim, defendant's wife, whom he had murdered by a contract killer.

> I didn't know [the victim], but I know and you know that she loved her boys. I know and you know that she loved her husband. For eight months that lady knew that his afternoons were spent in the arms of another woman. She continued to cook for him, she continued to clean his clothes, she continued to keep the house clean, she continued to make love with him, because she loved him. She wanted to start all over. She wanted to give him a second chance. She had a right to live her life in full, to watch her boys continue to grow, to watch them graduate from school, to get married and have families of their own, but he tossed it all away because of his desperation and his greed. And that is [the defendant].

[123 *N.J.* at 161, 586 *A.*2d 85.]

We found that the statement, for the most part, was not improper because it was "supported by evidence in the record and [was] consistent with the theory of the State's case." *Id.* at 162, 586 *A.*2d 85. "[T]he prosecutor's comments do not merely describe the victim sympathetically, but characterize her relationship with defendant in a manner relevant to 'critical aspects of the trial,' and tend to support the State's proofs

concerning defendant's motive for the homicide." *Id.* at 162–62, 586 *A.*2d 85 (quoting *Williams* II, *supra,* 113 *N.J.* at 451, 550 *A.*2d 1172). See also *State v. Clausell,* 121 *N.J.* 298, 340–41, 580 *A.*2d 221 (1990) (finding that although prosecutor's comments about activities of victim and his family on day on which a man was killed in front of his wife and children "should have been more restrained," we held, "Some reference to the victim's family was unavoidable because family members had witnessed the crime and because defendant was charged with aggravated assault of each person near the foyer at the time of the shooting.").

Likewise, the prosecutor's comments in this case related directly to the proofs. Perhaps in a few instances the prosecutor could have been more restrained, however, the comments were relevant and were not designed to divert the jury's attention from the question of guilt or innocence. Mrs. Flax's testimony concerned the events for which defendant was standing trial. Her participation in the kidnapping was not a collateral consequence of defendant's actions. A critical element of defendant's plan was to terrorize Mrs. Flax into producing ransom for the safe return of her husband. The impact of the kidnapping on Mrs. Flax was not an unintended and unforeseeable side effect on a victim's family member. Instead, defendant directly involved her for the express purpose of terrorization.

Additionally, nothing was mentioned of the victim's character. The prosecutor did not explore Irving Flax's background to any extent. Thus, because the character of the victim was not introduced into the minds of the jurors, the potential for tainted deliberations did not exist.

To the extent that Mrs. Flax's courtroom identification of defendant was prejudicial, we are satisfied that the curative instruction given by the trial court sufficiently ameliorated its negative effect.

We find that Mrs. Flax's testimony and the prosecutor's summation do not constitute victim-impact statements and hence were admissible.

### G. *Submission of the Handwritten Note Seized from Defendant's Apartment*

■■ Defendant contends that a handwritten note seized from his apartment was improperly admitted into evidence. He argues that the prosecutor failed to elicit a proper foundation for the note and that no witness authenticated the handwriting on the note as that of defendant. We agree. The prosecutor simply neglected to follow well-established rules concerning the admission of written instruments. However, we do not believe, as defendant argues, that the error warrants reversal of his conviction and sentence. Because of the insignificant nature of the evidence, we conclude that its admission was harmless error.

During the search of defendant's Fairview apartment, a few miscellaneous papers were seized from a nightstand in his bedroom. One of the papers had a handwritten note scribbled on it. At trial, no witness identified the papers nor did anyone verify the handwriting as belonging to defendant. However, the papers were marked for identification. At the close of the State's case, the prosecutor moved the papers into evidence. The record is not clear on whether the defendant objected to their admission. For purposes of this discussion, however, we will operate under the assumption that defendant sufficiently preserved an objection.

The papers did not play a significant role in the testimony of any of the witnesses. However, during her guilt-phase summation the prosecutor made the following remark concerning the handwritten note on one of the papers:

What's worse, of course, is what isn't really obvious about [the taped telephone conversation between defendant and Mrs. Flax]. John was a planner. There's no question about it, particularly after everything you've seen. And don't be afraid to go through all the evidence in this case. For example, S–32I, papers

from the night stand in the bedroom in Fairview. There's a lot of papers on that night stand. One of them, on one half indicates "Star Liquor, L.I.E. to Syosset." There's a couple of phone numbers. On the bottom of that piece of paper, "Just for Men haircolor, beard."

John didn't have a beard at that time. But you think he was trying to plan ahead just like was getting the new IDs. He was going to keep one step ahead of everybody so he was a planner all right. But what he didn't realize in that tape he was explaining to all of us the very reasons why Irving Flax was a dead man from the time this plan was conceived. Because John Martini did nothing to hide his identity from the victim, Irving Flax. He didn't hide his or Therese's identity. He didn't disguise himself in any way. He didn't kidnap him by putting a bag over his head or something like that.

The handwritten note is clearly a "writing" as defined by our Rules of Evidence. See *Evidence Rule* 1(13). *Evidence Rule* 67 provides that "[a]uthentication of the original or a copy of a writing is required before it may be received in evidence." No effort was made on the part of the State to authenticate the handwriting as that of defendant. Yet, the prosecutor clearly implied that there had been proof that defendant had written the "Just for Men haircolor, beard" note. However, there are at least two other potential authors: Afdahl, who also resided in the apartment, and Victor Picardi, who had visited there. One cannot assume that defendant wrote that note. The implication that defendant was the author was error.

Assuming that defendant properly preserved an objection to the authentication of the writing, we must determine if, "in the context of the entire case, * * * the error was clearly capable of affecting * * * the verdict or sentence." *Bey* I, *supra*, 112 *N.J.* at 94–95, 548 *A.*2d 846. Defendant argues that the note was clearly capable of undermining his diminished-capacity theory by portraying him as a rational planner. In addition, defendant asserts that the note was capable of affecting his sentence as it related to the existence of the "escaping detection" aggravating factor. We find neither argument persuasive.

Given the overwhelming evidence of defendant's guilt, it is "inconceivable that this evidence would have swayed a jury from the essential facts of the case." *State v. Dixon, supra,*

125 *N.J.* at 251, 593 *A.*2d 266; *Marshall* I, *supra,* 123 *N.J.* 1, at 113, 170, 586 *A.*2d 85. Moreover, to the extent that the evidence may have reflected on defendant's mental state, that the ultimate jury determination on that point rested on this tiny fraction of evidence concerning diminished capacity is difficult to imagine. "It is the very marginality of the evidence that establishes the lack of prejudice." *Dixon, supra,* 125 *N.J.* at 251, 593 *A.*2d 266. The error was harmless.

H. *Questions During Alice Martini's Testimony Concerning Defendant's Alleged Adultery*

Defendant argues that during cross-examination the prosecutor improperly placed in issue his character by questioning Alice Martini about his alleged instances of adultery. *Evidence Rule* 47 provides that in a criminal proceeding, evidence offered by the prosecution of a trait of character of the defendant on trial may be admitted only if the court has admitted evidence of good character offered by the defendant. Defendant asserts that Mrs. Martini did not testify about his good character; therefore, the prosecutor's cross-examination of Mrs. Martini about his "other girlfriends" constituted improper attacks on defendant.

During her direct testimony, Alice Martini testified that she had left defendant in September 1988 "[b]ecause of his drug addiction and girlfriend." Mrs. Martini testified that defendant had "just changed from a loving husband to a—just his drug addiction" after becoming involved with his "girlfriend." The prosecutor, during cross-examination, established that the "girlfriend" Mrs. Martini was referring to was Afdahl. The prosecutor then suggested that the defendant had committed adultery with another woman:

Q. * * * [Y]ou still love your husband don't you?

A. Yes, I do.

Q. You loved him even when he was cheating on you, isn't that correct?

A. That's right.

Q. He cheated on you for years, didn't he?

A. I'd just known about it—I thought it was a year and a half but I found out later it was over ten years.

Q. That was with Therese Afdahl?

A. Yes.

Q. What about Eileen Metzgroff?

A. I never heard of her name.

Q. You never heard of her name?

A. No.

Q. She used to call Arizona, she used to call the house, didn't she?

A. No, she hasn't.

　　　　*　　　*　　　*　　　*　　　*　　　*　　　*　　　*

Q. Isn't it a fact that John had lots of girlfriends?

A. Not to my knowledge.

Q. You know about Eileen Metzgroff who started going with him in 1976?

A. I never heard of the name until today.

Later in the cross-examination, the prosecution intimated that defendant had committed adultery with another woman.

Q. Isn't it a fact that John had lots of girlfriends?

A. Not to my knowledge.

Q. You know about Eileen Metzgroff who started going with him in 1976?

A. I never heard the name until today.

Q. You earlier told us that you didn't know the name Eileen Metzgroff, is that correct?

A. That's correct.

Q. How about Pat Chamberlain?

A. I know Pat Chamberlain.

Q. How long do you know Pat Chamberlain?

A. I know Pat Chamberlain maybe—as old as my daughter, 20 years. * * *.

Q. What was the relationship between your husband and Pat Chamberlain?

A. Friends. She's friends of the whole family.

Q. Were you still friends in 1988?

A. With Pat Chamberlain?

Q. Yeah.

A. No. She's back here in New Jersey. I'm in Arizona.

Q. Didn't you say there was a falling out between her and her husband, that's Bruce Chamberlain?

A. Yes, there was.

Q. And you don't talk to Pat Chamberlain anymore, do you?

A. I haven't heard from Pat Chamberlain since my husband has been in jail.

> Q. Isn't it a fact that she was one of the women that your husband ran around with?

Defense counsel objected, pointing out that there had been no proof of any relationship between defendant and Ms. Chamberlain. The prosecutor responded that "there has been testimony produced by the defense that Therese Afdahl is the only woman that was associated with Mr. Martini." The trial court agreed: "That's what this witness has said so far to her knowledge. Therefore I'll overrule the objections. It goes to the credibility of the witness."

The prosecutor finished her cross-examination with the following:

> Q. You know about your husband and Pat Chamberlain, don't you?
> A. No, I don't.
> Q. Do you know any reason why she would be visiting him over the last year and a half?
> A. Visiting where, here?
> Q. Yeah.
> A. She was a friend.
> Q. He had a lot of women friends, didn't he?
> A. I'm just finding it out now.

Defendant argues that the questions about Ms. Chamberlain and Ms. Metzgroff constituted impermissible attacks on his character, were outside the scope of the direct examination, and had no evidentiary support in the record. We disagree.

Defendant argues that Alice Martini's testimony did not establish that Afdahl was her husband's only girlfriend. According to defendant, the brief comment that defendant was a "loving husband" was not sufficient to open the door to questions suggesting numerous adulterous affairs. The State contends, however, that Alice Martini's testimony that defendant "just changed from a loving husband" after he became involved with Afdahl implied that before that time his fidelity had been intact. Through the challenged questioning, the prosecutor properly was testing Mrs. Martini's reliability and believability on whether defendant indeed had been a faithful husband.

 That the credibility of a witness may be impeached on cross-examination is well settled. *State v. Pontery,* 19 *N.J.* 457, 472, 117 *A.*2d 473 (1955); *State v. Engel,* 249 *N.J.Super.* 336, 375, 592 *A.*2d 572 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.*2d 616 (1991). The scope of cross-examination is a matter resting in the broad discretion of the trial court. *State v. Sanchez,* 224 *N.J.Super.* 231, 251, 540 *A.*2d 201 (App.Div.), *certif. denied,* 111 *N.J.* 653, 546 *A.*2d 561 (1988). The trial court concluded that Alice Martini had implied through her testimony that defendant's infidelity with Afdahl was an unusual occurrence. That conclusion finds sufficient support in the record. Therefore, permitting the prosecutor to pose questions about other instances of marital infidelity did not amount to an abuse of discretion.

 Cross-examination relating to a witness's credibility need not be based on evidence adduced at trial. *See State v. Crudup,* 176 *N.J.Super.* 215, 422 *A.*2d 790 (App.Div.1980). That is not to say that the prosecutor could ask questions about topics for which she had no basis in truth. Particularly in capital cases we have recognized

> [I]t is well settled and virtually self evident that the cross-examination of [a] character witness by interrogation concerning prior acts of misconduct is "pregnant with possibilities of destructive prejudice. The mere asking by a respected official of such a question, however answered, may well suggest to the jury that the imputation is true." E. Cleary, *McCormick's Handbook of the Law of Evidence* § 191 at 457–58 (2d ed. 1972).
>
> [*State v. Rose,* 112 *N.J.* 454, 504, 548 *A.*2d 1058 (1988).]

Nonetheless, we find, as did the trial court, that the prosecutor had adequate grounds to question Mrs. Martini about both Eileen Metzgroff and Pat Chamberlain.

The proof with respect to Eileen Metzgroff is particularly strong. Defendant, in his January 30th statement, which was referred to during the direct testimony of Officer Trahey, included the following reference to a telephone conversation from Ms. Metzgroff's home in 1977:

Q. Where were you when you spoke to her?

A. At that time, at this particular time in Eileen Metzgroff's house, I guess. She had the same phone number she has now.

Q. Now, Eileen Metzgroff is—

A. I don't remember if I called her or she called me.

Q. But you called from Eileen Metzgroff's house or apartment from New York City?

A. Yeah.

Q. Who is Eileen Metzgroff to you? What's the relationship to you?

A. A friend, girlfriend.

In addition, during Trahey's testimony in the penalty phase of the trial, the prosecutor produced a document memorializing a interview of Ms. Metzgroff conducted by Sergeant Minichino of the Prosecutor's Office. That report stated that Eileen Metzgroff said that she had met defendant on August 8, 1976. When asked how she remembered the exact day she replied, "When you love somebody, you remember those things." She further stated that she saw defendant during his marriage and that she kept in frequent contact with him in Arizona through telephone calls. Finally, she indicated that defendant had told her that he was prepared to divorce Alice Martini in order to marry Eileen Metzgroff.

In addition, Special Agent Peavy of the FBI testified that defendant had made contact with Pat Chamberlain during a December 1988 visit to New Jersey.

The prosecutor, therefore, did not invent either name nor did she fabricate communications between defendant and the two women. The prosecutor had sufficient evidentiary support for her questions. Moreover, the questions were fair challenges to the implications of defendant's good character that the defense sought to have drawn from Mrs. Martini's testimony. We conclude that the trial court did not abuse its discretion in allowing the prosecutor's cross-examination of Mrs. Afdahl.

I. *Testimony Concerning the Baby Food Jar not Admitted into Evidence*

 Defendant argues that the prosecutor improperly questioned his expert witness, using a baby-food jar allegedly con-

fiscated from defendant's apartment, but not admitted into evidence. That a Beechnut Bartlett Pear jar of baby food was found in Days Inn Motel room 211, together with rubber bands, is undisputed. Because the expert testified that he had based his opinion, in part, on defendant's possession of the jar, the prosecutor's cross-examination was not improper.

In his direct testimony Dr. Greenfield, the defense psychiatric and drug addiction expert, testified that "sterno, aluminum foil and rubber bands," items found in Martini's hotel room, were used to prepare drugs for ingestion. Defense counsel then asked Dr. Greenfield whether a baby-food jar also could serve such a purpose. Dr. Greenfield testified that such a jar could be used for the same purpose, to create "cheap works" in which to heat up cocaine for injection.

> Any jar. Baby food jars are certainly—I've heard them referred to as cheap works. "Works" is a street word that means drug paraphernalia. Cheap means cheap. And what it basically means is that you use the sterno to cook, to heat up whatever it is you're going to shoot or snort, inject or take through your nose or smoke. The aluminum foil is put on top of the baby food jar and held in place with rubber bands and then you basically heat up whatever is inside the jar, heat it up with the sterno and you inhale the fumes and [sic] are liberated when you heat this up.
>
> And my understanding from patients and people I know who do this is that it works pretty well as far as delivering cocaine smoke into the central nervous system is concerned.

Subsequently, the bag containing the jar of baby food was marked for identification. Near the end of his direct examination, defense counsel asked Dr. Greenfield a long hypothetical question, concerning whether he could "within a reasonable degree of psychiatric medical probability within your * * * experience as a psychiatrist and expert in the field of cocaine abuse, render an opinion as to Mr. Martini's psychiatric condition at the time of the shooting of Mr. Flax?" In responding to that hypothetical question the doctor was asked to "[a]ssume that in a search of Mr. Martini's room at the Days Inn, Room 211, along with other items were found rubber bands and a Beech–Nut Bartlett Pear baby food jar." Dr. Greenfield testified that he had relied, in part, on the presence of the baby-food

jar in Room 211 in reaching his conclusion that defendant was under the influence of cocaine at the time he shot the victim, "[a]nd that's, as I say, a very important factor in his mental state at the time."

During cross examination, the prosecutor set out to establish an alternative reason for the presence of the baby-food jar. Dr. Greenfield was asked whether persons who had ulcers, as defendant did, sometimes ate baby food. The witness confirmed that that was so. The prosecutor later engaged Dr. Greenfield in the following dialogue:

Q. Did you ever ask to see the baby food jar that was found?

A. No. I didn't ask to see it.

Q. Would you like to see it?

A. Certainly.

Q. I show you what's been marked S–48. Would you like to look at the contents of S–48?

A. What is has in it looks to me like some residual Bartlett pears in it. If this is the way it was found and it was found at a time around about when the offense took place, then I don't think it could have been used for smoking cocaine.

Q. Thank you, Doctor. And you would have known that earlier if you had asked to look at the jar, correct?

A. Yes.

Q. So this really doesn't confirm your opinion that he was using cocaine at the time of the incident?

A. No, not the way it appears now.

Defense counsel made no objection.

At the close of evidence, the prosecutor moved for admission of the baby-food jar. Defense counsel objected, noting that the prosecution had failed to establish a proper foundation for the jar. No one had identified it as the jar seized from Room 211 at the Days Inn. The court sustained the objection. However, the court ruled that "Dr. Greenfield was shown the jar marked S–48 and he testified as to what he saw there. Certainly, there's nothing to prevent the State from commenting on it since it was testified to, but the jar itself will not go in." Defense counsel made no objection to that ruling.

Defendant argues that after denying admission of the jar, the court should have, *sua sponte,* stricken the portion of Dr. Greenfield's cross-examination that was based on the jar. In addition, defendant objects to the prosecutor's reference to the baby-food jar in her summation:

I guess you can use the hot dog story to illustrate any point you want just like Dr. Greenfield thought he could use that baby food jar to indicate that John was a cocaine junkie. But he never stopped to look at the baby food jar. What John needed the baby food for was his own ulcer.

The presence of the baby-food jar in defendant's hotel room and its likely use in ingesting drugs supported defendant's theory that defendant had been a heavy cocaine user when he committed the crimes. Defendant argues that the prosecutor's cross-examination damaged the basis of Dr. Greenfield's expert opinion and weakened defendant's major defense, his state of mind. We agree that the prosecutor's cross-examination was effective, but find that it was proper.

The condition of the baby-food jar was certainly relevant and Dr. Greenfield's testimony about its impact on his opinion was admissible. Defense counsel was the first to ask Dr. Greenfield whether a baby-food jar could be used for drug purposes and whether it was a factor in his conclusion that Martini had been under the influence of cocaine when he shot Flax.

"[A]n expert witness is always subject to searching cross-examination as to the basis of his opinion * * *." *Glenpointe Assocs. v. Township of Teaneck,* 241 *N.J.Super.* 37, 54, 574 *A.*2d 459 (App.Div.), *certif. denied,* 122 *N.J.* 391, 585 *A.*2d 392 (1990). After an expert witness has given his opinion in response to a hypothetical question, his opponent is permitted on cross-examination to supply omitted facts and ask the expert if his or her opinion would be changed based on the new information. *State v. Freeman,* 223 *N.J.Super.* 92, 116, 538 *A.*2d 371 (App.Div.1988). Moreover, there is no reason that the materials on which an expert relies must also be admissible in the case-in-chief. For example, in *County of Ocean v. Landolfo,* 132 *N.J.Super.* 523, 528, 334 *A.*2d 360 (App.Div.1975), the

court refused to admit several appraisals that had formed the basis of an expert's opinion regarding the value of a piece of property. However, the court went on to hold: "That such sales were inadmissible to establish value did not lessen their potential for undermining opinion testimony which appeared to have been based thereon." *Id.* at 529, 334 *A.*2d 360. That reasoning also applies to instances in which an expert has testified in response to a hypothetical question and in which the opposing party, during cross-examination, offers omitted facts.

As the State correctly points out, defendant failed to object to either Dr. Greenfield's cross-examination or the prosecutor's summation with respect to the jar. However, because we find that testimony and summation free from error, we need not determine if defendant's arguments are barred on appeal. *See State v. Buonadonna,* 122 *N.J.* 22, 49, 583 *A.*2d 747 (1991); *State v. Souss,* 65 *N.J.* 453, 460, 323 *A.*2d 484 (1974).

Dr. Greenfield clearly testified that his expert opinion was based, in part, on the baby food jar having been in defendant's possession. The fact that the jar was later found to be inadmissible for lack of a foundation does not diminish the jar's value as evidence tending to undercut the expert's opinion. Thus, there was no reason for the court to have stricken testimony from the record *sua sponte* nor to have prohibited the prosecutor from referring to the jar during her summation.

### J. *Selective Use by the Prosecution of Defendant's Answers to the MMPI Examination*

Defendant argues that the prosecutor's cross-examination of Dr. Greenfield was improper in another respect. Defendant's argument concerns portions of a personality test that the expert administered to him. Again, we find that the prosecutor's questions were properly within the scope of cross-examination as they concerned the materials on which Dr. Greenfield had based his expert opinion.

As part of his testimony concerning defendant's personality, Dr. Greenfield recounted the results of the Minnesota Multiphasic Personality Inventory (MMPI) examination administered to defendant. The test consisted of 566 questions to which defendant was asked to respond either true or false. Subjects covered included the test-taker's symptomatology, interpersonal relations, depression, social withdrawal, aggression, and personal interest. Dr. Greenfield used the results of the test to reach a conclusion about defendant's addiction to cocaine and his mental state at the time the relevant crimes had been committed.

The test has four validity scales used to identify persons who are overly defensive during the test, those who try to look more emotionally disturbed than they are, those trying to look better than they are, and those who are indecisive.

During cross examination, the prosecutor asked Dr. Greenfield about a statement in a psychological report he had submitted with respect to defendant, which stated that " 'his MMPI responses gave a profile of a very troubled and agitated individual whose response pattern showed a trend toward exaggeration in the negative direction (*i.e.*, 'faking bad').' " That comment referred to the possibility that defendant had attempted, through dishonest answers, to make himself look more emotionally imbalanced than he actually was. In response to that questioning, Dr. Greenfield said that his previous conclusion had been incorrect and that he had changed his opinion to one that on the exam defendant "was not faking good or bad."

The prosecutor then pursued that line of questioning to determine what basis Dr. Greenfield had for changing his conclusion. The prosecutor asked what defendant's responses were to a few of the questions from the test.

Q. And his actual answers to question No. 45, "I do not always tell the truth." That answer indicates he answered that "true," doesn't it, Doctor?

A. Yes, that's true.

Q. No. 71, "I think a great many people exaggerate their misfortune in order to gain the sympathy and help of others."

He answered that "true," didn't he, Doctor?

A. Yes, that's true.

Q. No. 93, "I think most people would lie to get ahead." He answered that "true," didn't he, Doctor?

A. Yes.

Q. No. 111, "I have never done anything dangerous for the thrill of it." He answered that "false," didn't he, Doctor?

A. Yes.

Q. 128, "The sight of blood neither frightens me nor makes me sick." He answered that "true," didn't he, Doctor?

A. Yes.

Q. Did you take these things into consideration in determining whether or not Mr. Martini might be malingering or exaggerating his condition to you in order to help himself?

A. As I say, there are two responses to that. The question of malingering came up yesterday and malingering is always possible.

On the other hand, one of the reasons for using the MMPI is to take advantage of that so-called validity scale to indicate whether a person is faking at all, and when you take the 566 items as a totality and comparing them—by this point tests had been run for a long time. I think it was first copywrited [sic] in 1943 and it's been standardized on millions of people, so if you take into account the millions of people on whom its been standardized and compare these validity profiles with the standardized population, that gives you a good handle on what person is faking to look good or faking to look bad on this particular test.

So the answer to your question is it's certainly possible, but the MMPI report certainly doesn't support that.

Q. No. 250, "I don't blame anybody for trying to grab anything they can get in this world."

He answered that "true"?

A. That's correct.

Q. No. 251, "I have had blank spells in which my activities were interrupted and I did not know what was going on around me."

No. 251, he answered that "false," didn't he?

A. Yes.

Q. But he told you in the very first interview there were periods of time when he didn't know what happened to him in January, 1989, didn't he?

A. Yes.

Q. Did you ever think he was lying about that, Doctor?

A. As I say, it's certainly possible, but taking everything together I think that that was a true statement.

Q. 475, "When I am cornered I tell that portion of the truth which is not likely to hurt me."

He said "true," didn't he Doctor?

A. That's correct.

Defense counsel made no objection to that portion of the prosecutor's cross-examination.

In her summation, the prosecutor returned to defendant's answers to the MMPI questions.

All you have from what Dr. Greenfield tells us is what John Martini told him and what he knows of addicts himself.

Of course this is the same man who, when he gave those tests to Mr. Martini, first scored them as, I think, 'faking good' then said no, they were faking bad. After a while you began to wonder how meaningful the tests were.

Of course there were some particular questions that I asked him about, and the reason I asked him is that I said, 'Doctor, did this change your opinion as to whether or not John Martini was malingering or exaggerating or lying to you about his cocaine addiction?'

His actual answer to one of the questions, 'I do not always tell the truth,' he said that was true. But the doctor said that didn't change his opinion that John Martini was under the influence that day, and that was the end of it.

'I think a great many people exaggerate their misfortune in order to gain the sympathy and help of others,' and he answered that one true but the doctor said that didn't change his opinion.

He said, 'I think most people would lie to get ahead.' He said that was true. But the doctor said that didn't change his opinion.

Defendant made no objection but now argues that although the ostensible reason for asking the question was to determine the basis of Dr. Greenfield's opinion, the prosecutor's real motive was to elicit damaging testimony about defendant's moral character. In addition, defendant argues that the court should have applied the "weighing" test articulated in *Evidence Rule* 4 to bar the answers in light of their limited probative value and significant potential for prejudice. Defendant contends that the questions were so prejudicial as to warrant reversal of both his convictions and sentence.

The State argues that the questions were entirely proper attempts to ascertain the basis of Dr. Greenfield's opinion. We agree. That "the scope of cross-examination is a matter for the control of the trial court and an appellate court will not interfere with such control unless clear error and prejudice are shown" is well settled. *State v. Murray*, 240 *N.J.Super.* 378, 394, 573 *A.*2d 488 (App.Div.), *certif. denied*, 122 *N.J.* 334, 585

*A*.2d 350 (1990). In addition, "an expert witness is always subject to searching cross-examination as to the basis of his opinion." *Glenpoint Assocs. v. Township of Teaneck*, 241 *N.J.Super.* 37, 54, 574 *A*.2d 459 (App.Div.), *certif. denied*, 122 *N.J.* 391, 585 *A*.2d 392 (1990). To determine the credibility, weight and probative value of an expert's opinion, one must question the facts and reasoning on which it is based. *Johnson v. Salem Corp.*, 97 *N.J.* 78, 91, 477 *A*.2d 1246 (1984). Moreover, "a change of opinion is a valid basis for cross-examination of an expert witness," because that "affects the credibility of his expert opinion." *Murray, supra*, 240 *N.J.Super.* at 395, 573 *A*.2d 488 (citing *State v. Guido*, 40 *N.J.* 191, 206, 191 *A*.2d 45 (1963)).

In *Fitzgibbon v. Fitzgibbon*, 197 *N.J.Super.* 63, 69, 484 *A*.2d 46 (Chan.Div.1984), the court held that the data from an MMPI test administered to two parents in a child custody case were not privileged and were subject to discovery as part of the expert's evaluation of the best interests of the child. The court reasoned that the parties had to know "all of the relevant elements" used by the expert in coming to a conclusion if they are to have a "reasonable opportunity to contradict or rebut all or a portion of the expert's evaluation." *Id.* at 68, 484 *A*.2d 46.

The prosecutor's use of selected questions from the MMPI test for that purpose was fair. Defendant's own expert testified that the test answers were the basis for his opinion that defendant had a diminished mental capacity at the time that the crimes had been committed. In addition, the expert testified that he had changed his conclusion regarding defendant's truthfulness when answering the questions. To prevent the prosecutor from exploring the basis of either opinion would be unfair. The prosecutor's selected questions directly related to defendant's truthfulness. They were part of the test that Martini used in support of his mental-state defense and that Dr. Greenfield relied on in rendering his opinion on that defense. Furthermore, nothing prevented defense counsel from also

asking Dr. Greenfield selected questions from the test that reflected positively on defendant.

■ We also do not agree with defendant's contention that the probative value of the selected questions was outweighed by their potential for prejudice. The probative value of the questions was quite high as they were part of the basis of the opinion of defendant's key expert witness on defendant's main defense—his diminished capacity to commit the crimes due to his severe drug-abuse problem. Moreover, the potential prejudice of the questions was diminished by their general nature and by Dr. Greenfield's testimony that test-takers can manipulate the results by portraying themselves in an artificial light. *Evidence Rule* 4 provides no basis for excluding the challenged questions.

### K. *Mention of Public Defender Status of Case*

■ Defendant argues that he was prejudiced by his expert witness's statement that the Public Defender was representing defendant. We are satisfied that the statement was inadvertent and that the prejudice caused thereby, if any, was harmless.

During the cross-examination of Dr. Greenfield, the prosecutor asked the expert what fee he was receiving for examining defendant and filing a report. In response, Dr. Greenfield observed that the case was a "Public Defender case." Defendant did not object. The prosecutor proceeded to demonstrate that Dr. Greenfield had billed approximately $2000 for his work prior to his trial testimony.

Defendant argues that the reference was improper for two reasons. First, the comment may have suggested to the jury that defendant was indigent and had a financial motive for his crimes. Second, the remark may have led the jury to conclude that taxpayers, including the jurors themselves, were financing the defense. Defendant asserts that the court should have

stricken the testimony or, at the least, should have issued curative instructions.

Defendant also contends that Dr. Greenfield's remark tainted the testimony of his penalty-phase expert witness Diana Aviv, a psychiatric social worker. During cross-examination of Ms. Aviv, the prosecutor asked:

Q. What are you getting paid for your testimony?

A. Eighty dollars an hour.

Q. How many hours so far?

A. I haven't assessed. I'll have to check.

Q. I'm not going to take up any more time.

After an objection by defense counsel, the court instructed the jury that there was nothing wrong with an expert charging a reasonable fee for services. Defendant contends that Dr. Greenfield's previous comments also injected the "public expense" taint into Ms. Aviv's testimony.

Defendant overstates the potential impact of Dr. Greenfield's inadvertent remark. Of course, evidence of a defendant's financial state should not be admitted nor commented on. *State v. Farr*, 183 *N.J.Super.* 463, 468, 444 *A.2d* 593 (App.Div.1982). However, in most instances such evidence is elicited for the improper motive of establishing "that defendant had no apparent means of income and hence was likely to commit a crime for dollar gain * * *." *State v. Mathis*, 47 *N.J.* 455, 472, 221 *A.2d* 529 (1966); *State v. Robinson*, 139 *N.J.Super.* 58, 63, 352 *A.2d* 587 (App.Div.1976), *certif. denied*, 75 *N.J.* 534, 384 *A.2d* 514 (1977). Defendant does not argue that the prosecutor intentionally attempted to elicit the challenged testimony in order to have the jury infer a motive for the kidnapping. Nor does the record suggest that that was the case.

Dr. Greenfield's comment was brief and non-responsive. In addition, there having been no objection, the remark was not called to the attention of the jury. Indeed, defendant's failure to object to the comment at the time it was made may well reflect his desire not to highlight the topic. Additionally, defendant stretches the effect of the comment a bit far by

suggesting that it influenced Diana Aviv's testimony. Dr. Greenfield's testimony was admitted during the guilt phase. Ms. Aviv testified later during the penalty proceeding. The latter witness mentioned nothing of defendant's financial status. Furthermore, the trial court instructed the jury that experts were entitled to reasonable fees for their services.

Even assuming *arguendo* that Dr. Greenfield's remark created a potential prejudice in the minds of jurors, that prejudice was surely incapable of bringing about an unjust result. Defendant's financial motive was not at issue, he having admitted to participating in the kidnapping. The central question before the jury was defendant's asserted cocaine addiction and diminished capacity. If any harm resulted from the inadvertent remark, it was undoubtedly minimal.

## L. *Testimony Regarding Defendant's Criminal Record*

During the guilt phase rebuttal, the prosecutor offered the testimony of Dr. Stanley Kern, a psychiatrist. To establish background information provided to the expert regarding defendant, she asked the following questions:

Q. Was that about the extent of the information he gave you at that time?

A. Just that he had been on probation three years for theft—

Q. Doctor, is that the extent of the information—

Defense counsel interrupted and moved for a mistrial, based on both the revelation of defendant's conviction and the witness's previous reference to a Philadelphia police report concerning defendant. The court denied the motion. The court agreed with the prosecutor that any prejudice created by the witness's testimony was vitiated by the earlier testimony of Dr. Greenfield. In his direct testimony, Dr. Greenfield stated that he had reviewed defendant's "criminal record printout" in forming his opinion of defendant's mental state. However, he did not testify on whether the print-out had any entries. That such a print-out would show an absence of criminal activity is possible.

The trial court did provide the following curative instruction to the jurors:

Ladies and gentlemen, you may have heard Dr. Kern mention 'probation.' I'm striking that statement. Dr. Kern mentioned that. And you also heard Dr. Greenfield mention that he reviewed a criminal record.

There's no evidence in this case before this jury that there is any criminal history. You're not to speculate one way or the other whether or not there is a criminal history. You're to go on this evidence presented in this Courtroom and you're not to draw any inference one way or the other.

Now, I'm going to charge you based upon what these doctors said later on but you have to understand that statements made to the doctors from the information they receive, when they relate that to us, is not to be considered as substantive evidence against the defendant relating to his guilt or innocence. You're not to accept that, and the doctor only accepts that evidence, and you're to only accept that evidence as tending to support or not support the opinion that he's going to be giving.

You all understand that? If so, if you understand it, please raise your hand. Very good. Let the record reflect that all jurors have raised their hand.

Defendant argues that Dr. Greenfield's previous comment was not as prejudicial as Dr. Kern's remark and that the substance of the two statements differed significantly. According to defendant, if Dr. Greenfield's reference had the potential to raise questions in the jurors' minds about defendant's possible criminal record, Dr. Kern's testimony resolved those questions against defendant. We agree with that distinction.

 However, "A mistrial is an extraordinary remedy." *State v. Hubbard*, 123 *N.J.Super.* 345, 351, 303 *A.*2d 87 (App. Div.), *certif. denied*, 63 *N.J.* 325, 307 *A.*2d 98 (1973). The court should grant such a motion "only where manifest injustice would otherwise occur" and the decision rests within the sound discretion of the trial court. *State v. Labrutto*, 114 *N.J.* 187, 207, 553 *A.*2d 335 (1989).

In *State v. La Porte*, 62 *N.J.* 312, 301 *A.*2d 146 (1973), a prosecution witness inadvertently testified that at the time of his arrest defendant was wanted for an unrelated robbery. The trial court denied defendant's motion for a mistrial. We affirmed defendant's conviction noting that "there is no indication that the error was anything but inadvertent" and that "the trial judge immediately instructed the jury in the strongest

terms to disregard the offending remark." *Id.* at 318, 301 *A.*2d 146. Moreover, we found that because "the evidence of defendant's guilt was so strong * * * in the overall picture the error in question must be regarded as inconsequential * * *." *Ibid.*

We follow the reasoning of *La Porte* today. The offending remark, although improper, was undoubtedly inadvertent. In addition, in light of Dr. Greenfield's previous testimony and the quick curative instruction, the potential for prejudice was insignificant. Denial of defendant's mistrial motion was within the trial court's discretion.

Defendant also argues that the trial court mistakenly believed that Dr. Kern merely stated that defendant had been "on probation" and not "on probation for theft." Defendant points out that the curative instruction stated "you may have heard Dr. Kern mention 'probation' " without also mentioning theft. Thus, defendant contends that the trial court's decision was based on misinformation. Even if the trial court was mistaken about what Dr. Kern had said, the instruction was sufficiently curative. Indeed, the trial court may have preferred to omit the witness's reference to theft to avoid aggravating the potential prejudice of the remark. Defendant's argument does not prevail.

M. *The Jury Charge On the Inference Created by the Use of a Gun*

Defendant argues that a portion of the jury instructions on the murder charge were erroneous and warrant a reversal of his conviction. Specifically, defendant challenges the instruction that permitted the jury to draw an inference from defendant's use of a deadly weapon that he purposely intended to kill Flax.

After providing the jurors with detailed instructions on the burden of proof, the reasonable-doubt standard, and the presumption of innocence, the court defined the elements of mur-

der, including purpose and/or knowledge. In defining "purposely" and "knowingly" the court explained:

> Purpose and knowledge are conditions of the mind which cannot be seen and can only be determined by inferences from conduct, words or acts.

The court then told the jurors that they could

> find that proof of purpose or proof of knowledge had been furnished beyond a reasonable doubt by inferences which may arise from the nature of the acts and circumstances surrounding the conduct under investigation. Such things as the place where the acts occurred, the weapon used, the location, the number and nature of the wounds inflicted, and all that was done or said by the defendant preceding, connected with and immediately succeeding the events leading to the death of the decedent are among the circumstances to be considered.
>
> The essential determination for you to make in regard to the charge of murder in this case is whether the defendant committed the killing purposely or knowingly as I've defined these terms for you.

> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

> In order for you to find the defendant guilty of murder the State must first establish beyond a reasonable doubt that the killing of the decedent was committed by the defendant and that it was done purposely or knowingly as I've defined those terms for you.

> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

> A homicide or a killing with a deadly weapon such as a .32 caliber handgun in itself would permit you to draw an inference that the defendant's purpose was to take life or to cause serious bodily injury resulting in death. A deadly weapon is defined as any firearm or other weapon, device, instrument, material or substance which, in the manner it is used or intended to be used, is known to be capable of producing death or serious bodily injury.
>
> In your deliberations you may consider the weapons used, the manner and circumstances of the killing. And if you were satisfied beyond a reasonable doubt that the defendant shot and killed the decedent with a handgun, you may draw an inference from the weapon used and from the manner and circumstances of the killing as to the defendant's purpose or knowledge.

The court also provided the jurors with an accurate and complete instruction on the defense of mental disease or defect. Defendant made no objection to those instructions.

Defendant now contends, however, that the instructions were erroneous because they failed to inform the jurors that any inference from defendant's use of a handgun was permissive, not mandatory. In addition, defendant asserts that the instruction failed to inform the jurors that the inference was rebuttable. Finally, defendant argues that those factors shifted the

burden of proof because it foreclosed the defenses of diminished capacity and voluntary intoxication by not informing jurors that for the inference to be applicable, they first must have found defendant's use of the weapon to have been purposeful and/or knowing.

As a threshold matter, the State submits that by failing to object to the instructions, defendant waived appellate review. More, significantly, the State contends that the instructions properly informed the jurors that the inference was permissible and in no way suggested that it was mandatory; that there was no need for the trial court to inform the jury specifically that the inference was rebuttable; and that the instructions did not shift the burden of proof.

We find that the instructions did not mislead the jurors. After reviewing the charge as a whole, we are confident that the jury was properly informed that the inference was not mandatory, nor did the instructions shift the burden of proof to defendant or foreclose his defenses.

▉▉ The purpose of a trial court's instruction is to "explain the law to the jury in the context of the material facts of the case." *State v. Concepcion*, 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988). An appropriate charge is essential for a fair trial. *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982). When reviewing instructions on appeal, " 'portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect.' " *Marshall* I, *supra*, 123 *N.J.* at 135, 586 *A.*2d 85 (quoting *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973)). The instructions also must be considered in light of the arguments of counsel. *Id.* 123 *N.J.* at 145, 586 *A.*2d 85.

▉ We have long accepted that "the use of a deadly weapon raises an inference that there was an intent to kill * * *." *State v. Thomas*, 76 *N.J.* 344, 357, 387 *A.*2d 1187 (1978). However, "a jury may reject such an inference." *Ibid.* Inferences are constitutionally sound so long as the jury is not

compelled to accept them and the trier of fact can rationally make the connection between the facts and the inference. *County Court v. Allen,* 442 *U.S.* 140, 157–63, 99 *S.Ct.* 2213, 2224–27, 60 *L.Ed.*2d 777 (1979). We are satisfied that both conditions are met with respect to the permissive inference that one who uses a deadly weapon may have the requisite purpose or knowledge to commit murder.

In *State v. McClain,* 248 *N.J.Super.* 409, 422, 591 *A.*2d 652 (App.Div.), *certif. denied,* 126 *N.J.* 341, 598 *A.*2d 897 (1991), the court considered an instruction similar to the one in question:

> In your deliberations, you may consider the weapon used and the manner and circumstances of the killing, and if you are satisfied beyond a reasonable doubt that the defendant shot and killed the decedent with a gun, you may draw an inference from the weapon used, that is the gun, and from the manner and circumstances of the killing, as to the defendant's purpose or knowledge.

The Appellate Division found that the instruction "was such as to convey to the jury that the inference was a permissible one \* \* \*." *Ibid.*

Like the charge in *McClain,* the disputed instructions made clear that the jurors could infer defendant's knowledge or purpose from the use of a gun but did not require that they do so. Use of the term "may" was sufficient to inform the jurors that the inference was permissive and not mandatory. That is particularly true because the accompanying instructions treated the inference like other evidence the jury should consider. The jury was told that it "may draw an inference from the weapon used and the manner and circumstances of the killing as to defendant's purpose or knowledge."

Furthermore, there is no need to inform a jury that a presumption is rebuttable if the court has already informed that jury that the presumption itself is permissive. Clearly, the jurors were aware that they were free to reject the presumption. An additional charge might have clarified in the jurors' minds that defendant could rebut the presumption, but such a clarification was unnecessary.

With respect to defendant's diminished-capacity defense, the court instructed the jurors that the State had the burden of showing beyond a reasonable doubt that defendant had not suffered from a mental disease or defect that had rendered him incapable of forming the particular state of mind that is an element of the charged offense. That instruction was certainly sufficient to confirm in the jurors' minds that they had to find that defendant had knowingly or purposely possessed the handgun before they could apply the inference.

Moreover, the jurors were instructed that they could consider "the manner and circumstances of the killing as to the defendant's purpose or knowledge." Contrary to defendant's assertions, that instruction could not be read as an obstacle to his evidence of diminished capacity. Indeed, it would have the opposite effect. In this regard, the court clearly informed the jurors of the law relating to defendant's theory of the case:

If you find the defendant, because of his mental disease or defect or disorder could not have acted purposely or knowingly or recklessly, then he is relieved of criminal responsibility because he is incapable of acting knowingly, purposely or recklessly as the law may require with respect to each material element of the offense charged as we've already gone over. And, therefore, you should then find defendant not guilty of the charges set forth in the indictment and the lesser included charges I've defined for you.

The burden of proving defendant's guilt of the offense charged here beyond a reasonable doubt, as I've said, is always on the State and that burden never shifts. You should consider all the relevant and material evidence having a bearing on the defendant's mental condition including his conduct at the time of the alleged act, his conduct since, any mental history, and any medical testimony which you've heard from witnesses who have testified for the defense and for the State, and such other evidence by the testimony of witnesses or exhibits in this case that may have a bearing upon and assist you in your determination of the issue of his mental condition.

We find that the jurors were adequately instructed on the burden of proof with respect to defendant's *mens rea*. Indeed, the court repeatedly informed the jurors that the State bore the burden of proof on each element of the crime, including mental state, and that the burden never shifted to defendant. The instructions did not permit the jurors to conclude that the burden of proof had somehow shifted to defendant. Defen-

dant's failure to object to the instructions supports our conclusion that the "disputed inference instruction" in the total context of the court's instructions was not erroneous.

IV

*Penalty Phase*

A. *Use of Inadmissible Evidence by the State During the Testimony of Diana Aviv*

■ Defendant challenges the State's evidence during the penalty-phase testimony of Diana Aviv on two grounds. First, defendant argues that the prosecutor improperly cross-examined his expert witness with inadmissible evidence. Second, defendant contends that the trial court erroneously relaxed the rules of evidence and permitted the State to introduce hearsay in rebuttal.

During the penalty-phase proceeding, defendant called to the stand Diana Aviv, a psychiatric social worker, as an expert witness. Ms. Aviv based her testimony on interviews she had conducted with defendant and Alice Martini as well as a brief conversation she had had with the couple's youngest daughter.

Prior to the commencement of Ms. Aviv's testimony, defense counsel did not establish that such interviews were the type of material reasonably relied on by experts in Ms. Aviv's field of expertise in forming opinions. Instead, her testimony, which consisted primarily of a recitation of the conversations she had had with defendant and his ex-wife, proceeded without any finding regarding its admissibility. Most of Ms. Aviv's testimony concerned the Martinis' early life and the circumstances that drove them apart. Defense counsel asked her no hypothetical questions. Her testimony, largely comprised of hearsay, prompted repeated objections from the prosecutor. The trial court overruled each objection, permitting Ms. Aviv to continue uninterrupted.

Eventually, the witness offered the following opinion of defendant:

John Martini had led, for the first approximately 50 years of his life, an average life, being in a family that was supportive and protective of his growing up, met a woman who he was attracted to and had a reasonably successful marriage for the first 25 years of their marriage, brought four children into the world who appeared to have grown up in a healthy, positive environment with the economic advantages that his income brought them, living in three houses in Bergen County, New Jersey and then moving to Arizona and living quite well over there.

He appeared to be a good father and good husband, and when approximately 50 years old appeared to reach a stage in his life in which he felt that his major responsibilities towards his family were accomplished and became attracted by a woman who was much younger than himself, 20 years old, to his 50 years. And this young woman who had been a prostitute and was a drug addict, appeared to capture his interest to the point where he felt it was necessary to take care of her. He had a desire to take care of her and it involved him in a pattern of drug abuse, and through that pattern of drug abuse he became seriously addicted to cocaine. It seriously impaired his judgment and his behavior. It destroyed his marriage. It ruined his relationships with his children to some degree and it made him paranoid and produced the kind of behavior that resulted in his killing Mr. Flax.

One of the statements relied on by Ms. Aviv in reaching her conclusion was defendant's remark that "the only person he was ever interested in outside of his wife was Therese [Afdahl], and he wasn't sure that he would describe it as a romantic involvement."

Prior to cross-examination, the prosecutor asked Ms. Aviv to review several documents that were not in evidence: a statement of Victor Picardi, defendant's January 30, 1989, statement, and an investigative report of Sergeant Leonard A. Minichino. Defendant's statement referred to Eileen Metzgroff as "[a] friend, girlfriend" of his from as early as 1977. In addition, the statement contained a different birth date for defendant from the one he related to Ms. Aviv. The report of Sergeant Minichino described a conversation he had with Eileen Metzgroff on January 27, 1989. In that conversation, Ms. Metzgroff told Sergeant Minichino that she loved defendant, had known him since 1976, and had had sexual relations with him on January 14, 1989, nine days before the kidnapping. The

report also stated that Ms. Metzgroff had claimed that defendant had wanted to marry her. In the remaining document, Picardi stated that he had seen no signs of drug use by defendant and Afdahl, and that Martini had bragged about getting Afdahl off of drugs. The prosecutor intended to ask Ms. Aviv if a review of those materials changed her opinion.

Defendant asked the court to limit the prosecutor's expected cross-examination, arguing that the documents contained extremely prejudicial remarks. However, defendant did not object on hearsay grounds.

In *State v. McDougald*, 120 *N.J.* 523, 577 *A.*2d 419 (1990), we upheld the constitutionality of *N.J.S.A.* 2C:11–3c(2)(b) (Section 3c(2)(b)), which provides:

> If the defendant produces evidence in mitigation which would not be admissible under the rules governing the admission of evidence at criminal trials, the State may rebut that evidence without regard to the rules governing the admission of evidence at criminal trials.

We held that because the defense is allowed to introduce mitigating evidence outside of the Rules of Evidence during the penalty phase to ensure that the jury imposes death only when the defendant is deserving of the punishment, the State should also be permitted to rebut that evidence under the same relaxed conditions. *Id.* at 549, 577 *A.*2d 419. To hold otherwise "could present a distorted view of defendant to the jury." *Ibid.*

The trial court, relying on our holding in *McDougald*, permitted the prosecutor to use the materials to "ask [Ms. Aviv] to take into consideration this information and to see if it would, in fact, change her opinion at all." The trial court noted that "the defendant is permitted to introduce evidence in mitigation that does not conform to the Rules of Evidence * * * [a]nd where the defense does that, the State is permitted to rebut that evidence, also without regard to the rules governing the admissibility of that evidence."

The prosecutor conducted the expected cross-examination, relying heavily on the hearsay statement of Eileen Metzgroff

contained in the Minichino report. Picardi's statement was not used.

During the penalty-phase rebuttal, Sergeant Minichino testified, over defendant's objection, about his conversation with Ms. Metzgroff. Again, the trial court relied on *McDougald* and Section 3c(2)(b).

> Anything in rebuttal, any character testimony such as statements given to Ms. Aviv by Mrs. Martini and John Martini can be rebutted in the same manner in which that evidence was received, which was irregardless [sic] of the Rules of Evidence. So, therefore, I'm going to allow this witness to testify.

Subsequently, the prosecutor offered the testimony of Aquilino Rocas, an employee at the Days Inn in Fort Lee. Rocas's testimony dealt entirely with documentary proof that Eileen Metzgroff and another person had stayed at the motel on January 14, 1989.

Defendant now contends that the use of hearsay statements by the prosecutor during the cross-examination of Ms. Aviv as well as during the State's penalty-phase rebuttal was improper. According to defendant, Ms. Aviv's testimony was based on materials reasonably relied on by experts in her field as permitted by *Evidence Rule* 56(2). Thus, defendant argues that the expert's direct examination was conducted within the parameters of the rules, thereby negating the State's right to disregard those rules during cross-examination and rebuttal. Defendant asserts that because the rules were not relaxed, the prosecutor should have been required to get the material admitted into evidence or should have been required to establish that they were the type of evidence relied on by psychiatric social workers.

We find defendant's arguments to be unpersuasive. The trial court clearly relaxed the Rules of Evidence during Ms. Aviv's direct testimony. Although the witness was properly qualified as an expert pursuant to *Evidence Rule* 19, the court did not undertake an analysis of the material on which Ms. Aviv relied in reaching her opinion.

*Rule* 56(2) permits experts to rely on otherwise-inadmissible evidence if such material is of the type reasonably relied on by experts in that field. However, as we stated in *Ryan v. KDI Sylvan Pools, Inc.*, 121 *N.J.* 276, 289, 579 *A.*2d 1241 (1990), the trial court is required to make an inquiry into and a finding regarding whether experts in the given field reasonably rely on that information in reaching conclusions of the type offered by the witness. The trial court did not make such a finding, the defense counsel did not request such a finding, nor did the State object to the lack of such a finding. Clearly, the court and both counsel recognized that Aviv's testimony was admitted outside of the Rules of Evidence.

Additionally, the court allowed Ms. Aviv to give an expert opinion based completely on hearsay. *Rule* 56(2) "permit[s] an expert opinion to be corroborated, confirmed or bolstered by hearsay, but not to rest exclusively or primarily upon it." *Dietzeman v. Peterson*, 196 *N.J.Super.* 96, 101, 481 *A.*2d 596 (Law Div.1984). Ms. Aviv's opinion rested primarily, if not exclusively, on hearsay statements and was permitted without interference from the court. The only reasonable conclusion one can draw from the court's inaction is that the Rules of Evidence had been suspended in order to give the defendant additional latitude for the production of mitigating evidence.

The cross-examination in question here differs materially from that which we found to be improper in *State v. Rose, supra*, 112 *N.J.* at 500, 548 *A.*2d 1058. In *Rose*, the prosecutor cross-examined the defendant's penalty-phase expert with materials which were "unrelated to [the expert's] opinion." In addition, there was no indication in that case that the trial court had relaxed the rules of evidence during the expert's direct examination. Similar circumstances led to our holding in *State v. Pennington, supra*, 119 *N.J.* at 578, 575 *A.*2d 816. The prosecutor's cross-examination of Ms. Aviv related directly to her opinion that defendant had had a "successful" marriage and was a "good husband" prior to his introduction to Afdahl. The prosecutor's rebuttal evidence squarely attacked the ex-

pert's reliance on defendant's assertion that Afdahl was the only woman, apart from Mrs. Martini, with whom he had been romantically involved.

In *Rose, supra,* 112 *N.J.* at 500, 548 *A.2d* 1058, we found that any error that may have occurred in permitting the improper cross-examination was not clearly capable of producing an unjust result. We likewise find here that even if the disputed evidence was improperly admitted, any consequent error was harmless given Martini's admitted long-term adulterous relationship with Afdahl, his long-term drug abuse, and his admission of the kidnapping and murder of Flax. "[I]t does not seem even remotely possible that the proposed testimony would show [defendant's] character in any worse light than had already been directly demonstrated." *State v. Coruzzi,* 189 *N.J.Super.* 273, 306, 460 *A.2d* 120 (App.Div.), *certif. denied,* 94 *N.J.* 531, 468 *A.2d* 185 (1983).

B. *The Adequacy of Evidence in Support of Aggravating Factor c(4)(f)*

Defendant argues that there was insufficient evidence to support the jury's finding that aggravating factor c(4)(f) existed. Thus, defendant asserts that the trial court erred in submitting that factor to the jury and that the jury's ultimate conclusion regarding the factor was insupportable. We disagree with both arguments.

Prior to the commencement of trial, defendant made a motion to strike the aggravating factors that the State had submitted. The trial court conditionally denied defendant's motion with regard to factor c(4)(f), that the murder had been committed for the purpose of escaping detection, trial, punishment, or confinement for another offense committed by the defendant. Expressly left open by the court was the possibility that the motion could be renewed if defendant's confession was found to be inadmissible.

> Well, there would be one important piece of evidence that the Court would not have or be able to consider in deciding this motion, and that piece of evidence would be the confession. If the Court were to suppress that, there would be something lacking, I would believe, because if I recall, the statement was as they stopped the vehicle at the Garden State Plaza parking lot, Mr. Martini heard Mr. Flax's door open and he shot him three times. The inference there is that he believed Mr. Flax was going to escape from his custody and, as a result, if Mr. Flax did, in fact, escape, Mr. Martini would then be detected, apprehended, charged with Mr. Flax's kidnapping, as to the first aggravating factor.

When the trial court decided to admit defendant's confession, that decision inevitably led to a reaffirmation of the denial of the motion to strike factor c(4)(f).

> We have from his own words why he killed Mr. Flax. 'I thought he was going to run away.' If we take that, add it to the fact that Irving Flax knew him, Mr. Martini told Mrs. Flax he knew him, Mrs. Flax didn't know him, was he going to release Mr. Flax, the person who could say it was John Martini. Didn't he say to her a number of times I'm wanted for murder, I have to get out of here, it's my life? What were his intentions? As he pulled away from the Forum Diner, he believed that the police might be in the area. He went into the Bronx to try to lose them if they were following him. He didn't want to be caught. I believe there's sufficient evidence to justify the first aggravating factor and the motion to strike that it be stricken [sic].

Defendant's renewed his motion prior to the commencement of the penalty phase proceeding. Again, the court denied the motion.

> I'd like to address just momentarily the statements by John Martini. There, in my opinion, is corroborating evidence concerning that in many aspects. Even if there were not the jury would be instructed that they have to be satisfied beyond a reasonable doubt of the trustworthiness of the statements in order to utilize those to support any aggravating factors * * *. [T]here's sufficient evidence for the jury to consider that the murder of Irving Flax was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for the crime of kidnapping * * *.

Defendant argues that the trial court should not have submitted aggravating factor c(4)(f) to the jury because the State had offered insufficient proof of its existence. He urges us to adopt standards that would strictly limit the murders to which factor c(4)(f) would apply and erect significant obstacles in the State's path towards proving that factor. After careful consideration of the purpose of the "escaping detection" factor, we conclude that the trial court was correct in submitting it to the jury. In addition, the record reveals that the State produced

ample evidence on which a reasonable jury could conclude that the factor existed.

The key to finding factor c(4)(f) is that the defendant intended to eliminate a potential witness to his crimes. *State v. Hightower, supra,* 120 *N.J.* at 421, 577 *A.*2d 99. In *Hightower,* we rejected a challenge to factor c(4)(f) premised on the grounds that it should apply only to crimes committed prior to the murder and not to those committed contemporaneously with the murder. *Id.* at 420–23, 577 *A.*2d 99. The defendant in *Hightower* argued that without such a limitation, factor c(4)(f) would duplicate aggravating factor c(4)(g), that the murder was committed during a felony, in every murder involving a robbery, sexual assault, arson, burglary, or kidnapping. *Id.* at 420, 577 *A.*2d 99. Although rejecting that argument, we did recognize that the concern raised by the defendant was realistic.

[O]ur refusal to construe c(4)(f) narrowly as requested by defendant does not mean that in all felony murders that circumstance will duplicate c(4)(g). The requisite intent of c(4)(f) of avoiding detection is not involved in c(4)(g). Thus 'the mere fact of a death is not enough to invoke this factor.' The State must present evidence 'from which the jury can infer that at least one of the purposes motivating the killing was defendant's desire to avoid subsequent detection and apprehension for his crime.'

[*Id.* at 422, 577 *A.*2d 99 (quoting *Riley v. Florida,* 366 *So.*2d 19, 22 (Fla.1978), *North Carolina v. Goodman,* 298 *N.C.* 1, 257 *S.E.*2d 569, 586 (1979)).]

We have long held that the same evidence can support more than one aggravating factor. *See Rose, supra,* 112 *N.J.* at 526–27, 548 *A.*2d 1058. However, "[i]f the trial court does charge on c(4)(f) and c(4)(g) it must follow the guidelines set forth in *Bey* [II] and warn the jury not to double-count the evidence." *Hightower, supra,* 120 *N.J.* at 422, 577 *A.*2d 99 (citing *Bey* II, *supra,* 112 *N.J.* at 176, 548 *A.*2d 887). Such precautions guard against the automatic application of factor c(4)(f) to every killing that takes place in the course of a felony.

Despite the language to the contrary in *Hightower,* defendant contends that in order for factor c(4)(f) to be submitted to the jury, the State should be required to show clearly that the

dominant or only motive for the murder was the elimination of a witness. The State, on the other hand, urges reaffirmation of the holding in *Hightower*, that the factor may be found to exist where at least one of the motives for the killing was to avoid apprehension.

We see no reason to depart from *Hightower*. Had the Legislature intended the factor to be applied in such a circumscribed manner, it could easily have made its intentions clear in the statute. Nothing in the language of the factor indicates that it was meant to apply only to those murders undertaken solely for the purpose of eliminating a witness.

Defendant also requests that we require the production of direct evidence of a defendant's intention to avoid apprehension in order to support the factor. The State, although acknowledging that direct evidence would be useful in that regard, argues that its absence should not be considered fatal. We agree with the State.

Direct evidence of a defendant's intention to eliminate a potential witness would seldom be available to prosecutors. We permit the use of circumstantial evidence to establish motive in other contexts in our criminal law. As we stated in *State v. Rogers*, 19 *N.J.* 218, 228, 116 *A.*2d 37 (1955):

> In criminal prosecutions, whenever the motive or the intent of the accused is important and material, a somewhat wider range of evidence is permitted in showing such motive or intent than is allowed in the support of other issues * * *. Otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist. Such intent or motive may be proved either by direct or circumstantial evidence. All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him although they may have occurred previous to the commission of the offense.

We reaffirmed the holding in *Rogers* with our decision in *State v. Carter*, 91 *N.J.* 86, 103, 449 *A.*2d 1280 (1982), noting that its dictates were the majority rule throughout the country.

In sum, we hold that aggravating factor c(4)(f) may be submitted to the jury when the State has produced sufficient

evidence on which a jury can reasonably conclude that at least one of the motives of the defendant in killing his or her victim was to eliminate a witness or avoid subsequent apprehension and prosecution for criminal acts. Such evidence may be either direct or circumstantial. That holding is consistent with our treatment of other aggravating factors. *See State v. McDougald,* 120 *N.J.* 523, 566–67, 577 *A.2d* 419 (1990) (holding that sufficient evidence is needed for a rational jury to find the existence of factor c(4)(c)).

We now apply that standard to the evidence produced in support of factor c(4)(f). We find that the trial court correctly decided that the State had produced sufficient evidence on which the jury could conclude that at least one of the motives for defendant's murder of Irving Flax was to escape detection and apprehension for the kidnapping.

The State outlines six facts supported by evidence in the record that bolster a finding that factor c(4)(f) existed: (1) defendant had been acquainted with Flax prior to the kidnapping; (2) defendant made several telephone calls to Mrs. Flax in which he told her he was wanted for murder elsewhere and that he intended to flee; (3) the victim was in the company of defendant for an extended period of time during which defendant did not disguise his identity; (4) defendant eluded police after retrieving the ransom money; (5) defendant forced Flax to drive to a remote area of the parking lot prior to killing him; and (6) defendant killed his victim because he believed that he was trying to escape. Defendant contests the appropriateness of each factor.

We find most persuasive the fact that the victim had been acquainted with defendant and was in his presence for an extended period of time during which defendant's identity was not disguised. Defendant argues that acceptance of that evidence as support for factor c(4)(f) would qualify every defendant whose crime extended over a long duration for the death sentence. That assertion is plainly incorrect. The duration of

the kidnapping does not in and of itself justify a finding that the factor existed. Instead, the victim's past knowledge of defendant and defendant's failure to disguise himself coupled with the significant opportunity available to the victim to observe defendant and confirm his identity support the factor.

Finally, we note that defendant did not have to kill Flax in order to complete the kidnapping. He had already recovered the ransom money and successfully eluded police at the time that the murder took place. Indeed, no apparent purpose was served by Flax's murder except for defendant's escape from detection.

The steps that defendant took to avoid apprehension, including his eluding police after picking up the ransom money, also shed light on his motive for the murder. True, as defendant argues, everyone who commits a felony seeks to avoid detection. Standing alone, those circumstances may not support application of the factor. However, when a jury views those circumstances along with the victim's familiarity with defendant, it could reasonably infer that the defendant firmly intended to escape and that the elimination of Flax was essential to the fulfillment of that objective.

Finally, we consider defendant's statement, contained in his confession, that he shot Flax because he believed that his victim was about to escape from defendant's control. Defendant argues that the State set out to disprove that fact and emphasized that the medical examiner's report concluded that the killing could not have occurred under those circumstances. We agree. In fact, neither party sought to prove that defendant's statement was accurate. The defense asserted that defendant, under cocaine-induced intoxication, must have hallucinated Flax's impending flight. Thus, defendant's statement did not support the jury's conclusion that defendant had killed Flax in order to escape detection.

However, even without defendant's statement, the judge had more than sufficient evidence to submit the factor to the jury

and its conclusion that the factor existed was supported by sufficient evidence.

C. *Jury Charge Regarding Aggravating Factor c(4)(f)*

 Defendant argues that the trial court's instructions concerning aggravating factor c(4)(f) were so confusing and incomplete as to warrant reversal of his sentence. He asserts that the instructions contained two errors: (1) that the court incorrectly informed the jury that flight was an element of the factor, and (2) that the court failed adequately to admonish the jury not to double-count the evidence when it was considering the alleged aggravating factors.

 The court first instructed the jury that the State could not establish aggravating factors merely by showing that the murder had been committed knowingly and purposely. The jurors were also told that they had to determine whether the alleged aggravating factors existed independent of the other crimes for which defendant had been convicted. The court then charged the jury on the elements of factor c(4)(f) as follows:

Aggravating factor [c(4)(f)], to find this aggravating factor you must be satisfied that the defendant, John Martini, Sr., while he was committing the murder, had in mind a purpose to avoid detection, arrest, trial or punishment, either for himself or for some other person with regard to either a prior crime or a contemporaneous crime committed before the murder, and that he was committing the murder to accomplish or to help in accomplishing that goal.

The court correctly told the jurors that

[a]ny evidence of actions taken by the defendant to conceal the murder itself cannot be used to prove this aggravating factor.

However, the instructions then included the following passage concerning flight:

Flight is one of the elements of aggravating factor [c(4)(f)] that I've gone over. Flight is the evading of the course of justice by voluntarily withdrawing one's self in order to avoid arrest or detection or the institution or the continuance of criminal proceedings regardless of whether one flees the jurisdiction.

Defendant correctly argues that instructing the jury that flight "is one of the elements" of factor c(4)(f) was incorrect. We stated in *Hightower, supra,* that post-murder events are not

relevant to the "escaping detection" aggravating factor. 120 *N.J.* at 422–23, 577 *A.*2d 99. Flight is simply not relevant to a defendant's intent to kill in order to escape detection. The State concedes that much.

However, the State also contends that the error was apparently inadvertent and "mere surplusage" that did not fatally infect the court's otherwise correct and adequate instructions. Defendant disagrees that the court's overall instructions cured the defect. According to defendant, the jury was presented with inherently contradictory instructions on the nature of the factor. He argues that we cannot accurately guess which of the two sets of contradictory instructions the jury followed. From defendant's point of view, the instruction did not create an additional element for the State to prove, but planted in the jurors' minds the idea that they could infer defendant's desire to escape detection from his post-murder flight. The State, however, contends that the mistake inured to defendant's benefit as it required the State to prove an unnecessary additional element. We reject that contention.

" '[A]ppropriate and proper charges to a jury are essential for a fair trial.' " *State v. Collier, supra,* 90 *N.J.* at 122, 447 *A.*2d 168 (1982) (quoting *State v. Green,* 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981)). As we previously stated, " 'portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect.' " *Marshall* I, *supra,* 123 *N.J.* at 135, 586 *A.*2d 85 (quoting *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973)). When the jury instructions in this case are considered as a whole, they clearly were adequate and not likely to confuse the jury.

Apart from the challenged passage, the trial court's instructions accurately explained aggravating factor c(4)(f). Flight was probably inadvertently attributed to factor c(4)(f) instead of factor c(4)(g), the other aggravating factor charged, which includes murders committed during the flight from a kidnap-

ping. The court did not dwell on the subject nor instruct the jury to consider post-murder acts in general. The jury was not presented with two sets of contradictory instructions.

We reach a similar conclusion with respect to the court's instructions regarding the prohibition against the double-counting of evidence. The court's final instruction concerning the weighing of aggravating and mitigating factors was as follows:

The weighing process, the balancing of aggravating and mitigating factors is not mechanical nor numerical in nature. You do not count factors. You consider them qualitatively. The answer depends on your exercise of careful and considered judgment.

One aggravating factor may be found to outweigh beyond a reasonable doubt numerous mitigating factors. However, any aggravating factors may be found not to outweigh a single mitigating factor.

Now, when as we have here the prosecutor is using the same evidence or some of the same evidence in seeking to prove multiple aggravating factors, if you find that such multiple aggravating factors have been proved by the same evidence, it's particularly important to remember that you may not simply compare the number of aggravating factors against the number of mitigating factors. You must weigh those factors. As I said, it's a weighing process.

■■■ We have consistently held that the same evidence may be used to prove more than one aggravating factor. As we explained in *Bey* II, *supra*, 112 *N.J.* at 176, 548 *A*.2d 887, the State may use

the same evidence in seeking to prove multiple aggravating factors, provided the trial court advises the jury that it should not simply compare the number of aggravating factors against the number of mitigating factors, that it is considering the same facts more than once, and that it should be cognizant that the same facts are being used to prove more than one aggravating factor.

If such a method is employed by the State, the jury must be told that it may not "assign inordinate weight to the facts that support multiple factors." *Rose, supra,* 112 *N.J.* at 527, 548 *A*.2d 1058. Thus, jurors should be informed of two obligations: (1) that the weighing process of aggravating and mitigating factors must be qualitative rather than quantitative; and (2) that they should not give inordinate weight to evidence that supports more than one factor. Defendant argues that the instructions in this case failed to inform the jurors of the latter duty.

The Judges Bench Manual for Capital Cases includes a charge that accurately reflects both jury obligations. The trial court followed those instructions but omitted the following passage: "it is particularly important to remember * * * that in such an instance you are considering the same facts more than once, that the same facts are being used to prove more than one aggravating factor." *See Judges Bench Manual for Capital Cases*, App. J(1)–22. Defendant argues that without that sentence, the instructions permitted the jury to double-count the evidence. We disagree.

Although the model charges are extremely helpful, they do not represent the only method for correctly informing a jury. So long as the court properly informs the jury of its obligations, the instructions will be found to be adequate. There is no other way in which a reasonable juror could have interpreted the instructions in this case than that he or she would be relying on some of the same facts to prove each of the two aggravating factors. The court told the jurors that the State intended to use the same evidence or some of the same evidence to prove more than one aggravating factor. Immediately following that remark the court informed the jury that its weighing process was to be a qualitative rather than quantitative one. We find that the instructions adequately informed the jurors of their role.

In addition, this case presents less of a danger that "one practical fact, instead of overlapping inter-related facts was doing double duty." *See State v. McDougald, supra,* 120 *N.J.* at 569, 577 *A.*2d 419. The overall effect of the instructions in this case was to inform the jury that the same evidence could support more than one factor and that it should not be double-counted during the weighing process.

In *Rose, supra,* the State sought to prove both factor c(4)(f) and factor c(4)(h), that the defendant murdered a public servant engaged in his official duties. The proof for the two factors was the same: that the defendant had killed a police officer in

order to escape apprehension for illegal possession of a gun. 112 *N.J.* at 524–27, 548 *A.*2d 1058. *Ibid.* Similarly in *Bey* II, *supra,* the State sought to establish both factor c(4)(g), that the murder had been committed during a felony, and factor c(4)(c), that the murder had included aggravated assault, torture, or depravity of mind. 112 *N.J.* at 174, 548 *A.*2d 887. Both factors focused solely on the defendant's particularly-brutal sexual assault of his victim prior to her murder.

Unlike the evidence in *Rose* and *Bey* II, the evidence proving the existence of the two factors was not identical. The trial court's instructions properly informed the jurors that the evidence they would consider with respect to aggravating factor c(4)(g) was different from and substantially more extensive than the evidence they would consider with respect to aggravating factor c(4)(f). The two factors do not rest on the same conduct. The felony-murder factor required proof of all of the elements of a kidnapping for ransom. Factor c(4)(f) was supported by the circumstantial evidence from which the jurors could infer defendant's motive for killing Mr. Flax, including the victim's knowledge of defendant's identity and his long exposure to him during the crime. The mere fact of the kidnapping was insufficient in itself to prove the existence of factor c(4)(f) and functionally served only as a triggering mechanism permitting the jury to consider that factor.

We conclude that the trial court's instructions with respect to factor c(4)(f) did not constitute reversible error.

D. *The Trial Court's Refusal to Charge Mitigating Factor c(5)(g)*

Defense counsel sought to introduce mitigating factor c(5)(g), namely, that defendant had rendered substantial assistance to the State in the prosecution of another person for the crime of murder. Defense counsel's theory was that at the meeting between defendant and Afdahl on the evening of their arrest defendant had induced Afdahl to confess, thereby aiding

the State in its prosecution of Afdahl. The State opposed defendant's application, asserting that defendant had not rendered substantial assistance to the State.

> The trial court rejected defense counsel's request. It stated:
>
> Substantial assistance means considerable assistance, assistance which played a fairly large or important role in the arrest or prosecution of the other person [*Judge's Bench Manual For Capital Cases*, Appendix J(1)–18]. And that has not happened here.
>
> Mr. Martini's short two to three minute discussion or statement to Therese Afdahl at approximately one a.m. on January 26, might have led Therese to then voluntarily give a statement as to her involvement in this, but certainly that in and of itself is not substantial assistance....
>
> Defense may be able to utilize that testimony on the catch-all mitigating factor and argue that, but as a separate mitigating factor I'm going to sustain the objection of the prosecutor.
>
> *However, if other evidence comes in that changes my mind on that, of course then we can always deal with that.*

[Emphasis added.]

Although not precluded from offering any further evidence on the subject, defense counsel did not do so. Although in his penalty phase summation defense counsel did mention the extent of defendant's cooperation with law enforcement, he made no mention of Martini's assistance with respect to the prosecution of Afdahl.

Defendant alleges that the trial court violated defendant's rights in not specifically instructing the jury on c(5)(g). The State argues that there was insufficient evidence to submit that factor to the jury, and even if it was error, it was harmless, because the jury could consider the evidence under catch-all mitigating factor c(5)(h).

Significantly, this is not a case like *Eddings v. Oklahoma*, 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982), in which the trial court prevented the defense counsel from presenting evidence of a mitigating factor. Here, the trial court did not prevent defense counsel from submitting any evidence on factor c(5)(g). The trial court allowed, indeed invited, defendant to present additional evidence. Rather, the trial court refused to

charge c(5)(g) specifically because it believed that there was insufficient evidence to submit that factor to the jury. We agree that there was insufficient reliable evidence of factor c(5)(g) to submit it to the jury; but even if there had been sufficient evidence, the failure to submit the factor was harmless error.

Defendant contends that Martini's "substantial assistance" occurred at the meeting he and Afdahl had on the evening of his arrest. That meeting was the focus of defendant's argument that his confessions were inadmissible. See *supra* at 233–234, 619 *A*.2d at 1234–1236. That when the trial court made its ruling and when the penalty-phase jury received the case the *only* evidence before the jury on this issue was Officer Trahey's testimony at the guilt phase of trial is undisputed:

A At that time [Martini] indicated that he would be more than willing to cooperate and talk with us and lay out his entire involvement in the case, but that he first wanted an opportunity to speak to Therese Afdahl. It was agreed to afford him that opportunity, and he did speak with Therese.

Q Before you gave him that opportunity, did he tell you what he wanted to say to Therese Afdahl?

A Only that he was going to cooperate with us and that he was going to tell us what had happened and that he wanted her to be aware of that fact.

Q Where was Therese Afdahl at this time?

A Therese was in what was Captain Denning's office at that time, which was about ten feet down the hall.

Q Did you give him that opportunity to speak to her?

A Yes, I did.

Q Was that done in your presence?

A Yes, it was.

Q About how long did that conversation last?

A At best two to three minutes.

Q And did it consist of what John Martini told you it would consist of?

A Yes.

At the pretrial hearing on defendant's motion to suppress his confessions, however, there was additional testimony concerning what had occurred at the January 26th meeting between defendant and Afdahl and at a subsequent meeting between them on January 30th.

With respect to the January 26th meeting, the testimony was as follows. At various times throughout the pretrial hearing, Officer Trahey testified as below:

A John Martini, actually we allowed John Martini to tell her that he was going to cooperate with us and that she—he wanted her to know that he was going to cooperate with us, and that's what he was allowed to tell her, that, "Therese, I'm now going to cooperate with them and I'm going to tell them what happened."

Q What did Therese say in response if anything?

A I don't recall what she said. I don't know that she said anything because we told John that we weren't going to allow him to engage in conversation, that we would only allow him to tell her specifically that he was going to cooperate with us, and then we told him we were going to remove him from the room and go back to the conference room.

*　　*　　*　　*　　*　　*　　*　　*

A John had had the opportunity to tell Therese that he was going to cooperate with us and at that point we sat down and we started to get into the questioning of, you, about himself and what had happened.

Officer Petersen also testified about the meeting between defendant and Afdahl:

A. Well, he had told us at one point in time that he'd be willing to cooperate and tell us exactly what had happened in this matter. He said but, first, he would like to consult with Therese Afdahl because he wanted to alert her to tell the whole truth as well and, basically, that's what he had provided to us.

Q. So did you discuss—you or Investigator Trahey in your presence discuss with Mr. Martini what he was going to say to Ms. Afdahl when they met?

A. Well, basically he told us what he wanted to tell her, is that he wanted to tell her to just tell the truth of exactly what had happened and he would be doing the same to us.

*　　*　　*　　*　　*　　*　　*　　*

A. * * * What Mr. Martini said to us basically was that, you know, he wanted to talk to Ms. Afdahl to tell her to—you know, to tell the truth as to what had happened.

However, Officer Petersen was not present during the conversation between Martini and Afdahl.

Officer Carlino, the policeman involved in questioning Afdahl and not Martini, testified that Afdahl had signed the consents to search the apartment and the rooms at Days Inn prior to speaking to Martini, that she had requested to speak to Martini,

and that he brought her to the January 26th meeting but was not present during the meeting. In his report, he stated that when Afdahl returned from her meeting with Martini,

[w]e then asked Ms. Afdahl if she was willing to cooperate with us at this time and tell us the truthful facts concerning her and Martini's participation in Irving Flax's murder. At this time, Ms. Afdahl was crying and said that she was willing to cooperate with us and she said that she could now tell us the truth regarding Mr. Flax's murder, because Martini had told her to cooperate with the police.

With respect to the January 30th meeting, there was pretrial testimony by FBI Officer Hoyt Peavy and Officer Carlino, and the State submitted a report by Officer Trahey. They all testified that at the later meeting defendant had urged Afdahl to tell the police that she, rather than defendant, had shot Flax.

Agent Peavy testified as follows:

Q. Was there a meeting where—do you recall Mr. Martini indicating to you that he had been lying about when said that he had shot Flax and that it was really Ms. Afdahl that had done it?

A. Yes.

Q. And when was that that he told you that?

A. I don't recall which day that was. It was late in the week though, I believe.

Officer Carlino also testified about such a meeting at the pretrial hearing:

A She said that she had shot and killed Irving Flax.

Q And what was your response?

A Our response was I didn't feel as though she was being truthful.

Q What did she do at that point?

A She ultimately began crying again, and I asked her if she could truthfully tell me that she shot Irving Flax, and she said no.

Q And did she further tell you that Martini told her to say that she killed Irving Flax?

A Yes, she did.

Q Did she further tell you that John Martini told her that if she said that she shot Irving Flax, that the two of them could go off together in some sort of federal program and live together in a little cottage?

A That's correct.

Q So is it fair to say that as a result of what John Martini told her, Ms. Afdahl confessed to a shooting that she actually did not commit?

\* \* \* \* \* \* \* \*

Q Did she also tell you Martini promised her, "We'll get married while we're in prison and remain together throughout our sentence"?

A Yes, she did.

Q And that Martini said, "We'll live in a little cottage which will be furnished by the Witness Protection Program"?

MS. ZDOBINSKI: Objection, your Honor. It's been asked and answered. We've been over this.

THE COURT: I'll allow it in the context.

A That's correct.

Q Did she also tell you that this could only happen according to Martini if she told the police that he did not kill Irving Flax?

A Yes.

Details of the January 30th meeting also were contained in a report prepared by Officer Trahey:

John Martini, Sr. requested that we give him an opportunity to speak to Therese Afdahl so that he could convince her to tell the truth about the shooting of Irving Flax. I went to the room where Therese Afdahl was being interviewed by Sr. Inv. Michael Carlino and asked her if she would be willing to speak to John Martini, Sr. She agreed to speak to him, at which time I escorted her to conference room two, where Martini was being questioned. In my presence Martini told Therese Afdahl that he still loved her and that they could still get married while they were in jail. He told Afdahl that it was important that she now tell the police the truth that she was the one who actually shot Irving Flax. He suggested that if she did confess they would be able to get married in jail and do their prison time together under the witness protection program. Afdahl told Martini that if it meant they could be together in prison, she knew what she had to do. At this point I told Martini that I would not allow him to try and influence Therese Afdahl by making promises to her, which were never discussed at any time by our office. I then escorted Therese Afdahl back to the room she was being interviewed in, along with Sr. Inv. Michael Carlino.

Officer Trahey's report was not entered into evidence either at the pretrial hearings or during the trial. Defendant requested the court's ruling on the c(5)(g) instruction at the beginning of the penalty phase. The court should have withheld its ruling until the end of the penalty phase when all the evidence was before the jury and just prior to the time when the court actually charged the jury with respect to the mitigating factors. In this case, however, the failure to have done so made little difference. Defendant was given the unlimited right to introduce evidence on factor c(5)(g). The trial court specifically

stated that "if other evidence comes in that changes my mind, on that, of course, then we can always deal with that." The trial court also suggested to defense counsel that evidence of that mitigating factor could be used in the catch-all factor.

Defendant, however, chose neither course. Indeed, he presented no other evidence before the jury. At the end of the penalty phase, the jury still had before it as evidence of Martini's substantial assistance to the State only Officer Trahey's testimony that defendant had told Afdahl "[o]nly that he was going to cooperate with us and that he was going to tell us what happened and that he wanted her to be aware of that fact."

A defendant has the burden to produce evidence of the existence of any mitigating factor. *N.J.S.A.* 2C:11–3c(2)(a). Although the statute does not specify the quantum of evidence needed to justify jury consideration of a mitigating factor, *N.J.S.A.* 2C:11–3c(2)(b) provides that defendant "may offer evidence relevant to any of the mitigating factors."

Defendant is entitled to "the use of all reliable, helpful information." *State v. Davis*, 96 *N.J.* 611, 619–20, 477 *A.*2d 308 (1984). In *Biegenwald IV, supra,* 126 *N.J.* at 47, 594 *A.*2d 172, we concluded that a factor could be established "by some reliable evidence." Some of the pretrial testimony was such reliable evidence. However, defendant chose not to produce that evidence at trial. In view of Trahey's report and the testimony of Agent Peavy and Officer Carlino about the January 30th meeting, defense counsel's failure to do so is understandable. That meeting discloses that instead of substantially assisting the State, defendant was actively attempting to obscure the facts and to frustrate the State's case. Disclosure of the pretrial testimony of the January 26th meeting or comment on it in the penalty phase would have allowed the State to offer in rebuttal the testimony of Agent Peavy and Officer Carlino, and Officer Trahey's report. More damaging testimony to

defendant's character than his attempt to have Afdahl confess to the murder is hard to imagine.

We reject the dissent's contention that the trial court's clear invitation to defendant to present additional evidence to the jury supporting factor c(5)(g) "was in effect an exclusionary ruling." *Post* at 342, 619 *A*.2d at 1295. The following facts remain undisputed: (1) the only evidence before the jury of defendant's alleged substantial assistance to law enforcement was Officer Trahey's testimony that defendant had told Afdahl that he was going to cooperate with the police; (2) the trial court informed defense counsel that he could submit any other evidence on factor c(5)(g) and that the court on the basis of such testimony would be willing to reconsider its denial of defendant's requested c(5)(g) instruction; (3) the trial court told defendant that he could use the evidence in support of c(5)(h), the catch-all mitigating factor; and (4) most significantly, defense counsel did not introduce any other c(5)(g) evidence before the jury.

These are the facts and no tortured analysis of the record by the dissent can change them. There is simply no support for the dissent's allegation that defense counsel did not introduce the evidence because the court had already decided such evidence to be insufficient and inadmissible. *Post* at 349, 619 *A*.2d at 1298. Such a conclusion is unfounded.

Defense counsel had every right to produce all of the pretrial evidence *before the jury*. Such evidence could clearly have been used by counsel not only to request the trial court to reconsider its ruling but equally importantly to influence *the jury* in its consideration of the catch-all factor, c(5)(h).

However, defense counsel did not present the jury with that pretrial testimony and did not even comment in his closing statement on defendant's alleged assistance in securing Afdahl's cooperation. Defense counsel was faced with a realistic and practical problem. Although he was given the unlimited right to introduce *before the jury* all of the pretrial evidence, he

wisely realized that to do so would allow the State to introduce in rebuttal the extraordinarily damaging evidence of FBI Agent Hoyt Peavy, Officer Carline and Officer Trahey that Martini on January 30th had urged Afdahl to tell the State that she, and not he, had killed Flax. This evidence is virtually ignored by the dissent. *Post* at 349, 619 *A*.2d at 1298. Thus, a realistic reading of the record discloses that defense counsel did not introduce to the jury any other evidence, including the evidence produced at the pretrial proceedings, because of the serious damage such testimony could have on the defendant's chance to escape the death penalty and not because he was prohibited by the court from doing so.

In any event, the only evidence before the court of Martini's substantial assistance to the State with respect to Afdahl was Officer Trahey's statement. We do not think that that satisfies the threshold requirement. We find unpersuasive the dissent's analysis of three contract-murder cases to support its conclusion that a c(5)(g) instruction should have been given. Two of these cases, *State v. Miguel Melendez* and *State v. Michael Rose*, A–4874–84TA (Feb. 16, 1989), are unreported and were chosen by the dissent from the Baldus Report's *Detailed Narrative Summaries of Death Eligible Cases*. An examination of these cases reveals that the evidence of cooperation of the respective defendants in each of the three contract-murder cases is substantially greater than the evidence of Martini's cooperation.

In *State v. Melendez*, the assistance rendered was greater than that alleged by the dissent. Although the dissent asserts in its Appendix, *post* at 371, 619 *A*.2d at 1310 that "the only assistance Melendez rendered was to break down under questioning," the trial transcript states that Melendez made a statement to law-enforcement officers that led to the arrest and indictment of a co-defendant, and he took the police to the co-defendant's home. *State v. Melendez, transcripts microformed* at State Law Library, Box 5150, Reel 7335. As a result of that assistance, the co-defendant pleaded guilty to a criminal

offense. *Ibid.* Clearly, the degree of assistance afforded to the State by Melendez greatly exceeds the assistance to the State derived from Martini's brief conversation with Afdahl.

Likewise, the defendant in *State v. Michael Rose,* who identified for police the person who had hired him to kill and testified about that person at trial rendered substantially greater cooperation to the State than did Martini. Moreover, even from the narrative summary set forth in the Baldus Report, it is evident that defendant Rose was a far different person than defendant Martini:

> There was substantial testimony from friends and family that D was "helpful", "quiet", "easy-going", "always there for me". He had been a church goer and in the Choir. It appears that he went downhill after meeting Zoran Cveticanin. Tests done after his arrest indicate that D has an I.Q. of 68 and is mildly retarded although defense witnesses testified that it was not apparent to them. D had no prior record.
>
> [Baldus Report, *Detailed Narrative Summaries of Death Eligible Cases* § B, at 268 (1991).]

In *State v. DiFrisco,* 118 *N.J.* 253, 571 *A.*2d 914 (1990), without defendant's identifying Franciotti as the person who had hired him to kill, the police would have had absolutely no clue to Franciotti's identity. Moreover, as found by the trial court, DiFrisco gave substantial assistance to the police:

> On the day of his arrest, Anthony DiFrisco, the defendant, informed both New York Detective Kukk and Detective Sergeant Saunders of Maplewood in detail concerning his role and that of Franciotti in the death of Potcher. He described Franciotti. He provided his address. He related when and where he had been paid as well as how Franciotti had transported him to and from the scene of the crime. And the State does have in its possession at least circumstantial evidence to corroborate that Franciotti and the defendant were well known to each other.
>
> Apparently, upon the retention of and prior to speaking to private counsel the defendant, upon the advice of his father, ceased his cooperation until such time, he stated, as he should have had an opportunity to speak to counsel or to the counsel that his father had retained to represent him. Since that time the State had not requested nor has the defendant further offered any further cooperation. The State's witnesses, Detective Kukk and Detective Saunders and Investigator Kennedy all offered the opinion that the defendant's confession was a truthful one. It is noteworthy that until the defendant voluntarily related his participation and that of Mr. Franciotti in the crime, that no one had the slightest idea or even a scintilla of evidence of any culpability on their part.

[118 *N.J.* at 261, 571 *A.*2d 914.]

Even considering all the pretrial evidence of Martini's cooperation with the State, the assistance defendants in *Melendez*, *Rose* and *DiFrisco* rendered to the State, which those courts found sufficient to meet the threshold requirement of presenting mitigating factor c(5)(g) to the jury, was far greater than the degree of assistance offered by Martini.

Thus, we conclude that the evidence admitted during both the guilt and penalty phases of this trial did not support a finding of "substantial" assistance. Defendant did not aid in Afdahl's apprehension, did not lead police to additional evidence used in Afdahl's prosecution, and did not testify at her trial. At best, the evidence shows that defendant had merely informed Afdahl that he planned to confess.

We further find that even if the court erred in failing to instruct the jury on mitigating factor c(5)(g), the error was harmless. In *North Carolina v. Bacon*, 326 *N.C.* 404, 390 *S.E.*2d 327, 335 (1990), the court held that in order to show that a trial court's omission of a statutory mitigating circumstance was harmful, defendant must establish three things:

(1) that the particular factor was one which the jury could have reasonably deemed to have mitigating value (this is presumed to be so when the factor is listed in G.S. 15A–2000(f)); (2) that there was sufficient evidence of the existence of the factor; and (3) that, considering the case as a whole, the exclusion of the factor from the jury's consideration resulted in ascertainable prejudice to the defendant.

[*State v. Pinch*, 306 *N.C.* 1, 27, 292 *S.E.*2d 203, 223, *cert. denied* 459 *U.S.* 1056, 103 *S.Ct.* 474, 74 *L.Ed.*2d 622 (1982), *reh'g denied*, 459 *U.S.* 1189, 103 *S.Ct.* 839, 74 *L.Ed.*2d 1031 (1983).]

Under the *Bacon* test, condition one is certainly met in this case. For purposes of this argument, assuming that condition two is met, we find that condition three clearly is not met.

In enacting mitigating factor c(5)(g) the Legislature did not make "any assistance" to the State evidence of c(5)(g) but only "substantial assistance" to the State. Although evidence of mitigating factors is to be interpreted liberally, we cannot delete the plain language of the statute. Words in a statute

are to be given their "ordinary and well-understood meaning." *Levin v. Township of Parsippany–Troy Hills*, 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980). Moreover, "The words chosen by the legislature are deemed to have been chosen for a reason." *Merin v. Maglaki*, 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992).

Defendants in other capital murder cases have made similar arguments, alleging that the presence of words like "substantial" and "extreme" in mitigating factors unconstitutionally circumscribe the jury's evaluation of that mitigating factor. *People v. Cox*, 53 *Cal.*3d 618, 280 *Cal.Rptr.* 692, 729, 809 *P.*2d 351, 388 (1991) (holding that use of "substantial" to modify mitigating factor concerning "domination of another person" did not constitutionally circumscribe jury's evaluation of that mitigating factor), *cert. denied*, —— *U.S.* ——, 112 *S.Ct.* 945, 117 *L.Ed.*2d 114 (1992); *California v. Benson*, 52 *Cal.*3d 754, 276 *Cal.Rptr.* 827, 802 *P.*2d 330, *cert. denied*, —— *U.S.* ——, 112 *S.Ct.* 336, 116 *L.Ed.*2d 277 (1991); and *California v. Brown*, 46 *Cal.*3d 432, 250 *Cal.Rptr.* 604, 758 *P.*2d 1135 (1988) (using "extreme" to modify mitigating factor "under the influence of extreme mental or emotional disturbance," is not unconstitutional), *cert. denied*, 489 *U.S.* 1059, 109 *S.Ct.* 1329, 103 *L.Ed.*2d 597 (1989). In each of these cases the courts held that the presence and instructions about the catch-all mitigating factor was sufficient to insure that the jury would consider all the mitigating evidence, whether or not "substantial" or "extreme."

Moreover, the catch-all factor, c(5)(h), permitted defendant to introduce evidence of his cooperation with police that was short of "substantial" assistance. *Infra* at 305–308, 619 *A.*2d at 1275–1277. Indeed, the trial court in declining to give the specific instruction factor c(5)(g) informed defense counsel that he "may be able to utilize that testimony on the catch-all mitigating factor." Nor did the trial court preclude defendant from submitting any evidence on that issue.

The jurors were not "precluded from considering, *as a mitigating factor,* any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffer[ed] as a basis for a sentence less than death." *Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964–65, 57 *L.Ed.*2d 973, 990 (1978); accord *Skipper v. South Carolina,* 476 *U.S.* 1, 4, 106 *S.Ct.* 1669, 1670–71, 90 *L.Ed.*2d 1, 6 (1986); *Eddings, supra,* 455 *U.S.* at 110, 102 *S.Ct.* at 874, 71 *L.Ed.*2d at 8. The trial court made clear to the jurors that they could consider any evidence presented in mitigation of a death sentence. The trial court's ruling did not prejudice defendant. His constitutional right to a fair sentencing proceeding was safeguarded. *Boyde v. California,* 494 *U.S.* 370, 386, 110 *S.Ct.* 1190, 1201, 108 *L.Ed.*2d 316, 333 (1990); *Cox, supra,* 280 *Cal.Rptr.* at 692, 809 *P.*2d at 351; *see Marshall* I, *supra,* 123 *N.J.* at 141–42, 147, 586 *A.*2d 85.

E. *The trial court's instructions with respect to mitigating factors c(5)(a) and c(5)(d)*

Defendant contends that the trial court erred in instructing the jurors that in considering mitigating factors c(5)(a) and c(5)(d), they could consider evidence of defendant's mental or emotional disturbance and intoxication *only* if they determined that those conditions were "extreme" or "great in degree." Defendant again contends that the modifying language of the mitigating factor unconstitutionally circumscribed the jury's evaluation of the mitigating circumstances. The specific language of the mitigating factors is as follows:

c(5)(a) The defendant was under the influence of *extreme* mental or emotional disturbance insufficient to constitute a defense to prosecution.

[Emphasis added.]

5(d) The defendant's capacity to appreciate the wrongfulness of his conduct to conform his conduct to the requirement of the law was *significantly impaired* as a result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution.

[Emphasis added.]

On the mental-disturbance mitigating factor, the trial court instructed the jury as follows:

Now, mitigating factor [c(5)(a)] deals with the defendant's mental or emotional condition at the time he committed the murder, but this mitigating factor does not require evidence of a mental disease or defect or intoxication.

On the other hand, if defendant was suffering from mental disease or defect or was intoxicated, such evidence may be considered along with any other relevant evidence in determining the absence or presence of this mitigating factor.

But it is important to remember that this mitigating factor may be present even though defend[a]nt was not intoxicated and had neither a mental disease or mental defect. This mitigating factor is established by evidence showing that defendant was suffering from an extreme mental or emotional disturbance and that such disturbance influenced him to commit the murder.

In this regard you are to consider the evidence on the totality of his intellectual and emotional processes at the time he acted. In other words, what was he thinking or feeling at the time, what was the effect of those feelings and thoughts upon him.

Then you must consider whether his thoughts or feelings constituted extreme mental or emotional disturbance, and if they did, whether he was under their influence or power.

By disturbance I mean ag[]itation, confusion or violent change. But in order to find this factor present you must be satisfied that the mental or emotional disturbance was extreme, that is that it was great in degree.

Similarly, on the intoxication mitigating factor, the trial court informed the jury:

Mitigating factor [c(5)(d)] is about disease or defect or intoxication and the effect of such condition upon the defendant during the murder. To find this mitigating factor you must be satisfied the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired by reason of mental disease or defect or intoxication.

To appreciate means to understand. By "significantly impaired" the statute means made worse, weakened or deteriorated, not slightly but to an important, meaningful or substantial degree.

Intoxication means a disturbance of a mental or physical capacity resulting from the introduction of substances into the body.

Mitigating factor [c(5)(d)] may be found to be present based on mental disease or defect alone or based on intoxication alone or based on a combination of both.

It is particularly important to remember that defendant does not have the burden of establishing a mitigating factor in relation to the question of presence [or] absence of mental disease or defect or intoxication as referred to in the mitigating factor. If you find that mental disease or defect or intoxication was present the question now is not whether such condition rendered

defendant unable to form a purposeful or knowing state of mind, nor is it whether the condition disabled defendant from knowing the nature and quality of his acts and that what he was doing was wrong.

Rather, under mitigating factor [c(5)(d)] the question is whether the mental disease or defect or intoxication, such condition or conditions significantly impaired defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law.

Defendant did not object to those instructions. Now, however, defendant is attempting to delete the words "extreme" and "significantly impaired" from the statute. We reiterate what we stated in the prior section: "We cannot delete the plain language of the factor." *Supra* at 299, 619 *A*.2d at 1272. Whether the words "significantly impaired" and "extreme" modifying the respective mitigating factors unconstitutionally circumscribed the jury's evaluation of the mitigating evidence depends on whether defendant was precluded from presenting mitigating evidence on those factors and whether the jury was precluded from considering and independently weighing those factors. *Lockett, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990.

Throughout this trial defense counsel presented evidence that defendant had been suffering from a mental and emotional disturbance and intoxication due to his cocaine addiction. Defendant's ability to introduce evidence of his mental state and his diminished capacity was unlimited. This is not a case in which the penalty-phase jury was barred from considering evidence of nonstatutory mitigating circumstances. *Hitchcock v. Dugger,* 481 *U.S.* 393, 398–99, 107 *S.Ct.* 1821, 1824–25, 95 *L.Ed.*2d 347, 352–53 (1987); *Hargrave v. Dugger,* 832 *F.*2d 1528, 1534–35 (11th Cir.1987), *cert. denied,* 489 *U.S.* 1071, 109 *S.Ct.* 1353, 103 *L.Ed.*2d 821 (1989).

This case instead is substantially identical to three California cases previously discussed. *Supra* at 300–301, 619 *A*.2d at 1272–1273. In *Benson, supra,* the defendant claimed that the trial court's refusal to delete the modifier "extreme" from the mental- or emotional-disturbance mitigating factor precluded the jury from considering mitigating evidence of non-extreme

mental or emotional disturbance. 802 *P.*2d at 330. The California Supreme Court rejected that argument because the jury had been instructed on the catch-all mitigating factor provided by the California statute. The court in that case expressly told the jurors that they could take into account any aspect of defendant's character or circumstances of the crime. Thus, there was "no reasonable likelihood that the jury would have inferred * * * that they would not consider mental or emotional disturbance *of any degree whatever* in mitigation of penalty." *Id.* at 360; *accord Cox, supra,* 280 *Cal.Rptr.* at 729, 809 *P.*2d at 388 (using same analysis on substantial-domination-of-another-person mitigating factor); *California v. Medina,* 51 *Cal.*3d 870, 274 *Cal.Rptr.* 849, 799 *P.*2d 1282, 1306–07 (1990), *aff'd,* —— *U.S.* ——, 112 *S.Ct.* 2572 120 *L.Ed.*2d 353, *reh'g denied,* —— *U.S.* ——, 113 *S.Ct.* 19, 120 *L.Ed.*2d 946 (1992); *Brown, supra,* 758 *P.*2d at 1152 ("instructions and counsel's arguments thereon viewed as a whole, sufficiently informed the penalty-phase jury it could consider a mental condition of the defendant which, though not characterized as extreme would potentially mitigate the circumstances of the offense").

The test therefore is to take all of the trial court's instructions into account and to determine if the jury was adequately informed that it could consider as a mitigating factor the mental condition and intoxication of defendant, even if they did not find that such conditions met the statutory standard. There must be no "reasonable likelihood that the jury had applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde, supra,* 494 *U.S.* at 380, 110 *S.Ct.* at 1198, 108 *L.Ed.*2d at 329. The jury must understand the function and meaning of mitigating factors. *Williams* II, *supra,* 113 *N.J.* at 497, 550 *A.*2d 1172. In reviewing the record in its entirety we find that the jury understood that it could consider in mitigation and independently weigh all the evidence of defendant's mental state and diminished capacity.

At the outset of the penalty phase the trial court described briefly the aggravating factors and the mitigating factors. With respect to mitigating c(5)(h), the catch-all provision, the court stated the following:

> And four, any factor which is relevant to the defendant's character or the circumstances of the offense, and any factor which the jury sees from the evidence as being a mitigating factor.

At the end of the penalty phase, the trial court instructed the jury that "mitigating factors are those which would tend towards the sentence of imprisonment for life. The factors have to do with the circumstances of the crime, personal traits, qualities and background of defendant." The court further charged that evidence of mitigating factors is not offered to justify or excuse a defendant's conduct; rather, it is intended to present extenuating facts about defendant's life or character or circumstances surrounding the murder that would justify a sentence of less than death.

Moreover, the court told the jury more than once that

> the evidence to be considered by you includes that material presented by both sides at both phases of the trial, all of the witnesses and all of the physical evidence * * *. You can use anything that you've heard, even if its not presented by counsel as a mitigating factor, if you believe it is there.

The jury was also specifically instructed that the same facts could be used to prove more than one mitigating factor. With respect to the weighing of mitigating factors, the court informed the jury that "if there is evidence of a mitigating factor you must consider the evidence and give it such weight as you deem appropriate."

The trial court also instructed the jury on the catch-all mitigating factor, c(5)(h) ("[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense") as follows:

> Mitigating factor [c(5)(h)] is not merely a single factor. Rather it requires that you consider *all the evidence* received as it relates to or concerns the defendant's life, his characteristics or background and the totality of the circumstances of the crime as well as the defendant's potential for rehabilitation. You do not have to describe such evidence or factors in words on the jury verdict form. We'll go over that shortly.

*All mitigating evidence* is to be considered by you, whether it appears during the first part of the trial from witnesses called by the State or the defense, and from the physical evidence, or it appears during this phase of the trial from the evidence produced by either side, or any mitigating factor that you see present.

[Emphasis added.]

Throughout the penalty phase, defense counsel also focused on the fact that the jurors were to

[t]ake into consideration the extreme mental and emotional disturbance that might have been involved. The Court is going to give you some specific instructions and our Supreme Court has come up with various different guidelines on how this is followed. But two things to look at along those lines is his cocaine abuse and intoxication, not only during the commission of the offense, but before and after; the fact that his world fell apart, that he got divorced after being married for forty years. Those are aspects that you're going to hear and think about.

In his summation defense counsel likewise emphasized that the jurors were to consider all the evidence presented regarding defendant's drug abuse and his emotional and mental state in determining whether there was any evidence that defendant suffered from a mental or emotional disturbance or had diminished capacity due to a mental disease or defect or intoxication. Further, defense counsel explained the wide scope of evidence that the jury could consider in reviewing the catch-all factor:

another thought process that we ask you to utilize in the mitigating factors of taking any other items that you can find either that I brought to your attention or by virtue of something that the Prosecutor said or something the Judge is instructing you clicked off in your mind that you heard at the first trial that helps mitigate the situation. It doesn't make it right. It's never going to make it right, but helps mitigate the situation. You can take all of those factors in. The Legislature has given us a catch-all for that purpose. Even if you had the slightest little doubt during the course of your deliberations on the first trial you can take into consideration and utilize those.

Like defense counsel, the prosecutor in her summation also impressed on the jury the broad scope of evidence it could consider in determining mitigating factor c(5)(h).

The last mitigating factor, any other factor which is relevant to the defendant's character or the circumstances of the offense. Did you see anything in mitigation of this crime all throughout the trial? You are entitled to consider anything that you heard, make any excuse that you want for the defendant's actions. When you think about it, were there any? Was this the product of

something he couldn't control? Was this the product of some substance he introduced into his body, or were these clear and conscious decisions made by a man who's not sick, who's just evil. Who else but an evil person could concoct such a plan as to kidnap and execute another human being? Someone who's driven by one thing, and it's not cocaine.

In *Marshall* I, *supra*, 123 *N.J.* at 145, 586 *A.*2d 85, we recognized that "[a]lthough arguments of counsel can by no means serve as a substitute for instructions by the court, * * * the prejudicial effect of the omitted instruction must be evaluated 'in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel....' " (quoting *Kentucky v. Whorton*, 441 *U.S.* 786, 787, 99 *S.Ct.* 2088, 2089, 60 *L.Ed.*2d 640, 643 (1979)).

No defendant has the right to select the particular phrasing of the jury instructions. *Bey* II, *supra*, 112 *N.J.* at 168, 548 *A.*2d 887. The important factor is that there is no reasonable possibility that the jury misunderstands its role in the capital sentencing procedure or misunderstands the meaning and purpose of the mitigating factor.

We recognize as we did in *Marshall* I, *supra*, 123 *N.J.* at 147–48, 586 *A.*2d 85, the "desirability of more precise instructions that would clarify even further the scope and function of those mitigating factors." But in assessing the overall adequacy of the trial court's instructions in the sentencing case we are satisfied that the jury did understand its function and the function and meaning of the mitigating circumstances.

Defendant was not precluded from submitting any evidence concerning his mental state and diminished capacity: the court properly instructed the jury about mitigating factor c(5)(h) and specifically told it to consider "all the evidence" from whatever source in determining whether that factor exists, and individually to evaluate the existence of any mitigating factor. The jurors were "adequately instructed to take into consideration all of [defendant's] mitigating evidence * * * and [to] give effect to [t]his mitigating evidence." *Penry v. Lynaugh*, 492 *U.S.* 302, 313, 109 *S.Ct.* 2934, 2943–44, 106 *L.Ed.*2d 256, 274 (1989);

*Biegenwald* IV, *supra,* 126 *N.J.* at 52–53, 594 *A.*2d 172. There was no "reasonable likelihood that the jury * * * applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde, supra,* 494 *U.S.* at 380, 110 *S.Ct.* at 1198, 108 *L.Ed.*2d at 329. There is no reasonable likelihood that the jury would have inferred from the instructions it received that it could not consider "mental or emotional disturbance" or "disease or defect or intoxication" of any degree whatsoever in mitigation of defendant's penalty.

F. *The Trial Court's Failure to Inform the Jury that the Alternative to a Death Sentence Might Include a Period of Parole Ineligibility Beyond Thirty Years*

 Defendant contends that the trial court deprived him of his due-process right to a reliable sentencing procedure and subjected him to cruel and unusual punishment by not instructing the jurors that the alternative to a death sentence possibly included a period of parole ineligibility in excess of thirty years. Defendant contends that during the penalty phase the trial court was aware that it could impose a sentence for his kidnapping conviction that included a fifteen-year period of parole ineligibility to run consecutively to defendant's sentence for murder. Because defendant never requested such an instruction, nor did the jury make an inquiry into the subject, we hold that no error resulted. In addition, we note that defense counsel repeatedly informed the jury of the potential kidnapping sentence and the jurors were aware that defendant's age made his release unlikely in any event.

In its preliminary statement to the jury the trial court told it that

> having found defendant guilty of murder, you now have the added responsibility of determining what penalty for that crime is to [be] impose[d] on Mr. Martini. Under the law as enacted by our Legislature the penalty may be either death or a term of imprisonment between thirty years and life, of which thirty years must be served before the defendant is eligible for parole.

During the penalty-phase instructions the court substantially reiterated that statement.

[T]he Legislature of the State of New Jersey has given to you as a jury and to each of you individually the responsibility of deciding whether John Martini, Sr., is to be put to death or be subjected to imprisonment in the New Jersey State Prison for from thirty years to the end of his life, and in any event without any possibility of parole for a minimum of thirty years.

With respect to parole, the court instructed the jurors, at defense counsel's request,

that the State Parole Board may release a defendant convicted of murder after thirty years have passed on if satisfied that his release would be fully compatible with the safety and welfare of society. The decision to release may be further reviewed in court.

You're not to speculate [on] the precise sentence that this defendant might receive from me between thirty years and life. You must not speculate as to whether this defendant would or would not be released after the thirty years.

The court repeated that the sole alternative to the sentence of death was a term of imprisonment for from thirty years to life, with a minimum period of parole ineligibility of thirty years. Similar language was contained in the penalty-phase verdict sheets.

During penalty-phase summation, defense counsel argued that the jurors should impose a life sentence because the sixty-year-old defendant would "most likely die in prison before" the minimum thirty-year sentence had been completed. Over the prosecutor's objection, defense counsel was also permitted to make the following comment:

The kidnapping charge calls [sic] that the sentence is to be consecutive, to follow this murder charge, and that there's a minimum mandatory time on that as well that can be imposed by the judge for parole ineligibility. So it's not even thirty years then that he's going to be available [sic] to make application for parole to get out if he should live that long.

The judge can impose a fifteen year minimum mandatory time period on that as well, which makes it then forty-five years.

Defendant now argues that the trial court should have, *sua sponte*, informed the jury that it intended to impose the maximum sentence on defendant for the kidnapping and mandate that it run consecutively to his sentence for murder. Two of

our recent decisions address related arguments and guide our resolution of this issue.

In *Biegenwald* IV, *supra*, 126 *N.J.* at 45, 594 *A.*2d 172, we rejected a defendant's request that the jury verdict sheet specifically list as a mitigating factor that he had previously been sentenced to a lengthy prison term for a prior murder. We noted that such evidence "raises the specter that a jury in this case may be unduly influenced by the determination of another jury made on a substantially different record" and had "little probative value to the present jury's sentencing decision." *Id.* at 49, 594 *A.*2d 172. Furthermore, we found that a "properly-impanelled jury in a capital case is aware of the limited options available in sentencing a defendant convicted of murder." *Ibid.* Finally, the record in that case supported "the argument that defendant [would] never be eligible for parole in his lifetime * * * based on the current proceeding." *Ibid.*

A different scenario was presented in *State v. Bey*, 129 *N.J.* 557, 610 *A.*2d 814 (1992) (*Bey* III), in which we recently decided that the trial court had committed harmless error by failing to inform the jury that the defendant had previously been sentenced for a prior murder. In *Bey* III, defense counsel had submitted a written request that the penalty-phase jury charge inform the jurors that the defendant was serving prior sentences carrying forty years of parole ineligibility and that a life sentence in that case would mean that the defendant, who was in his early twenties, would serve a total of seventy years before becoming eligible for parole. *Id.* at 599, 610 *A.*2d 814. The trial court refused the request, noting that the previous sentence was on appeal. *Ibid.*

In addition, after two hours of deliberation, the jury sent a note to the trial court asking if the defendant would be "eligible for parole in the next seventy years" Before the court had decided on how to answer the question, the jury returned a death sentence. *Id.* at 599–600, 610 *A.*2d 814.

We found that the circumstances in *Bey* III differed from those in *Biegenwald* IV for two important reasons. First, the defendant in *Bey* III had not requested that his prior sentence be introduced as a mitigating factor but as a sentencing option; and second, he could not argue that a thirty-year period of parole ineligibility would effectively keep him in prison for his lifetime without adducing evidence of his prior murder sentence. *Id.* 129 *N.J.* at 601, 610 *A.*2d 814.

Our analysis focused on the need to inform jurors fully of their responsibility in determining the appropriateness of a death sentence and the practical effect of a life sentence. *Ibid.; see California v. Ramos,* 463 *U.S.* 992, 1009, 103 *S.Ct.* 3446, 3457, 77 *L.Ed.*2d 1171, 1186 (1983) (upholding statute that requires jurors to be informed that a life sentence may be commuted by the governor). However, we also recognized the "need to preclude speculation about a defendant's release from distorting a jury's decision to impose life or death." *Bey* III, *supra,* 129 *N.J.* at 602, 610 *A.*2d 814. Not doing so could lead to "the incongruous result that first offenders would be more likely to be sentenced to death than would repeat offenders." *Id.* at 603, 610 *A.*2d 814. Thus, we held that

> courts in capital cases should inform juries about the defendant's prior sentences either on the defendant's request or in the event of a jury inquiry. If the defendant is appealing those convictions and sentences, the jury should be informed that the sentence is not final. The court should also instruct the jury that the court alone will decide whether a sentence in the present case is to be served concurrently or consecutively to any prior sentences.

> [*Ibid.*]

Finally, we limited our holding in that courts

> should instruct the jury that it should not consider prior sentences in its decision to impose a life or death sentence because they are not statutory aggravating or mitigating factors.

> [*Ibid.*]

We noted that such a jury instruction was "all the more necessary" in cases in which the State had used defendant's prior murder conviction to establish aggravating factor c(4)(a).

In such circumstances, the jurors are made aware of the prior conviction but not the sentence imposed, creating the possibility that their decision will be affected by uncertainty about whether the defendant has been punished adequately for the earlier murder. *Ibid.*

The circumstances of this case differ significantly from those in both *Biegenwald* IV and *Bey* III. This case is not concerned with defendant's prior criminal convictions but defendant's contemporaneous convictions. Having just been convicted of kidnapping, defendant had not even been sentenced for that offense. Thus, the length of defendant's sentence was uncertain, although its imposition was not.

Moreover, the trial court might not have determined whether or not to impose a sentence for the kidnapping that would run consecutively to that for murder. Defendant argues that the consecutive nature of the two sentences was almost certainly decided by the trial court and assumed by counsel for both parties. As likely as the consecutive nature of the sentence may have been in the minds of counsel, the trial court had yet to announce its intention. Nor should it have announced its intention. Non-capital sentencing determinations are made with the benefit of pre-sentence reports and argument from counsel. Obviously, the trial court had yet to be presented with either.

Significantly, defense counsel did not request that the court inform the jurors that defendant's sentence for kidnapping might include a parole-ineligibility period to run consecutively to any such period attached to his sentence for murder. And, unlike the situation in *Bey* III, the jury also did not request instruction on the point. Given the potential improper influence of such information, for the court to proffer it without a request from counsel or an indication of confusion on the part of the jury would be unwise.

Finally, we note that defense counsel effectively made the argument that defendant was not likely to live long enough to

be released after a thirty-year period of parole ineligibility. Defendant was already sixty-years old at the time of trial. Having served more than a year in jail prior to trial, his release, at the earliest, would have come as he approached ninety. The jury was well-aware of those circumstances.

 Based on this record, lack of defense counsel's request, and the jury's knowledge of the practical consequences of defendant's life sentence, we find no error in the court's failure to instruct the jury about defendant's potential sentence for his kidnapping conviction. Nonetheless, we hold that in the future when defense counsel or the jury requests instructions on the potential sentences a defendant will receive for convictions arising from the same trial as his capital-murder conviction, such information should be provided by the trial court. The jurors should be informed of the sentencing options available to the judge, and that the determination of sentence had not yet been made. In addition, the trial court should explain that the sentence may or may not run consecutively to that for murder, but that the determination is left to the court. Finally, the court should inform the jury that defendant's possible sentence for the other convictions should not influence its determination regarding the appropriateness of a death sentence on the murder count. Such instructions will assist in dispelling confusion on the part of the jury and will help to safeguard against improper sentencing determinations.

G. *The Trial Court's Response to the Penalty–Phase Jury's Inquiry Concerning the Use of Mitigating Evidence*

██ ██ Defendant argues that the trial court's response to a jury inquiry erroneously limited his right to have the jury consider his experts' testimony when determining whether the alleged aggravating factors existed. According to defendant, that error denied him his due-process right to a reliable sentencing procedure and subjected him to cruel and unusual punishment.

During the penalty-phase deliberations, the jury sent the following inquiry to the court: "(A) Are the expert witnesses' written reports available or (B) are we only to consider their testimony for mitigating factors?" In response to the inquiry the following colloquy ensued at sidebar:

[THE COURT:] With counsel's approval I will advise the jurors that only those items that were marked into evidence are available and, two, that as to 'b' that the testimony of Dr. Musikoff, Dr. Greenfield and Ms. Aviv is to be considered for mitigating factors? Any objections?

[PROSECUTOR]: No.

[DEFENSE COUNSEL:] Judge, wait, if I can. I have a question on that aspect. When I first heard the question I had a different assumption on it. But if they're asking if it can only be interpreted for mitigating factors maybe they're still trying to determine if there's an existence [sic] of an aggravating factor and they're looking to weigh the testimony in opposition of [sic] an aggravating factor instead of in favor of an aggravating factor.

THE COURT: I can't speculate as to what they might have in mind. All I can do is answer the questions they pose to us.

[DEFENSE COUNSEL]: Understandable. But the response that it's only going to be utilized for a mitigating factor, what happens if the proofs that were being utilized, meaning that thought process in the beginning because they're still asking to differentiate between the guilt phase an the penalty phase, that as to the diminished capacity aspect of it, whether or not that existed. Because we do have case law that has told us if they had a lingering doubt in the first trial, that could be utilized as well as another factor, as a mitigating factor.

THE COURT: Mr. Van Rye, you're reading more into it than the question itself asks. They want to know are they totally to use the testimony for mitigating factors, and I'm going to answer the question they've asked.

Thereafter, the court answered the jury inquiry with the following remarks:

You have a question at 3:18, '(A) are the expert witnesses' written reports available?'

Ladies and gentlemen, they're not available. Only those items that were admitted into evidence are available to you. You'll have to rely on your recollection of the testimony with reference to what was contained in the reports.

'(B) Are we only to consider their testimony for mitigating factors?'

They were presented as far as Ms. Aviv, Dr. Musikoff, their testimony was presented to establish mitigating factors. You can utilize also Dr. Greenfield's testimony if you see that supporting any mitigating factors. That's what they were presented for and that's how you're to consider their testimony for those purposes.

Defendant argues that the second part of the trial court's answer was erroneous and prejudicial because it impermissibly limited the jury's ability to use the experts' testimony not only to establish mitigating factors but also to decide the existence or weight of aggravating factors. Defendant asserts that his experts' testimony could have raised doubts in the minds of the jurors about the intent elements of both aggravating factors alleged by the State. That was particularly true of Dr. Greenfield's testimony, which defendant relied on in both phases of the trial to counter the State's proofs regarding defendant's mental state during the kidnapping and murder. We recognize that that use of the mitigating evidence on the part of the jury was possible.

The State disagrees entirely with defendant's interpretation of the jury note. It contends that despite the fact that the court answered the note as if it posed two questions, it actually posed only one: could the jurors consider as mitigating evidence the defense experts' written reports in addition to their testimony. The State's reading of the note is premised on the jurors' use of the disjunctive "or" rather than the conjunctive "and" to link the two parts of the inquiry. Thus, the State contends that the jury's only question was whether it could go outside the testimonial evidence of the expert witnesses and also review their written reports when considering whether mitigating factors existed, not whether that evidence should be used solely to determine the existence of those factors and not the aggravating factors.

We agree that the State's interpretation of the note is most likely the accurate one. However, we do not accept the State's conclusion that the trial court's response to the inquiry could be construed only as a directive limiting the jurors' deliberations to the testimony of defendant's experts without consideration of their written reports. Regardless of the jury's intended inquiry, the trial court's response is what may have caused prejudice. At best, the court's instruction was ambiguous. Plainly, however, the response, standing on its own, could have been

understood by the jurors to limit their ability to use defendant's mitigating evidence when determining if the alleged aggravating factors existed. However, because the response cannot be read in isolation, we examine all of the trial court's penalty-phase instructions and conclude that the jury was adequately informed of the proper role of mitigating evidence and that any harm caused by the court's error was harmless.

Defendant admits that the difference between allowing jurors to use evidence to establish mitigating factors but not allowing them to use it to rebut or neutralize the weight of aggravating factors is "a very refined distinction." Defendant asserts, however, that it is one fraught with significant constitutional concerns. Had the erroneous answer been the only instruction jurors were given on this point, their deliberations would probably have been tainted. Defendant is entitled to submit mitigating evidence that serves three purposes: (1) to weaken the State's proofs concerning the existence of aggravating factors; (2) to establish the existence of mitigating factors; and (3) to bolster the weight of those mitigating factors found to exist in an attempt to have those factors outweigh the aggravating factors found to exist during the jurors' ultimate deliberation. Permitting the jury to apply mitigating evidence in those fashions comports with our insistence "that juries must be allowed to consider all mitigating circumstances advanced by defendant at trial." *Biegenwald* IV, *supra,* 126 *N.J.* at 53, 594 *A.*2d 172; *State v. Bey, supra,* 112 *N.J.* at 169, 548 *A.*2d 887.

We find, however, that the challenged instructions in this case did not inhibit defendant's ability to use his experts' testimony effectively during the jurors' penalty-phase deliberations. That " 'portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect.' " is well-settled. *Marshall, supra,* 123 *N.J.* at 135, 586 *A.*2d 85 (quoting *State v. Wilbely, supra,* 63 *N.J.* at 422, 307 *A.*2d 608). In

several instances the court correctly informed that jury of the proper use of mitigating evidence.

The court previously instructed the jurors with respect to the aggravating factors that "the evidence to be considered by you includes that material presented by both sides at both phases of the trial, all of the witnesses and all of the physical evidence." The court also had instructed the jurors that "[w]ith respect to the aggravating factors I've discussed and the mitigating factors I'm about to discuss, remember that in determining the factors including the defendant's state of mind you must consider all of the circumstances."

With respect to the mitigating factors the court informed the jurors that "[y]ou can use anything that you've heard, even if it's not presented by counsel as a mitigating factor, if you believe it is true." At the penalty-phase proceeding, defense counsel had ample opportunity to rebut the aggravating-factor evidence that the State had presented. Indeed, during his summation defense counsel argued at length against the existence of those factors, referring to the evidence presented in both phases of the trial.

Moreover, the disputed response to the jurors' inquiry did nothing to inhibit the proper use of mitigating evidence during the process of weighing the aggravating factors found to exist against the mitigating factors so found. During the jurors' weighing process, the jurors could consider defendant's expert witnesses' testimony about defendant's mental state. The jury was thus free "not merely to decide the existence of aggravating and mitigating factors, but to evaluate the evidence supporting those factors in making the 'unique, individualized judgment' regarding the appropriateness of the death penalty." *Bey, supra,* 112 *N.J.* at 163, 548 *A.*2d 887 (quoting *Zant v. Stephens,* 462 *U.S.* 862, 900, 103 *S.Ct.* 2733, 2755, 77 *L.Ed.*2d 235, 265 (1983) (Rehnquist, J., concurring)).

Defendant's argument that the court's response to the jury inquiry resulted in a violation of the holding in *Penry v. Lynaugh, supra,* 492 *U.S.* 302, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256, is unsupportable. In *Penry,* the penalty-phase jury in a capital

proceeding was given only three questions to answer; each asked if a specific aggravating factor existed. *Id.* 492 *U.S.* at 310, 109 *S.Ct.* at 2942, 106 *L.Ed.*2d at 272–73. The jury was told that if it answered all three affirmatively the sentence imposed would be death. *Ibid.* "The jury was never instructed that it could consider the evidence offered by [the defendant] as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence." *Id.* at 320, 109 *S.Ct.* at 2947, 106 *L.Ed.*2d at 279.

The court agreed with the defendant that "his mitigating evidence of mental retardation and childhood abuse ha[d] relevance to his moral culpability beyond the scope" of the alleged aggravating factors and should have been considered by the jury. *Id.* at 322, 109 *S.Ct.* at 2948, 106 *L.Ed.*2d at 280. Thus, the court found that "without any jury instructions on mitigating evidence," the death sentence was reached with out an expression of the reasoned moral response of the jurors. *Ibid.* The same is not true of sentence in this case.

The record shows that jurors were well informed that they might consider any of the evidence presented at trial except defendant's own statements to his expert, which they were forbidden to. use to determine the existence of the alleged aggravating factors. The trial court's inclination on this point, although not expressed in terms of legal precedent, was correct and intended to protect defendant. For the jury to use defendant's own statements submitted in the mitigating evidence to support the existence of an alleged aggravating factor would have been improper. Martini was permitted to argue to the jury the existence of four statutorily-delineated mitigating factors, including a catch-all factor, c(5)(h), open to any evidence the jury believed to be of mitigating value. In addition, the jurors were repeatedly instructed about the role of mitigating evidence and their obligation to weigh any aggravating factors found to exist against any mitigating factors found exist. We find that the jurors were not "precluded from considering, *as a mitigating factor,* any aspect of the defendant's character or

record of the circumstances of the offense that the defendant proffer[ed] as a basis for a sentence less than death." *Lockett v. Ohio, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964, 57 *L.Ed.*2d at 990.

## V

### *Other Issues*

A. *Defendant's Conviction for Possession of a Handgun Without a Permit*

When defendant and Afdahl were arrested, he was carrying a black canvas bag that contained a fully-loaded .32 caliber revolver. It was not the weapon that had been used to kill Flax. Defendant was convicted of possession of a handgun without a permit, contrary to *N.J.S.A.* 2C:39–5b, and sentenced to a four-year term of imprisonment, to run concurrently with his other sentences.

One of the essential elements of this crime is the lack of a permit to carry the handgun. *State v. Ingram,* 98 *N.J.* 489, 494–95, 488 *A.*2d 545 (1985). The State "must prove beyond a reasonable doubt all elements of its handgun control offense, * * * including the absence of a permit" in order to secure a conviction. *State v. Vick,* 117 *N.J.* 288, 566 *A.*2d 531 (1989).

The only evidence the State offered to prove that element was the following testimony of Sergeant Trahey:

Q. Did you ever check to see if John Martini had a permit to carry a gun in the State of New Jersey?

A. Yes, I did.

Q. Did you find that he did?

A. Yes, I found that he did not.

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: Your Honor, it's an exception to the hearsay rules.

THE COURT: I would like to know how you checked.

THE WITNESS: I contacted the New Jersey State Police.

THE COURT: Do you know what they checked?

THE WITNESS: They maintain the records in the State of New Jersey of anyone who gets a permit. A copy goes to the State.

THE COURT: Did you request a copy of any permit issued to John Martini?
THE WITNESS: I just requested if there were any at all.
THE COURT: I'm going to overrule the objection.

Defendant correctly claims that because Sergeant Trahey simply related what the State Police had told him, his testimony was hearsay, not admissible under any exception to the hearsay rule. *See Evid.R.* 63(1) to –(33). In order to prove the absence of an entry in State Police files under *Evidence Rule* 63(14) (the business record exception to hearsay), a witness with personal knowledge of those files must testify.

The State argues, however, that the error was harmless, because a jury can infer, "until the defendant comes forward with some evidence to the contrary, that the defendant does not possess the required license or permit to carry a dangerous weapon." *See State v. Ingram, supra,* 98 *N.J.* at 498, 488 *A.*2d 545. Although that is true, in *Ingram,* we also held that the court must instruct the jury that it may draw or reject such permissive inference. *Id.* at 500, 488 *A.*2d 545. Although the court so instructed this jury, as defendant points out, Trahey's testimony virtually precluded the possibility that the jury would draw an inference that defendant had a gun permit. To assume that a jury would disregard Trahey's testimony without any assertion by defendant that he had a permit is simply not reasonable.

We conclude, therefore, that the State's failure to prove, over defendant's objection, one of the essential elements of the offense requires a reversal of defendant's conviction of *N.J.S.A.* 2C:39–5b. See *Vick, supra,* 117 *N.J.* at 293, 566 *A.*2d 531.

## B. *Defendant's Request for Proportionality Review*

As authorized by the Capital Punishment Act, *N.J.S.A.* 2C:11–3e, defendant has requested that we determine whether his "sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Review of defendant's sentence shall be undertaken pursuant

to a briefing and argument schedule to be established by the Clerk of the Court after consultation with counsel.

## C. *The Cumulative Effect of Errors*

■ Defendant argues that if we find, as we do, that none of the trial errors, standing alone, warrant reversal of his death sentence, then the sentence cannot withstand their cumulative weight. Together, defendant argues, the trial court errors contributed to his death sentence, making it constitutionally unreliable. *See State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954) (noting that where "legal errors * * * in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury").

As we noted in *Marshall* I, *supra,* 123 *N.J.* at 169, 586 *A.*2d 85:

> The fact that capital cases are vigorously contested, protracted, and consistently implicate subtle and difficult legal issues virtually assures that in the course of each trial some errors and imperfections will be apparent. Trial judges, unlike appellate judges, make their rulings in the heat of trial, without the opportunity for deliberative review, and not even the most experienced and conscientious trial judges can be perfect.

"A defendant is entitled to a fair trial but not a perfect one." *Lutwak v. United States,* 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L.Ed.* 593, 605 (1953). That is true even in capital cases, where we " 'subject the record to intense scrutiny,' recognizing that a defendant's very life is at stake." *Marshall* I, *supra,* 123 *N.J.* at 170, 586 *A.*2d 85 (quoting *Bey* I, *supra,* 112 *N.J.* at 92–93, 548 *A.*2d 846).

We have carefully reviewed each of the errors identified in the course of this opinion. With the exception of defendant's conviction under *N.J.S.A.* 2C:39–5b, we are satisfied, in the context of a trial that produced overwhelming evidence of defendant's guilt, that the combined effect of those errors was not clearly capable of affecting either defendant's convictions or his sentences.

### D. *Ineffective Assistance of Counsel*

 Defendant argues that his counsel's performance was ineffective in several respects. Most often, defendant points to omissions on the part of counsel, instances in which no objection was made in response to crucial errors. In addition, defendant asserts that his counsel conducted an ineffective *voir dire*, permitting potentially-biased jurors to determine defendant's fate.

 We have adopted, with some modification, the federal standard for ineffective assistance of counsel as articulated in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987). Thus, defendant is entitled to the assistance of counsel whose representation does not fall below an objective standard of reasonableness. *Strickland, supra*, 466 *U.S.* at 688, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 693. In order to prevail on an ineffective-assistance-of-counsel claim defendant must show that his attorney's "performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to [his] conviction." *Fritz, supra*, 105 *N.J.* at 58, 519 *A.*2d 336.

 "Judicial scrutiny of counsel's performance must be highly deferential," and the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra*, 466 *U.S.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. We will not second-guess counsel's strategic decisions made on the basis of thorough knowledge of relevant law and fact. *State v. Purnell, supra*, 126 *N.J.* at 536, 601 *A.*2d 175.

We find that counsel's performance at every stage of the proceedings in this case was reasonable and effective. Several pre-trial motions were made, including one attacking the admissibility of defendant's confession and the fruits thereof. At *voir dire*, counsel engaged prospective jurors in dialogue aimed at uncovering their biases toward drug users and psychiatric

experts. Both of those topics were essential components of the defense theory. The fact that counsel did not discuss the kidnapping aspect of this case with each prospective juror (although he did discuss the topic with a few venirepersons) may very well have been a strategic decision not to highlight that aspect of the case.

Moreover, the critical issue during trial was not whether defendant had kidnapped and murdered Irving Flax but his state of mind at the time he committed those crimes. During the guilt phase, defense counsel presented a thorough presentation of evidence, including the testimony of an expert witness, to support the reasonable defenses of diminished capacity and intoxication. Defendant also presented additional experts during the penalty-phase proceeding in an attempt to establish four relevant mitigating factors.

The fact that defense counsel missed some opportunities to object to trial errors does not render his assistance ineffective. No attorney can recognize every possible prejudicial event during the course of a lengthy trial. Defense counsel did raise numerous relevant objections, some of which were included in this appeal. Despite the State's requests to the contrary, we have not excluded from our review, because of counsel's failure to object to a potential error at trial, any issue raised in defendant's appeals.

### E. Defendant's sentence for kidnapping

The trial court improperly imposed a sentence of life imprisonment with a twenty-five-year period of parole ineligibility on defendant for his kidnapping conviction. That sentence exceeds the statutory maximum of thirty-years imprisonment with a fifteen-year period of parole ineligibility. *See N.J.S.A.* 2C:13–1c(1); *N.J.S.A.* 2C:43–6b. Therefore, we vacate defendant's sentence for kidnapping and remand to the trial court for imposition of a new sentence conforming to the statutory mandate.

## VI

### Conclusion

In summary, defendant's convictions for murder and kidnapping and his sentence of death are affirmed. Because the court imposed a sentence on defendant for the kidnapping conviction that exceeded the statutory maximum, his sentence for the kidnapping conviction is vacated and the matter is remanded so that the trial court may impose a new sentence that conforms to the statute. In addition, defendant's convictions for the related offenses are affirmed with the exception of his conviction for possession of a handgun without a permit. The conviction on that count is reversed.

Finally, defendant's request for proportionality review is acknowledged and the matter will proceed according to a briefing and argument schedule to be established by the Clerk of this Court.

HANDLER, J., dissenting

The Court for the third time affirms both the murder conviction and death sentence of a defendant prosecuted for capital murder. It does so despite the fact that this prosecution abounds with major trial-level errors and deficiencies. Those relate to the failure to qualify properly the jury, the refusal to allow the jury to consider a mitigating factor that was supported by evidence, the restriction on the use of mitigating defense-expert evidence to disprove the existence of aggravating factors, the inadequacy of instructions with respect to both aggravating and mitigating factors, and the failure to instruct the jury on likely sentencing alternatives other than the death sentence. Those errors impugn this prosecution and justify the reversal of the conviction and sentence. Further, this capital-murder prosecution underscores the infirmity and weakness of the constitutional support on which capital-murder prosecutions and the death penalty rest. See *e.g.*, *State v. Marshall*, 123 *N.J.* 1, 256–57, 586 *A.*2d 85 (1991) (Handler, J., dissenting). I

remain of the view that the capital conviction and death sentence are indefensible under our state constitution.

I

The jury *voir dire* in this case was extended, but nonetheless seriously deficient in several respects. Through the resort to leading questions, the *voir dire* foreclosed a full exposition of the attitudes of jurors concerning the death penalty. Further, it failed to explore the possible effect on the attitudes of prospective jurors of the two alleged aggravating factors. The factors had the clear potential for triggering possible bias and impairing the ability to consider and weigh the mitigating factors. To find the voir dire constitutionally adequate, the Court considers the voir dire sufficiently thorough and discounts these deficiencies. *Ante* at 212, 221–222, 619 *A.*2d at 1225, 1230–1231. I believe that close scrutiny of the record establishes that the *voir dire* did not assure that the jury in this capital case was properly qualified. This grave shortcoming requires reversal of defendant's conviction and capital sentence.

Capital defendants are constitutionally entitled to a comprehensive *voir dire.* Following and elaborating on the United States Supreme Court decisions in *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L.Ed.*2d 581 (1980), and *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L.Ed.*2d 841 (1985), this Court has held that jurors may not serve in capital cases if their personal views on capital punishment "prevent or substantially impair" the performance of their duties as jurors in accordance with their oaths and the court's instructions. *See, e.g., State v. Williams,* 113 *N.J.* 393, 415, 550 *A.*2d 1172 (1988) (*Williams* II) (quoting *Adams, supra,* 448 *U.S.* at 45, 100 *S.Ct.* at 2526, 65 *L.Ed.*2d at 589).

This Court on several occasions has emphasized "the critical importance of the *voir dire* in exposing potential and latent bias" of jurors. *E.g., Williams* II, *supra,* 113 *N.J.* at 409–10, 550 *A.*2d 1172. Unless the defendant is afforded a *voir dire*

sufficiently "thorough and probing" to ensure that the *Adams/ Witt* test is satisfied, the defendant's death sentence must be overturned. *State v. Biegenwald,* 126 *N.J.* 1, 34, 594 *A.*2d 172 (1991) *(Biegenwald* IV).

In assessing the adequacy of a *voir dire,* the Court should examine the juror selection process "as a whole." *State v. Dixon,* 125 *N.J.* 223, 244, 593 *A.*2d 266 (1991). Among the most important factors the court *should* consider are the scope and the method of questioning. Each potential juror's feelings about the death penalty should be probed to ensure that the juror would be both able and willing to follow the court's instructions. To that end, open-ended questions are favored and leading questions are discouraged.

–A–

Much of the *voir dire* in this case was dominated by the sort of leading questions criticized in *Biegenwald* IV. The Court there reviewed what it found to have been an inadequate *voir dire:*

> The suggestion in the colloquy [between defense counsel and trial judge] that there is a "correct" answer to the open ended question "what are your views on the death penalty?" is most troubling. Although such an open-ended question is undeniably a proper jumping-off point for death qualification, the vapid response "it depends on the circumstances" in no way reduces the need for additional probing of a venireperson's views on the appropriateness of the sentence of death. The purpose of *voir dire* is not to elicit from a potential juror the correct answer; it is to draw out the potential juror's views, biases, and inclinations and to provide both counsel and the court the opportunity to assess the venire-person's demeanor. . . . The court's initial open-ended question and variations on the "it depends" response were too often followed by closed-ended, suggestive questions that, not surprisingly, elicited the obvious "correct" response.

[126 *N.J.* at 39, 594 *A.*2d 172.]

In this case, as in *Biegenwald* IV, initial open-ended questions elicited equivocal responses, which were in turn followed by a series of leading questions that ultimately induced obviously preferred responses. In some instances, the court asked

open-ended questions only after suggesting, through leading questions, the preferred response. More than half of the jurors who actually served were qualified on the basis of their answers to leading questions regarding the imposition of the death penalty.[1] Some of the juror responses indicating a will-

---

1 The questioning of jurors De Simon, Edson, Kruse, Marchito, Olsommer, Salemo, and Swagger all fell into the proscribed pattern. The questioning of juror Gina Marchito provides an example of the common questioning sequence, in which the potential juror gave noncommittal answers to open-ended questions followed by leading questions that elicited more definitive answers:

THE COURT: What are your feelings about the death penalty? Do you have any beliefs or feelings?

MR. MARCHITTO: Well, I believe that in extreme cases I don't think it's wrong.

THE COURT: What types of cases do you mean?

MS. MARCHITTO: Well, I think in anything—I don't know how to define extreme. I mean extremely brutal.

THE COURT: Let me ask you this. If the defendant were found·guilty of murder, you would be presented with aggravating factors by the State and mitigating factors by the defense, and I would tell you what the legal principles are that you have to work with.

MS. MARCHITTO: Uh-huh.

THE COURT: And your function would then be to weigh the aggravating and mitigating factors and make a determination is it life imprisonment with thirty years without parole or is it death?

Would you be able to, in all good conscience, weigh those factors, keeping in mind the duty that you've taken upon your oath? Would you be able to weigh the factors, and if the facts warrant it, vote to impose death?

MS. MARCHITTO: If everything weighed that way, yes.

THE COURT: And if the facts warrant it would you be able to, instead of imposing the death penalty, if the facts warrant it, impose life imprisonment with thirty years without parole?

MS. MARCHITTO: Yes.

\* \* \* \* \* \* \* \*

THE COURT: Could you weigh those against the aggravating factors and then decide based on all of this, and the weighing process, whether or nor defendant should be put to death or whether or not he should be placed in prison for life without parole for thirty years?

MS. MARCHITTO: Yes.

THE COURT: And you'd be sworn to perform that function, do you understand that?

MS. MARCHITTO: Yes, I do.

ingness to weigh aggravating and mitigating factors appear to have been prompted and influenced by the form of the precipitating questions. This form of questioning not only failed to delve deeply into juror attitudes about the death penalty but indeed masked actual attitudes.

I recognize that the Court defers to strategic decisions made at trial regarding the method of conducting *voir dire*. When the record reveals that the lawyer has made a conscious decision not to investigate the attitudes of jurors toward the death penalty, this Court has deferred to the trial attorney's calculated choice. *E.g., Dixon, supra,* 125 *N.J.* at 247, 593 *A.*2d 266; *Marshall, supra,* 123 *N.J.* at 93, 586 *A.*2d 85; *State v. Long,* 119 *N.J.* 439, 480, 575 *A.*2d 435 (1990). However, the trial court cannot employ procedures that would allow a biased jury to sit simply because trial counsel seems not to care. In *Biegenwald* IV, the Court acknowledged "the paucity of objection by defense counsel" but stated that "whatever lack of zealousness and vigor one might ascribe to defense counsel in no way diminishes our duty to ensure that defendant is sentenced by a fair and impartial jury." 126 *N.J.* at 42, 594 *A.*2d 172. Further, the Court concluded that it could not "attribute that inadequacy [of the *voir dire*] to a strategic decision by trial counsel." *Id.* at 43, 594 *A.*2d 172. "[T]he primary responsibility for the conduct of *voir dire* rests with the trial court." *State v. Pennington,* 119 *N.J.* 547, 591, 575 *A.*2d 816 (1990). When the Court reversed the death sentence in *Williams* II, it said that "the lack of significant information regarding jurors' attitudes on a host of issues denied both parties the ability to challenge jurors for cause, and perhaps *most importantly* left the trial court unable to fairly evaluate the fitness of many of the jurors to serve." 113 *N.J.* at 408, 550 *A.*2d 1172 (emphasis added). Today the Court simply sidesteps the problem.

THE COURT: And is there anything in your background, in your conscience that would prevent you from doing either one of the two?
MS. MARCHITTO: No.

There is no indication in this case that defense counsel affirmatively wished to limit vigorous questioning on juror attitudes toward the death penalty. He never expressed concern that the court was "overemphasizing" death qualification. Nor did he indicate that he wanted to minimize death qualification to maximize defendant's chances of prevailing at the guilt phase. On the contrary, the record is full of instances in which defense counsel pursued the topic and objected to potential jurors who appeared to favor the death penalty. In my view, if defense counsel failed to probe thoroughly into the attitudes toward the death penalty of many jurors, as it appears he did, that failure should not be attributed to a desire on his part to limit questioning. Any doubts in this regard must be resolved to favor a thorough probing of juror attitudes, for the possibility that an unqualified jury will impose a death sentence is too grave a risk to accept. *See State v. Marshall, supra,* 123 *N.J.* at 224, 586 *A.*2d 85 (Handler, J., dissenting) (holding that defense counsel does not have prerogative to decide whether to death-qualify a jury in capital cases because risk of unfair conviction of death poses too grave a constitutional offense).

–B–

In addition to its failure to explore fully the jurors' views of the death penalty in general, the *voir dire* failed to account for juror attitudes about the specific aggravating factors in the case. The two aggravating factors were kidnap murder and murder to escape apprehension. Prospective jurors were never asked how they felt about those specific aggravating factors, nor how proof of those circumstances would affect their abilities to weigh aggravating and mitigating factors. (Only two jurors who heard the case, Paul Edson and Loretta Olsommer, were asked whether they would vote for the death penalty in a kidnap-murder case. Olsommer actually indicated that she would vote for the death penalty automatically unless the defendant had not intended to kill.)

This Court has acknowledged that some jurors who would not vote for the death penalty automatically in all murder cases might be unwilling to impose a life sentence given the presence of certain aggravating factors. In *Williams* II, *supra,* 113 *N.J.* 393, 550 *A.*2d 1172, the Court suggested that questioning of potential jurors on specific aggravating factors may be required. In that case, which involved the aggravating factor of murder committed in conjunction with rape, the Court stated that

> a juror who will not, or cannot, consider relevant mitigating evidence pertaining to the defendant because the crime involves rape and murder is "substantially impaired" under the *Adams–Witt* test. Therefore, the failure to inquire into whether any juror could consider the mitigation evidence if it was established that the defendant was guilty of rape and murder denied counsel and the trial court the tools with which to insure that the jury panel could fairly undertake its role in this case.

[*Id.* at 417, 550 *A.*2d 1172.]

In *Biegenwald* IV, *supra,* 126 *N.J.* 1, 594 *A.*2d 172, the Court applied the same reasoning to a case involving the aggravating factor of a prior murder committed by a person charged with capital murder. The reasoning of *Williams* II was found to be "equally applicable" to cases involving the prior-murder aggravating factor because prior murder convictions, like rape-murders, "could blind venirepersons in the performance of their duties as jurors." *Id.* at 31, 594 *A.*2d 172. Thus, broadening the rule to apply to all such inflammatory aggravating factors, the Court concluded that the *"voir dire* should include questioning about evidence of aggravating factors that will be presented during the sentencing proceeding and that may with reasonable likelihood have such an effect on a prospective juror as to render him or her 'substantially impaired' under the *Adams–Witt* standard." *Id.* at 32, 594 *A.*2d 172.

A case involving a kidnapping that ends in the killing of the victim so that the defendant may escape detection and capture surely presents a highly inflammatory and disturbing situation, one that could readily engender intense outrage toward the

defendant and deep sympathy for the victim. The Court acknowledges that the rule on aggravating factors enunciated in *Williams* II and reaffirmed in *Biegenwald* IV should apply to kidnap murders, and that the *voir dire* should have explored the potential that this aggravating factor might unfairly sway the verdict toward death. *Ante* at 212, 619 *A*.2d at 1225. The Court concludes that the kidnapping factor meets the more exclusive standard articulated by Justice Garibaldi in her dissent in *Biegenwald IV*, whereby *voir dire* would address only those factors which could cause "excessive, and deserved, sympathy for the victim." 126 *N.J.* at 93, 594 *A*.2d 172.[2]

Nonetheless, the Court concludes that, considering the *voir dire* as a whole, this flaw does not rise to the level of reversible error. I believe that it does, for the circumstances of a kidnapping murder are certain to evoke sympathy not only for the victim, but his family as well. Prosecutorial strategy throughout the trial emphasized the impact of defendant's intimidation upon Mrs. Flax, and the terror which she experienced. It is precisely in these cases where such evidence is admissible to establish the existence of an aggravating factor that the *voir dire* must account for juror sentiments and attitudes which would blind them to mitigating evidence. While the use of such evidence may not be so inflammatory as to preclude its admissibility under *Evidence Rule* 4, in a capital prosecution the *voir*

---

[2] In the past year, a number of cases involving kidnapping have been widely publicized, showing the public outrage, and a consequential prosecutorial fervor, that this issue evokes. *See Star Ledger,* April 30, 1991, at 1; June 20, 1992, at 1; June 29, 1992, at 1 (recounting the kidnapping and murder of Exxon executive and illustrating intense public interest in kidnap murder); "Michael Chertoff—Justice on the Jersey Side," *N.J.L.J.,* Oct. 5, 1992, at 4 (describing United States Attorney relentless prosecution of that case); *see also, New York Times,* Jan. 14, 1993, at A1, B6 (describing the kidnapping of ten-year-old Katie Beers, held in an underground cell for sixteen days); Lucinda Franks, "Annals of Surveillance," *New Yorker,* Dec. 14, 1992, at 58 (describing widely publicized case of New York judge arrested for allegedly making kidnapping threats as part of extortion scheme; U.S. attorney determined not to "allow this case to slip away").

*dire* must ensure that the effect of the evidence is confined to establishing the aggravating factor and does not serve to distort the jury's deliberations.

In sum, the *voir dire* failed sufficiently to explore and expose juror attitudes concerning the death penalty in general and to explore such attitudes concerning the specific aggravating factors. The defects in the *voir dire* impugned the juror death-qualification process and justify the reversal of defendant's conviction and death sentence.

## II

Defense counsel sought to rely on mitigating factor c(5)(g). That factor is available if the "defendant rendered substantial assistance to the state in the prosecution of another person for the crime of murder." According to the defense, at the meeting between defendant and Therese Afdahl on the evening of their arrest, defendant induced Afdahl to confess, thereby aiding the State in its prosecution of Afdahl. (In a separate trial, the State used Afdahl's confession to convict her of Flax's murder.) The trial court rejected defense counsel's request for an instruction on the c(5)(g) factor. The Court now concludes that there was insufficient evidence to submit that factor to the jury, and even if the trial court's ruling was an error, that error was harmless because the jury could consider the evidence under the catch-all mitigating factor c(5)(h). *Ante* at 299, 619 *A.*2d at 1272. I strongly disagree with the Court's analysis and resolution of this issue.

When defense counsel asked the trial court to instruct the jury on the mitigating c(5)(g) factor, the prosecutor objected because he could not "conceive of a basis in the evidence as I understand it, and any evidence that may be produced that could possibly substantiate that mitigating factor." The prosecutor further observed that the State did not intend to call defendant in Afdahl's trial.

In response, defense counsel pointed to defendant's signed statement and observed that it "was made only after Mr. Martini went to Therese Afdahl and told her that, 'I'm going to tell them what happened and what the participation is.'" Counsel continued, "Now, that, of course, is not part of that statement [Martini's signed sworn confession] but that is part of Mr. Trahi's [sic: Trahey's] testimony and Mr. Carlino's testimony and the F.B.I. agent's testimony that that happened." Counsel for the defendant emphasized, to the court below, that Afdahl's confession came only after the defendant had confessed.

The trial court then ruled as follows:

Under the statute 2C:11–3(c)5(g), mitigating factor talking about defendant rendered substantial assistance to the State in the prosecution of another person for the crime of murder, I have to be satisfied that the defendant had rendered substantial assistance.

Substantial assistance means considerable assistance, assistance which played a fairly large or important role in the arrest or prosecution of the other person. And that has not happened here.

Mr. Martini's short two to three minute discussion or statement to Therese Afdahl at approximately one a.m. on January 26, might have led Therese to then voluntarily give a statement as to her involvement in this, but certainly that in and of itself is not substantial assistance, meaning that it was considerable assistance, assistance which played a fairly large or important role in the arrest and prosecution of Therese Afdahl.

Defense may be able to utilize that testimon[y] on the catch-all mitigating factor and argue that, but as a separate mitigating factor I'm going to sustain the objection of the prosecutor.

However, if other evidence comes in that changes my mind on that, of course then we can always deal with that.

When the trial court made its ruling at the beginning of the penalty phase of the trial, the *only* evidence bearing on the issue of defendant's "cooperation" that had been placed before the *jury* consisted of Officer Trahey's testimony at the guilt phase of trial. That evidence was as follows:

A At that time [Martini] indicated that he would be more than willing to cooperate and talk with us and lay out his entire involvement in the case, but that he first wanted an opportunity to speak to Therese Afdahl. It was agreed to afford him that opportunity, and he did speak with Therese.

Q Before you gave him that opportunity, did he tell you what he wanted to say to Therese Afdahl?

A Only that he was going to cooperate with us and that he was going to tell us what had happened and that he wanted her to be aware of that fact.

Q Where was Therese Afdahl at this time?

A Therese was in what was Captain Denning's office at that time, which was about ten feet down the hall.

Q Did you give him that opportunity to speak to her?

A Yes, I did.

Q Was that done in your presence?

A Yes, it was.

Q About how long did that conversation last?

A At best two to three minutes.

Q And did it consist of what John Martini told you it would consist of?

A Yes.

Nevertheless, the record indisputably shows that in addition to Trahey's testimony before the jury at the guilt-phase of the trial, other evidence bearing on the issue of defendant's cooperation had been adduced in the course of the prosecution. That evidence was clearly urged by defense counsel as a basis for the c(5)(g) mitigating factor.

The pretrial hearing on defendant's motion to suppress his confessions included testimony concerning what had occurred at meetings between defendant and Afdahl on January 26 and 30. For example, Officer Trahey testified with respect to the January 26 meeting:

A John Martini, actually we allowed John Martini to tell her that he was going to cooperate with us and that she—he wanted her to know that he was going to cooperate with us, and that's what he was allowed to tell her, that, "Therese, I'm now going to cooperate with them and I'm going to tell them what happened."

Q What did Therese say in response if anything?

A I don't recall what she said. I don't know that she said anything because we told John that we weren't going to allow him to engage in conversation, that we would only allow him to tell her specifically that he was going to cooperate with us, and then we told him we were going to remove him from the room and go back to the conference room.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

A John had had the opportunity to tell Therese that he was going to cooperate with us and at that point we sat down and we started to get into the questioning of, you, about himself and what had happened.

Agent Petersen also testified about the January 26 meeting, stating that, though he was not present during the conversation between defendant and Afdahl, he heard defendant express his intent to encourage Afdahl to cooperate with the police. Specifically, Agent Petersen testified:

A Well, he had told us at one point in time that he'd be willing to cooperate and tell us exactly what had happened in this matter. He said but, first, he would like to consult with Therese Afdahl because he wanted to alert her to tell the whole truth as well and, basically, that's what he had provided to us.

Q So did you discuss—you or Investigator Trahey in your presence discuss with Mr. Martini what he was going to say to Ms. Afdahl when they met?

A Well, basically he told us what he wanted to tell her, is that he wanted to tell her to just tell the truth of exactly what had happened and he would be doing the same to us.

 * * * * * * * *

A * * * What Mr. Martini said to us basically was that, you know, he wanted to talk to Ms. Afdahl to tell her to—you know, to tell the truth as to what had happened.

With respect to the January 26 meeting Officer Carlino, the police officer who questioned Afdahl, testified that Afdahl had signed the consent forms to search the apartment and the rooms at Days Inn prior to speaking to defendant, and that she had requested to speak to defendant. In his report, he stated that after Afdahl's meeting with defendant,

[w]e then asked Ms. Afdahl if she was willing to cooperate with us at this time and tell us the truthful facts concerning her and Martini's participation in Irving Flax's murder. At this time, Ms. Afdahl was crying and said that she was willing to cooperate with us and she said that she could now tell us the truth regarding Mr. Flax's murder, *because Martini had told her to cooperate with the police.* (emphasis added)

Those witnesses, as well as FBI Agent Hoyt Peavy, also testified on matters bearing on defendant's cooperation with respect to the January 30 meeting. (Some of this testimony and a written report indicated that at the later meeting defendant had urged Afdahl to tell the police that she was the one who shot Flax.)

—A—

The Court now reasons that the only evidence before the trial court relevant to defendant's substantial assistance to the State with respect to Afdahl was Officer Trahey's testimony before the jury. *Ante* at 296, 619 *A.*2d at 1270. According to the Court, that evidence shows at best that defendant had merely informed Afdahl that he planned to confess, which, the Court concludes, does not satisfy a threshold finding of "substantial" assistance. *Ante* at 297, 619 *A.*2d at 1271.

I believe that the trial court erred by its apparent failure to consider fully the evidence of defendant's cooperation that had been adduced at the pretrial phases of the prosecution when it then determined that there was insufficient evidence—trial or pretrial—to submit c(5)(g) to the jury. This Court, in my opinion, now errs in finding that the only testimony available to support the defense request was Trahey's jury testimony. It compounds the error in concluding that even that testimony was insufficient to enable the jury to find that defendant had rendered substantial assistance in aid of Afdahl's prosecution.

The trial court clearly erred in not giving due consideration of and full weight to the pretrial evidence relating to defendant's cooperation. In the penalty-phase trial of a capital case, the defendant is entitled to "the use of all reliable, helpful information." *State v. Davis*, 96 *N.J.* 611, 619–20, 477 *A.*2d 308 (1984). In *Biegenwald* IV, *supra*, 126 *N.J.* at 47, 594 *A.*2d 172, we concluded that a mitigating factor could be established "by some reliable evidence." Clearly, the pretrial testimony of the interrogating officers was such reliable evidence.

Furthermore, defendant could proceed by way of a proffer; he was under no obligation to have adduced evidence of mitigating factors in advance of the penalty-phase of the trial. Under *Rule* 3:13–4, the defense's obligation to notify the prosecutor of the mitigating factors upon which it will rely in the penalty phase arises only upon the verdict of guilt.[3] By contrast, the

---

[3] *Rule* 3:13–4 provides:

prosecutor's obligation to notify the defendant of the alleged aggravating factors arises when the defendant is arraigned. Mitigating factors as such are simply not relevant to the guilt phase and do not arise for consideration until after the conclusion of the guilt phase. *See e.g., Skipper v. South Carolina,* 476 *U.S.* 1, 4–5, 106 *S.Ct.* 1669, 1671, 90 *L.Ed.*2d 1, 7 (1986) (holding that trial court erred in excluding evidence that defendant was capable of being rehabilitated as shown by cooperative attitude in jail). Thus the Court's decision to hold against defendant the fact that there was no *guilt phase* testimony to support his *sentencing phase* contentions is indefensible.

In effect, the Court has approved a procedure whereby the trial court can look solely to the evidence adduced at the guilt phase of the trial to determine whether the defendant is entitled to submit specific mitigating factors in the penalty phase. That contradicts the logic of our death penalty statute *N.J.S.A.* 2C:11–3c(5) and the rules governing the courts of New Jersey. *Rule* 3:13–4. We expect defendants to ignore mitigating factors during the guilt phase. Indeed, as already noted, the duty of the defense to give notice of mitigating factors arises *only after a verdict of guilt.* Accordingly it is both unfair and illogical for a trial court—or this Court on appellate review—to reject a mitigating factor by looking at the evidence adduced *at the guilt phase.*

---

 (b) The defendant shall provide the prosecuting attorney with an itemization setting forth the mitigating factors he intends to rely upon at the sentencing hearing together with any discovery he may have in his possession to support same. Such discovery shall be transmitted to the prosecuting attorney, *forthwith upon a verdict of guilt, or plea of guilty,* to a crime punishable by death. (emphasis added)

The Committee Comment on *Rule* 3:13–4 explained:

 [T]he defendant's reciprocal obligation with respect to discovery would commence "forthwith upon a verdict of guilty or a plea of guilty to a crime punishable by death." In such a way, the defense would not be required to disclose information which might prejudice him with respect to guilt or innocence having a bearing only upon the appropriate sentence.

 [Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 3:13–4 (1993).]

Undeniably, some evidence that is relevant to certain mitigating factors may be introduced during the guilt phase. There are instances in which underlying evidence adduced during the guilt phase serves a dual purpose of bolstering a defense against guilt and supporting a mitigating factor that will be germane during the penalty phase. Nevertheless, even when evidence that is probative of such overlapping issues is relied upon by the defendant in the penalty phase, that will not itself necessarily mean that all or most of the evidence that is probative of the mitigating factor will have been admitted during the guilt phase. *E.g. State v. Biegenwald,* 106 *N.J.* 13, 23–24, 524 *A.*2d 130 (1987) (during guilt phase, defendant claimed he was not guilty of murder and that a friend had killed victim; during penalty phase, defendant relied upon and introduced evidence to support mental disturbance mitigating factor c(5)(a) and impairment due to mental disease, mitigating factor c(5)(d)).

A review of our death-penalty statute makes clear that there are mitigating factors that are not relevant to or have no bearing on guilt as such. The very nature of such mitigating factors dictates that guilt phase evidence will not ordinarily touch upon them. For example, the defendant's age c(5)(c), absence of prior criminal record c(5)(f), unusual and substantial duress insufficient to constitute a defense to prosecution c(5)(e), substantial assistance rendered to the State c(5)(g), and generally mitigating evidence under the catch-all factor c(5)(h) often would not be relevant in the guilt phase. For the Court, then, to suggest that a mitigating factor can only be submitted to the jury if the guilt phase record supports it is inconsistent with the structure of a capital trial; it fundamentally alters the bifurcated nature of capital prosecutions and defeats one of the essential goals of bifurcation—to allow a separate and more expansive trial to determine whether death is an appropriate sentence; and it imposes an impossible task, for the defense, in most cases.

Most of the testimony regarding defendant's cooperation emerged during the pretrial hearings. Defendant's proffer referred to Trahey's testimony, which was given at the pretrial hearing as well as at the guilt trial itself. The proffer also referred to Petersen's and Carlino's testimony. Because Petersen did not testify at the guilt phase, defendant was obviously referring to his pretrial testimony. Moreover, Carlino's guilt-phase testimony was limited to an inventory of the items seized after a search of the hotel rooms, and therefore defendant's reference to Carlino's testimony relating to defendant's cooperation could only have been to that elicited at the pretrial hearings. Thus, the proffer necessarily incorporated the pretrial evidence. Moreover, the prosecutor apparently understood that defense counsel was referring to more than guilt-phase trial evidence. The prosecutor observed: "I can't conceive of a basis *in the evidence* as I understand it, *and any evidence that may be produced* that could possibly substantiate that mitigating factor." (emphasis added).

Furthermore, the trial court was on notice that defendant was relying on such pretrial evidence. The defense counsel listed each of the agents as showing that the conversation between defendant and Afdahl had taken place, and he specifically identified the testimony of each of the agents as relevant evidence supporting the mitigating factor. The trial court was fully aware that the pretrial evidence had a bearing on defendant's claim that he had rendered substantial assistance. The same judge presided over the motions hearings and guilt trial. Having ruled on objections concerning the appropriateness of referring to the officers' written reports, he knew they existed. He heard the pretrial testimony of Peterson that defendant had wanted to speak to Afdahl to tell her to tell the truth about exactly what happened.

Thus, it is clear that defense counsel's proffer included the pretrial evidence. To the extent that the trial court's ruling at the outset of the penalty trial that the jury would not be instructed on the c(5)(g) factor was confined to the trial evi-

dence, that ruling was mistaken. The critical inquiry then is whether defendant proffered sufficient evidence to submit the factor to the jury, not whether the jury had already heard evidence that was sufficient to support the submission of the factor for its consideration in setting the punishment.

To reiterate, testimony at the guilt phase established that before defendant gave his oral and written statements on the morning of January 26, 1989, following his arrest, he had asked for and had received permission to speak to Therese Afdahl. Trahey testified during the suppression hearings that he had been in the room during the conversation. As noted, he stated that defendant "wanted [Afdahl] to know he was going to cooperate" and that he was "going to tell [the police] what [had] happened." Peterson testified during the pretrial hearings that defendant had told Peterson and Trahey that he had intended to tell Afdahl that he was going to cooperate and that Afdahl should tell the officers "the whole truth" and that "he would like to consult with Therese Afdahl because he wanted to alert her to tell the whole truth as well." And that "basically he told us what he wanted to tell her, is that he wanted to tell her to just tell the truth of exactly what had happened and he would be doing the same to us." He did not recall hearing the conversation. Carlino also testified that before either Afdahl or defendant had given a statement, Afdahl had wanted to speak to defendant. Shortly after speaking with defendant, Afdahl made an incriminating statement.

Moreover, at the hearings below, all parties involved seemed to assume that defendant had encouraged Afdahl to cooperate. The investigators' written reports, which summarize Trahey's interrogation of defendant and Carlino's interrogation of Afdahl, corroborate the defense position that defendant told Afdahl that she should cooperate. For example, the Carlino report states that after defendant spoke to Afdahl, "Afdahl was crying and said that she was willing to cooperate with us and she said that she could now tell us the truth regarding Mr. Flax's murder, because Martini had told her to cooperate with

the police." In fact, Trahey's written report, which is dated two months after the interrogation, states that "John Martini, Sr. told Afdahl that he was going to cooperate with the police and that she should tell the investigators the truth about the kidnapping and murder of Irving Flax." Indeed, when defendant asked to speak to Afdahl, the detectives met in the hall to discuss whether they would·grant the request. Carlino protested because he did not want defendant and Afdahl to create matching stories. It is significant that the others supported the meeting because defendant might get Afdahl to cooperate. ("[I]f he told her it was all right to speak to us, she would tell the truth").

Only on appeal does the State press the issue whether defendant told Afdahl "I am going to tell the truth" or "You should tell the truth." Even if defendant actually told Afdahl only that he was going to cooperate, without any encouragement for her to cooperate, given the relationship between the two, the jury could have also found that that statement constituted substantial assistance. Afdahl was a young woman with a substantial drug addiction and was dependent on defendant for care and support. Following the conversation, both Martini and Afdahl confessed to their respective involvement in the crime, signed consent to search forms, and signed sworn statements. Thus the jury could reasonably have found that the knowledge that her protector would confess would have been enough to induce her to cooperate.

—B—

The Court also finds that the trial court's ruling that defendant's proffered evidence was insufficient was not prejudicial, even if in error. *Ante* at 290, 619 *A.*2d at 1267. According to the Court, the trial court did not prevent defense counsel from submitting any evidence on factor c(5)(g). The Court reasons that this is not a case like *Eddings v. Oklahoma,* 455 *U.S.* 104, 102 *S.Ct.* 869, 71 *L.Ed.*2d 1 (1982), in which the trial court

prevented the defense counsel from presenting evidence of a mitigating factor. *Ante* at 290, 619 *A.*2d at 1267.

However, the Court fails to appreciate that the trial court's ruling was in effect an exclusionary ruling. When the trial court ruled on the request for the c(5)(g) instruction at the beginning of the penalty phase, as noted, it explicitly stated that "if *other* evidence comes in that changes my mind, on that, of course, then we can always deal with that." (emphasis added) The court's invitation to defense counsel to produce more evidence was not and could not have been understood to have referred to the pretrial evidence of defendant's coopera- tion. The pretrial evidence had already been presented to the trial court in defendant's proffer and had been rejected by the court as insufficient. Hence, the court's ruling could have meant only that the court had determined that *that* evidence— the pretrial evidence—as well as the evidence before the jury was insufficient and inadmissible. That ruling was wrong and the trial court's invitation to produce "more evidence" to coun- sel only confirmed that error.

At the end of the penalty phase, the jury still had before it, as evidence of defendant's substantial assistance to the State, only Officer Trahey's testimony that defendant had told Afdahl, "[o]nly that he was going to cooperate with us and that he was going to tell us what happened and that he wanted her to be aware of that fact." In my opinion, that evidence was itself adequate to support a finding that defendant encouraged Af- dahl to cooperate with authorities.

Under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, paragraph 12 of the New Jersey Constitution, the jury in a capital case must consider all evidence proffered by a defendant that is relevant to defen- dant's record or character or to the circumstances of the offense. *Eddings v. Oklahoma, supra,* 455 *U.S.* at 113–14, 102 *S.Ct.* at 876–77, 71 *L.Ed.*2d at 10–11; *Lockett v. Ohio,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L.Ed.*2d 973, 990 (1978); *State*

*v. Ramseur,* 106 *N.J.* 123, 191–92, 524 *A.*2d 188 (1987). A defendant has the burden to produce evidence of any mitigating factor. *N.J.S.A.* 2C:11–3c(2)(a). Although the statute does not specify the quantum of evidence needed to justify jury consideration of a mitigating factor, *N.J.S.A.* 2C:11–3c(b) provides that a defendant "may offer evidence relevant to any of the mitigating factors."

This Court has, in the past, recognized its "extraordinarily tolerant" practice in allowing evidence to be considered in determining the sentence of convicted defendants. *Davis, supra,* 96 *N.J.* at 622, 477 *A.*2d 308. "Even more so is judicial tolerance required in the sentencing of a capital case." *Ibid.* In those instances in which the State seeks to take the life of a criminal defendant, as punishment for a crime, the Court is confronted by a situation " 'profoundly different from all other penalties.' " *Ibid.* (quoting *Lockett, supra,* 438 *U.S.* at 605, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990). In *Davis, supra,* we wrote:

> It must be acknowledged that in the sentencing phase of a capital proceeding— a life or death contest—a defendant is entitled to the use of all reliable, helpful information. The determinative discretion that is invoked in criminal sentencing is extremely sensitive. A sentencing judge may exercise a far-ranging discretion as to the sources and types of evidence used to assist him or her in determining the kind and extent of punishment to be imposed.... In short, the sentencing process should embrace an evidential inquiry "broad in scope, largely unlimited either as to the kind of information that may be considered, or the source from which it may come." *United States v. Tucker,* 404 *U.S.* 443, 446, 92 *S.Ct.* 589, 591, 30 *L.Ed.*2d 592, 596 (1972).
>
> We must ascribe to the Legislature full appreciation of the singular nature of the penalty phase of a capital proceeding and the ineluctable conclusion *that doubts must be resolved in favor of admission when evidence of a mitigating factor is offered by the defendant.* "So long as the evidence [introduced at a capital sentencing hearing] * * * does not prejudice the defendant, it is preferable not to impose restrictions." *Zant v. Stephens,* 462 U.S. 862, 886, 103 *S.Ct.* 2733, 2748, 77 *L.Ed.*2d 235, 256 (1983) (quoting *Gregg v. Georgia,* 428 *U.S.* 153, 203–04, 96 *S.Ct.* 2909, 2939, 49 *L.Ed.*2d 859, 891 (1976)).
>
> [96 *N.J.* at 620–21, 477 *A.*2d 308 (emphasis added).]

Logic dictates that the same "extraordinary tolerance" used in resolving doubts about evidence of mitigating factors in favor of the defendant, should also apply to the decision wheth-

er to grant a capital defendant's request that a jury be charged on a specific mitigating factor under *N.J.S.A.* 2C:11-3c(5).

A "margin of error" attends all litigation and courts are enjoined to reduce that margin of error "where one party has at stake an interest of transcending value." The interest at stake of a capital defendant is of "transcending value." *Humanik v. Beyer*, 871 *F.*2d 432, 437 (3rd Cir.1989) (quoting *Speiser v. Randall*, 357 *U.S.* 513, 525–26, 78 *S.Ct.* 1332, 1342, 2 *L.Ed.*2d 1460, 1472–73 (1958). The interest at stake of a capital defendant is of "transcending value." Hence, in the penalty phase of a capital trial we strain to reduce the "margin of error." It is reduced not only by imposing upon the State the burden of demonstrating aggravating factors beyond a reasonable doubt, *see N.J.S.A.* 2C:11-3c(2)(a), but by freeing the defendant, in making the case for mitigating factors, from the "rules governing the admission of evidence at criminal trials." *N.J.S.A.* 2C:11-3c(2)(b). In cases where, as in defendant's case, the "transcending value" at stake is the defendant's life, the court should be all the more vigilant in "reducing the margin of error" and, accordingly, allow the defendant the widest latitude in placing mitigating factors before the jury.

The statute does not specify the quantum of evidence needed to justify jury consideration of a mitigating factor. A defendant need produce only some evidence of the existence of a mitigating factor to bring it into play. The trial court must determine whether the proffered evidence would render the desired inference more probable than it would be without the evidence. *Davis, supra*, 96 *N.J.* at 619, 477 *A.*2d 308. For example, the North Carolina Supreme Court analyzes "whether the record reveals any evidence to support a reasonable finding by the jury" on the mitigating factor and requires "that any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor." *State v. Bacon*, 326 *N.C.* 404, 390 *S.E.*2d 327, 334–36 (1990).

The record supported the submission of the c(5)(g) mitigating factor to the jury. In this case there is no warrant for the Court to treat Afdahl's confession as though it were a worthless or picayune prosecutorial event. The importance of a confession, a knowing admission of guilt to the elements of a criminal charge, is significant both to the jury's assessment of the case and the prosecution's burden to prove the offense. *Colorado v. Connelly*, 479 *U.S.* 157, 182, 107 *S.Ct.* 515, 529–30, 93 *L.Ed.*2d 473, 494 (Brennan, J., dissenting) (holding that a confession has "decisive impact" on a trial and "makes the other aspects of a trial in court superfluous"). We have recognized the enormous significance of a confession in a capital-murder prosecution. *See e.g.*, *State v. Di Frisco*, 118 *N.J.* 253, 571 *A.*2d 914 (1990). It is possible that Afdahl would have confessed without defendant's intervention. But, even if this were true, it would affect only the relative weight which the jury gave the evidence of the defendant's cooperation, not whether the evidence of the defendant's cooperation should have been admitted. Defendant's statement to Afdahl that he was going to tell the police what had happened was sufficient to trigger the assistance factor. A jury could have reasonably concluded, from the very fact that the man who had taken care of her for so long was about to tell the police the whole story, that that was enough without more to induce Afdahl to follow defendant's example.

I believe that encouraging an accomplice to confess is sufficient evidence to present a jury issue on the substantial-assistance mitigating factor. Whether the jury would find defendant's assistance substantial is not the issue, it is what the jury *could* find. The trial court went too far when it determined that substantial assistance "has not happened here." That factual question belonged to the jury. Persuading a criminal suspect to confess is of considerable value to a police investigation. The parties would be free to argue the import of the evidence, but the jury would determine its weight.

On this point, I draw attention to the Appendices to the Baldus Study (Appendix B, "Penalty–Trial Cases, With a Thumbnail Sketch"), which identify five [4] cases in which the c(5)(g) mitigating circumstance was found. These were:

| | | |
|---|---|---|
| 1. | Felix Diaz | (sentence: life) |
| 2. | Anthony Di Frisco | (sentence: death) |
| 3. | Miguel Melendez | (sentence: life) |
| 4. | Richard Joseph Redden | (sentence: life) |
| 5. | Michael Rose | (sentence: life) (hung jury) |

Of these cases, only *Di Frisco* is reported, 118 *N.J.* 253, 571 *A.*2d 914 (1990), though narrative summaries of each case appear in the appendices to the Baldus study. See Appendix I "Trial Cases Involving c(5)(g) Mitigating Factor."

In trying to distinguish the defendants in *Melendez, Rose,* and *DiFrisco* from defendant in this case, the Court has endorsed a commendably generous interpretation of substantial cooperation which, ironically, if applied to the instant case, would compel the conclusion that the c(5)(g) factor should have been submitted to the jury.

As I note in the appendix, *infra* at 368, 619 *A.*2d at 1308, a careful review of the records of those cases supports the contention that on evidence that is comparable to that presented by defendant in this case, courts have charged and juries have found mitigating factor c(5)(g).

The *Di Frisco* case, standing alone, argues that the Court here errs in concluding that the evidence presented by defendant failed to "satisf[y] the threshold requirement." *Ante* at 297, 619 *A.*2d at 1271. If Di Frisco's ambivalent game of "cat and mouse" with the police—which elicited absolutely no reliable evidence—was sufficient for a trier of fact to find substan-

---

[4] A sixth, *State v. Oglesby*, 122 *N.J.* 522, 585 *A.*2d 916 (1991), is also identified. The narrative summary, produced by Baldus, however, does not mention c(5)(g) as a mitigating factor in the trial, nor does this Court's decision in *Oglesby*. Accordingly, I have not included it.

tial assistance, surely defendant's willingness to talk to Afdahl, tell her that he would confess and (expressly or impliedly) that she should tell the truth, followed by her actual confession, provides an adequate basis for concluding that the mitigating factor of substantial assistance could have been found by a reasonable trier of fact.

As I have already observed, the record indicates that there was real disagreement among the police officers about allowing defendant to speak to Afdahl. At least one police officer objected that allowing defendant to speak with Afdahl would provide them with the opportunity to create matching stories and thereby impair the progress of the police investigation.

Significantly, the officers overcame that objection and determined that the benefit of allowing defendant to talk with Afdahl outweighed the risks of their coordinating their stories. Because no one disputes that the collusion of defendant and Afdahl, in coordinating their stories, was a significant threat to the progress of the police investigation, it follows logically that the police found the benefit—Martini's cooperation—outweighed and was *more* significant than the threat itself. Subsequent events confirmed that the police made the correct strategic decision. The value of defendant's assistance had to have been—at least in the minds of the police—reasonably substantial.

Moreover, following his brief conversation with Afdahl, defendant (for the first time) discussed the crime extensively, consented to the search of his apartment and his hotel room, and authorized the telephone company to release the toll records of his telephones. Although questions may arise about whether the practical effect of these measures by defendant was only to have saved the State some inconvenience, they nevertheless bespeak a *subjective* desire to assist the State and undoubtedly constitute cooperation with and assistance to the State's investigation.

What is beyond question is that the degree of assistance afforded to the State by defendant was comparable to the assistance demonstrated by the records of *Di Frisco, Melendez*, and *Rose*. Yet in each of those cases, unlike the case before the Court, the defendant was afforded the benefit of a charge on the mitigating factor of substantial assistance to the State. In two of those cases, the jury did not return a sentence of death.

There is also inconsistency, in the Court's view of defendant's conversation with Afdahl, between the Court's discussion of the admissibility of defendant's confession, and the Court's treatment of defendant's cooperation with the State. *Ante* at 228–233, 289–301, 619 *A*.2d at 1266–1273, 1234–1236.

In finding defendant's confession admissible, the Court notes that:

Trahey, the only law-enforcement officer at the meeting (between defendant and Afdahl) testified at the pre-trial hearing that Martini told Afdahl, 'Theresa, I'm now going to cooperate with them (the police) and I'm going to tell them what happened.

[*Ante* at 230, 619 *A*.2d at 1235]

Distinguishing defendant's case from *Harvey, supra*, 121 *N.J.* at 407, 581 *A*.2d 483, the Court notes:

Defendant's request to speak to Afdahl prior to talking to officers is materially different from the request made in *Harvey* in several respects. Prior to his request, defendant did not show a continued reluctance to talk to police. To the contrary, Martini signed forms indicating that he waived his right to remain silent.... Instead he voluntarily told Trahey and Petersen that if he could speak to Afdahl, he would tell them about his "complete involvement" in the kidnapping and murder of Flax.

[*Ante* at 232, 619 *A*.2d at 1236]

The Court then proceeds to describe Afdahl as "[a] major participant in the kidnapping and murder about which defendant was to be questioned. She was not an outside advisor but a likely co-defendant, potential informant, and possible alibi witness." *Ante* at 232, 619 *A*.2d at 1236.

When accepting the State's contention that defendant's confession was properly admitted into evidence, the Court paints a picture of a complaint defendant, showing no reluctance to talk

with police about his crime, who tells "a major participant in the kidnapping and murder ... a likely co-defendant, potential informant, and possible alibi witness" that he intends to confess. Yet when rejecting defendant's claim that the c(5)(g) mitigating factor should have been submitted to the jury, the Court sketches an image of defendant as "at best ... merely inform(ing) Afdahl that he planned to confess." *Ante* at 299, 619 *A.*2d at 1272.

The rhetorical inconsistency, alone, raises troubling questions about the internal coherence of the Court's analysis of defendant's multiple claims. Apparently, the Court finds consolation and support for its conclusions about defendant's cooperation with the State from the fact that there was some evidence that defendant may have attempted to persuade Afdahl to take the blame for the murder. *Ante* at 295–297, 619 *A.*2d at 1270–1271. The Court then declares that defense counsel did not introduce further evidence of defendant's cooperation during the penalty phase because counsel "wisely realized that to do so would allow the State to introduce" damaging rebuttal testimony. *Ante* at 297, 619 *A.*2d at 1271. The Court concludes, definitively, that the reason no further evidence of defendant's cooperation was introduced was because of a strategic decision by defense counsel, claiming that only an unrealistic reading and "tortured analysis" of the record would suggest otherwise. *Ante* at 296–297, 619 *A.*2d at 1270–1271.

The Court's assumption about why the defense counsel did not introduce further evidence of defendant's cooperation is admittedly plausible. It is also indisputably conjectural. And that conjecture misses completely the nature of the review required by defendant's claim that the trial court should have submitted a statutorily established mitigating factor to the jury. Accordingly, the Court skirts its obligation to determine whether a reasonable jury could have found that defendant's telling his partner in crime that he was going to confess constituted substantial assistance.

Had the Court applied the same spirit of its analysis of the State's submission of the c(4)(f) aggravating factor to the

defendant's submission of the c(5)(g) factor, the Court would have found the trial court in error in refusing to submit the c(5)(g) factor for the jury's consideration.

In its discussion of the adequacy of the evidence supporting aggravating factor c(4)(f) (that the murder had been committed for the purpose of escaping detection, trial, punishment, or confinement for another offense committed by defendant), *ante* at 279–289, 619 *A*.2d at 1261–1266, the Court refuses to adopt a "circumscribed" reading of the factor. *Ante* at 282, 619 *A*.2d at 1262. The Court then proceeds to inquire whether the State provided sufficient evidence—"either direct or circumstantial"—upon which a reasonable jury could have concluded that the factor applied to defendant. As the Court observes, such a conclusion, by the jury, would be a "reasonable inference" based upon all the circumstances presented to the jury. *Ante* at 284–285, 619 *A*.2d at 1263–1264.

In its analysis of the trial court's refusal to submit mitigating factor c(5)(g), the Court weighs the evidence, assesses the credibility of conflicting accounts, speculates about defense strategy, and concludes that the defendant had not offered substantial assistance to the State. Those activities, however, are the province and duty of a jury, not this Court. The jury should have been allowed to draw a "reasonable inference" from all the circumstances of the defendant's telling his partner in the kidnapping and murder, a "likely co-defendant, potential informant, and possible alibi witness" that he was going to cooperate with police by confessing his involvement in the crime.

To my mind, the conclusion is inescapable that, in refusing to allow defendant to submit evidence of the c(5)(g) factor to the jury, the trial court usurped a proper function of the jury. That error increased the likelihood that defendant would be sentenced to death and, accordingly, rendered the penalty phase of defendant's trial unfair.

—C—

The Court concedes that

[t]he court should have withheld its ruling until the end of the penalty phase when all the evidence was before the jury and just prior to the time when the court actually charged the jury with respect to the mitigating factors.

[*Ante* at 294, 619 *A*.2d at 1269–1270].

The Court states, however, that this trial error "made little difference" for three reasons: (1) "defendant was given the unlimited right to introduce evidence on factor c(5)(g)." *Ante* at 295, 619 *A*.2d at 1270; (2) defendant chose to present no other evidence to the jury on factor c(5)(g); and (3) the trial court "suggested to defense counsel that evidence of that mitigating factor could be used in the catch-all factor." *Ibid.*

But as already shown, defendant's proffer clearly incorporated all pre-trial and guilt-phase evidence on defendant's cooperation. Accordingly, the "unlimited right to introduce evidence" on the question of mitigation was an empty right—the trial court had already denied the defense proffer that incorporated all the evidence on mitigation available to the defendant. Thus, the first two reasons offered by the Court to explain why the trial court's error made "little difference" to the defendant are simply untenable.

With respect to the third reason, the Court accepts the State's argument that any prejudice to defendant was negated because the trial court permitted defense counsel to present the issue of defendant's cooperation under the catch-all mitigating factor. *Ante* at 296, 619 *A*.2d at 1270.

Giving the defense the unlimited right to argue the strength of relevant mitigating evidence cannot compensate for the trial court's failure to inform the jury that it must consider that evidence in deciding the appropriate punishment. Proper jury instructions are essential in ensuring that the jury in fact considers all relevant mitigating evidence proffered by a capital defendant. The jury will not necessarily infer from instructions which do not address the use of evidence in the catch-all factor, that they may consider mitigating evidence as a whole. *Cf.*

*Taylor v. Kentucky*, 436 *U.S.* 478, 488, 98 *S.Ct.* 1930, 1936, 56 *L.Ed.*2d 468, 477 (1978) (holding that a jury instruction on burden of proof does not convey presumption of innocence instruction). Such an instruction is essential, because the jury will treat arguments by counsel as statements of advocacy, but will consider instructions from the trial judge as definitive statements of the law. Statements of counsel cannot substitute for precise, adequate instructions by the court. *Taylor v. Kentucky, supra,* 436 *U.S.* at 488–89, 98 *S.Ct.* at 1930, 56 *L.Ed.* at 477.

The unique and indispensable role played by the trial court in instructing the jury was recognized by the trial court itself in this case. At the close of the penalty phase, the trial court instructed the jury:

Now, again in this phase the witnesses, the prosecutor, defense counsel have concluded their part of the trial. Again, it's *my* job to instruct you as to the law that you are to apply in this phase of the trial. And again you must accept the law as *I* state it to be even if you personally believe that I'm wrong or if you personally believe the law is wrong and it should be changed.

[ (emphasis added) ]

The failure of the trial court, to instruct specifically on the catch-all mitigating factor, cannot be cured by affording defense counsel an opportunity to comment upon the catch-all factor.

Accordingly, the jury instruction on the catch-all mitigating factor was insufficient because it did not make an express reference to that evidence as a non-specific statutory mitigating factor. *Biegenwald* IV, *supra,* 126 *N.J.* at 45–49, 594 *A.*2d 172. The instruction given simply repeated the statutory language but did not refer to any specific non-statutory mitigating factors.

In *Bacon, supra,* 390 *S.E.*2d at 335, the court held that in order to show that a trial court's omission of a statutory mitigating circumstances was harmful, defendant must establish three things:

(1) that the particular factor was one which the jury could have reasonably deemed to have mitigating value (this is presumed to be so when the factor is listed in G.S. 15A-2000(f)); (2) that there was sufficient evidence of the existence of the factor; and (3) that, considering the case as a whole, the exclusion of the factor from the jury's consideration resulted in ascertainable prejudice to the defendant.

[*State v. Pinch*, 306 *N.C.* 1, 292 *S.E.*2d 203, 223–24, *cert. denied*, 459 *U.S.* 1056, 103 *S.Ct.* 474, 74 *L.Ed.*2d 622 (1982).]

The Court reasons that under the *Bacon* test, condition one is certainly met in this case, and assuming that condition two is met, condition three is not met. *Ante* at 299, 619 *A.*2d at 1272.

As the Court observes, the trial court did instruct the jurors that they could consider any evidence presented in mitigation of a death sentence. Thus, the jurors were not literally "precluded from considering, as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffer[ed] as a basis for a sentence less than death." *Lockett, supra,* 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2964, 57 *L.Ed.*2d 973, 990 (1978); *see, Boyde v. California,* 494 *U.S.* 370, 386, 110 *S.Ct.* 1190, 1201, 108 *L.Ed.*2d 316, 333 (1990); *Skipper, supra,* 476 *U.S.* at 4, 106 *S.Ct.* at 1671, 90 *L.Ed.*2d at 6 (1986); *Eddings, supra,* 455 *U.S.* at 110, 102 *S.Ct.* at 874, 71 *L.Ed.*2d at 8; *Marshall I, supra,* 123 *N.J.* at 141–42, 147, 586 *A.*2d 85. *Ante* at 301, 619 *A.*2d at 1273.

Although it is literally true that the trial court did not preclude the jury from considering mitigating factors, it is also true that after each injunction to consider all the available evidence, the trial court also commented on restrictions that had been placed on that evidence. Typical of the trial court's instruction is the following excerpt from the penalty phase:

Now, the evidence to be considered by you includes that material presented by both sides at both phases of the trial, all of the witnesses and all of the physical evidence. But if you recall, certain evidence was admitted for limited purposes.

The trial court then went on to explain that the statements made by defendant to defense experts could be used only in the jury's assessment of the mitigating factors. See discussion *infra* at 227–232, 619 *A.*2d at 1233–1235.

Similarly, the statement of the trial court quoted by the Court, in support of its contention that the jury was permitted to consider any evidence in mitigation, was followed immediately by a limiting instruction. The Court notes, *ante* at 305, 619 *A.*2d at 1275, that the trial court told the jury:

> You can use anything you've heard, even if it's not presented by counsel as a mitigating factor, if you believe it's there.

The Court does not note that this particular remark of the trial court was followed immediately by a restriction:

> But as I indicated, statements made by the defendant, and some of the other evidence I've just gone over, cannot be utilized to establish or to corroborate other evidence that may establish the aggravating factors that will [sic: we'll] go over."

Granting, arguendo, that the trial court's restrictions on the use of evidence by the jury were correct, the point of these excerpts is that the jury was not—as the Court suggests—repeatedly extended a *carte blanche* to find evidence of mitigation. Rather, each invitation to use evidence in mitigation was followed by a restrictive qualifier that, even if correct and favorable to defendant, nevertheless may have created in the minds of the jurors the expectation that the trial court was exhaustively identifying the uses to which each piece of mitigating evidence could be put.

The explicit nature of the trial court's instructions in some areas casts into even greater and more troubling relief the failure of the trial court ever to make explicit that the catch-all factor could accommodate evidence bearing on defendant's cooperation with the State.

In a trial that spanned, from jury selection to determination of sentence, more than two months; produced a record of more than a thousand pages; and eventuated in a sentence of death for a criminal defendant; the jury charge in the penalty phase contained a total of 127 words on the catch-all factor, c(5)(h). The trial court provided no discussion of factors that although not meeting specific statutory requirements, could be used in the catch-all factor. That omission, I believe, undermined the

jury's sentencing determination, *see Jeffers v. Lewis*, 974 *F.*2d 1075 (9th Cir.1992), and denied the defendant a fair adjudication of the sentence of death.

## III

The failure of the trial court to instruct the jury more thoroughly on the catch-all factor, combined with the Court's reliance on the catch-all factor as an antidote for other errors in restricting the presentation of mitigating evidence by the defendant, makes other errors that occurred in the sentencing-phase trial all the more serious. Several of those relate specifically to the trial court's instructions on the standards governing the jury's determination and balancing of the aggravating and mitigating factors.

## —A—

The defense sought to show that during the criminal episode defendant had been suffering from a mental or emotional disturbance and intoxication. Defendant relied specifically on mitigating factor c(5)(a), namely, that "[t]he defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." He also relied on c(5)(d): "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law was significantly impaired as a result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution." The evidence supporting those mitigating factors was derived from defendant's history of cocaine addiction.

Defendant contends that the trial court improperly restricted his ability to present mitigating evidence and his right to have the jury consider that evidence when it instructed the jury that evidence of his mental disturbance or intoxication must be "extreme," "substantial," or "great in degree." Defendant asserts that the trial court's error unconstitutionally circum-

scribed the jury's evaluation of the mitigating factors c(5)(a) and c(5)(d). The Court rejects that contention. *Ante* at 303–304, 619 *A.*2d at 1274–1275.

On the mental-disturbance mitigating factor, c(5)(a), the trial court's instruction to the jury included the following comments:

This mitigating factor is established by evidence showing that defendant was suffering from an extreme mental or emotional disturbance and that such disturbance influenced him to commit the murder.

\* \* \* \* \* \* \* \*

... [Y]ou must consider whether his thoughts or feelings constituted extreme mental or emotional disturbance, and if they did, whether he was under their influence or power.

\* \* \* \* \* \* \* \*

... But in order to find this factor present you must be satisfied that the mental or emotional disturbance was extreme, that is that it was great in degree.

Similarly, on the intoxication mitigating factor, c(5)(d), the trial court informed the jury:

Mitigating factor [c(5)(d)] is about disease or defect or intoxication and the effect of such condition upon the defendant during the murder. To find this mitigating factor you must be satisfied the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired by reason of mental disease or defect or intoxication.

To appreciate means to understand. By "significantly impaired" the statute means made worse, weakened or deteriorated, not slightly but to an important, meaningful or substantial degree.

The trial court also instructed the jury on the catch-all mitigating factor, c(5)(h), namely, "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense," as follows:

Mitigating factor [c(5)(h)] is not merely a single factor. Rather it requires that you consider all the evidence received as it relates to or concerns the defendant's life, his characteristics or background and the totality of the circumstances of the crime as well as the defendant's potential for rehabilitation.

According to *Lockett, supra,* 438 *U.S.* at 604, 98 *S.Ct.* at 2964–65, 57 *L.Ed.*2d at 990, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a

mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." See *Biegenwald* IV, *supra,* 126 *N.J.* at 46, 594 *A.*2d 172; *accord Hitchcock v. Dugger,* 481 *U.S.* 393, 398–99, 107 *S.Ct.* 1821, 1824, 95 *L.Ed.* 347, 353 (1987); *Skipper, supra,* 476 *U.S.* 1, 106 *S.Ct.* 1669, 90 *L.Ed.*2d 1; *Eddings, supra,* 455 *U.S.* at 112–15, 102 *S.Ct.* at 875–77, 71 *L.Ed.*2d at 9–11.

Defendant argues that the jury instructions, taken as a whole, violated those concepts by precluding the jury from considering mitigating evidence of mental or emotional disturbance and intoxication unless the evidence of those conditions showed them to be "extreme" or "substantial." By then failing to inform the jury that they could consider non-extreme mental or emotional disturbance or intoxication under the catch-all mitigating factor, the trial court precluded the jury's consideration of mitigating evidence.

The catch-all factor acts as a safety net, and in order for it to function properly, specific instructions are required. *Hargrave v. Dugger,* 832 *F.*2d 1528, 1534–35 (11th Cir.1987), *cert. denied,* 489 *U.S.* 1071, 109 *S.Ct.* 1353, 103 *L.Ed.*2d 821 (1989); *Cheshire v. State,* 568 *So.*2d 908, 912 (Fla.1990) (holding that when trial court found that defendant's proffered emotional disturbance evidence did not support statutory mitigating factor of mental disturbance because disturbance was not extreme, trial court's failure to consider his non-extreme emotional disturbance as non-statutory mitigating factor had violated *Lockett* principles because *"any* emotional disturbance relevant to the crime must be considered and weighed by the sentencer"). Here, the jury could have understood that it was permitted to consider any relevant mitigating evidence *except* that which it had already determined was specifically related to, but insufficient to establish, the specific factors mentioned by the court: c(5)(a) and c(5)(d). *Contra People v. Benson,* 52 *Cal.*3d 754, 276 *Cal.Rptr.* 827, 802 *P.*2d 330 (1990) (holding that trial court's refusal to delete modifier "extreme" from the mental or emotional distur-

bance mitigating factor did not preclude jury from considering mitigating evidence of non-extreme mental or emotional disturbance under instruction on the catch-all mitigating factor), *cert. denied,* —— *U.S.* ——, 112 *S.Ct.* 336, 116 *L.Ed.*2d 277 (1991). *Accord People v. Cox, supra,* 280 *Cal.Rptr.* at 729, 809 *P.*2d at 388 (using same analysis on substantial domination of another person mitigating factor); *People v. Medina,* 51 *Cal.*3d 870, 274 *Cal.Rptr.* 849, 799 *P.*2d 1282, 1306–07 (1990), *cert. granted in part,* —— *U.S.* ——, 112 *S.Ct.* 336, 116 *L.Ed.*2d 276 (1991); *People v. Brown,* 46 *Cal.*3d 432, 250 *Cal.Rptr.* 604, 758 *P.*2d 1135, 1152 (1988) (holding that "instructions and counsel's arguments thereon viewed as a whole, sufficiently informed the penalty phase jury it could consider a mental condition of the defendant which, though not characterized as extreme, would potentially mitigate the circumstances of the offense"), *cert. denied,* 489 *U.S.* 1059, 109 *S.Ct.* 1329, 103 *L.Ed.*2d 597 (1989).

The Ninth Circuit recently considered a situation strongly analogous to the case at bar. *Jeffers, supra,* 974 *F.*2d 1075. In *Jeffers,* the court considered a death sentence imposed by a trial court in Arizona. During the penalty trial, the defendant had sought to introduce evidence satisfying a statutory mitigating factor under Arizona law. *Id.* at 1078. The relevant statute provided a mitigating circumstance if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was *significantly impaired,* but not so impaired as to constitute a defense to prosecution." *Ibid.* (citing *Ariz.Rev.Stat.* § 13–703(G)(1)). The sentencing court, applying the standard established by the statute, found that the defendant's impairment did not meet the threshold requirement for application of the mitigating factor. *Ibid.* The Supreme Court of Arizona upheld this finding of the sentencing court. *State v. Jeffers,* 135 *Ariz.* 404, 661 *P.*2d 1105, 1132 (1983). The sentencing court failed, however, to consider the defendant's evidence of psychological impairment as a nonstatutory mitigating circumstance. *Jeffers, supra,* 974 *F.*2d at 1078. The Arizona Supreme Court upheld defendant's

sentence of death after performing what it termed an "independent review" of the record. *Id.* at 1080.

The Ninth Circuit reversed, finding that "[b]ecause there is a risk that mitigating evidence in this case was not fully considered, Jeffers' sentence of death cannot stand." *Id.* at 1084.

The Ninth Circuit relied on *Smith v. McCormick*, 914 *F.*2d 1153 (9th Cir.1990) (holding that mitigating evidence of mental impairment could not be excluded from penalty phase of capital trial simply because it was not sufficiently substantial to meet state statutory requirement), to reverse and remand Jeffers' death sentence. *Id.* 974 *F.*2d at 1078–79. Citing *Smith*, the court noted that it is "not permitted to presume that because evidence was admitted before the factfinder, it was necessarily given consideration." *Id.* at 1079 (quoting *Smith, supra,* 914 *F.*2d at 1166).

In my opinion the failure of the trial court to instruct specifically that the jury could consider non-extreme mental or emotional disturbance and intoxication under the catch-all factor created a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde, supra,* 494 *U.S.* at 380, 110 *S.Ct.* at 1198, 108 *L.Ed.*2d at 329. Moreover, state constitutional principles do not allow the risk that a jury might misunderstand the function and meaning of mitigating factors. *Williams* II, *supra,* 113 *N.J.* at 457, 550 *A.*2d 1172. Here, the jury could have disregarded relevant mitigating evidence relating to defendant's addiction simply because it did not understand and was not informed that those were in fact aspects of his character under the c(5)(h) factor. The error had a clear capacity for producing an unjust result because the incomplete instructions denied defendant a reliable determination of sentence.

—B—

Another serious error relating to aggravating factors involves the trial court's response to a jury inquiry that limited

the jury's consideration of defense experts' testimony when determining whether the alleged aggravating factors existed. The Court admits that "at best, the (trial) court's instruction was ambiguous" and "may have caused prejudice." *Ante* at 315, 619 *A*.2d at 1281. Nevertheless, the Court concludes that, reading this response in the context of the penalty phase instructions, any error was harmless. *Ante* at 316, 619 *A*.2d at 1281.

During its deliberations on the appropriate sentence, the jury sent the following note to the trial court: "(A) Are the expert witnesses' written reports available or (B) are we only to consider their testimony for mitigating factors?" The court met with counsel to frame a response.

> THE COURT: With counsel's approval I will advise the jurors that only those items that were marked into evidence are available, and two, that as to "b" that the testimony of Dr. Musikoff, Dr. Greenfield and Ms. Aviv is to be considered for mitigating factors. Any objections?
>
> [THE PROSECUTOR]: No.
>
> [DEFENSE COUNSEL]: Judge, wait, if I can. I have a question on that aspect. When I first heard the question I had a different assumption on it. But if they're asking if it can only be interpreted for mitigating factors maybe they're still trying to determine if there's an existence of an aggravating factor and they're looking to weigh the testimony in opposition of an aggravating factor instead of in favor of an aggravating factor [sic: a mitigating factor].
>
> THE COURT: I can't speculate as to what they might have in mind. All I can do is answer the questions they pose to us.
>
> [DEFENSE COUNSEL]: Understandable. But the response that it's only going to be utilized for a mitigating factor, what happens if the proofs that were being utilized, meaning that thought process in the beginning, because they're still asking to differentiate between the guilt phase and the penalty phase, that as to the diminished capacity aspect of it, whether or not that existed. Because we do have case law that has told us if they had a lingering doubt in the first trial, that that could be utilized as well as another factor, as a mitigating factor.
>
> THE COURT: Mr. Van Rye, you're reading more into it than the question itself asks. They want to know are they totally to use the testimony for mitigating factors, and I'm only going to answer the questions they've asked.

The court then brought in the jury and instructed it as follows:

> You have a question at 3:18, "(A) are the expert witnesses' written reports available?"
>
> Ladies and gentlemen, they're not available. Only those items that were admitted into evidence are available to you. You'll have to rely on your

recollection of the testimony with reference to what was contained in the reports.

"(B) Are we only to consider their testimony for mitigating factors?"

They were presented as far as Ms. Aviv, Dr. Musikoff, their testimony was presented to establish mitigating factors. You can utilize also Dr. Greenfield's testimony if you see that as supporting any mitigating factor. That's what they were presented for and that's how you're to consider their testimony for those purposes.

The jury then continued its deliberations.

The question expressed a concern with the purpose for which the evidence could have been considered, and not merely whether testimonial or written reports were available. Juries should be informed that evidence offered at any phase of the trial that they view as mitigating can be considered not only to establish mitigating factors but also to determine the existence or the weight of alleged aggravating factors. The trial court's instruction was in error because it instructed the jury that the testimony of defendant's expert witnesses could be used only to establish mitigating factors because "that's what they were presented for." The expert testimony was not presented merely to establish mitigating factors; it was presented also to affect the jury's deliberations on the existence and more importantly, the weight of the aggravating factors alleged.

In *Penry v. Lynaugh,* 492 *U.S.* 302, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256 (1989), the Supreme Court reversed a death sentence because the Texas special issues system for penalty phases did not allow the jury to consider and give effect to mitigating evidence of defendant's mental retardation and abusive upbringing in the absence of requested instructions allowing it to do so. The Court agreed that the proffered evidence was relevant and admissible to affect the jury's consideration of the first special issue, that is, whether the killing had been committed deliberately. *Id.* at 322, 109 *S.Ct.* at 2948, 106 *L.Ed.*2d at 280. Similarly, argues defendant, the Eighth and Fourteenth Amendments would have been violated had the court instructed the jury that the mitigating evidence could be used to establish a mitigating factor but was entirely irrelevant

on the question of whether the first special issue should be answered in the affirmative. The same situation exists here because defendant's mental mitigation evidence, as articulated by Aviv, Greenfield, and Musikoff, was equally relevant to the existence of the aggravating factors. The trial court, however, restricted the jury's use of the mitigating evidence. Here, as in *Penry*, the effect is that the jury was "unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." *Id.* at 322, 109 *S.Ct.* at 2948, 106 *L.Ed.* at 280.

In addition, limiting the use of mitigating evidence solely to determine and weigh mitigating factors when that evidence might neutralize the aggravating factors violates *Skipper, supra*, 476 *U.S.* at 5 n. 1, 106 *S.Ct.* at 1671 n. 1, 90 *L.Ed.*2d at 7 n. 1 (holding that, under *Lockett* and *Eddings*, defendant must be afforded opportunity to introduce evidence to rebut prosecutor's argument and under due process principles allowing defendant an opportunity to explain or deny prosecutor's information).

In this case, the prosecutor's penalty-trial summation concentrated on the theme that the sheer amount of planning that had gone into the kidnapping and murder of Flax proved the intent elements of the two aggravating factors. Defense counsel's argument relied on his experts' testimony to rebut the prosecutor's allegation of calculated planning by showing that, because of defendant's drug addiction, his thoughts and actions were too random and chaotic to establish the aggravating factors beyond a reasonable doubt. Accordingly, allowing the State to rely on evidence of deliberation adduced during the guilt phase to establish the aggravating factors without allowing defendant to rebut that evidence or diminish the weight of the aggravating factors by reference to the expert testimony raises the due process problems addressed in *Skipper*.

The Court appears to accept the State's argument. It rejects the distinction pressed by defendant that the weighing process

mandated by statute could not have begun until after the jurors had first found that the State had proven the existence of at least one aggravating factor beyond a reasonable doubt. *Ante* at 315–316, 619 *A.*2d at 1281–1282.

For that proposition, the State relies on the statutory provision that "[i]f the jury or the court finds that no aggravating factors exist, or that all of the aggravating factors which exist do not outweigh all of the mitigating factors, the court shall sentence the defendant pursuant to subsection b [life sentence]." *N.J.S.A.* 2C:11–3c(3)(b). Apparently the State construes the provision as requiring the jury to deliberate in an ordered fashion. Consequently, the State concludes that "although evidence supporting the existence of mitigating factors may be utilized by defendant, as it was here, to rebut the State's evidence of aggravating factors, it cannot affect the weight of the aggravating factors found; as the death-penalty statute makes clear, it is mitigating factors, if any, which the jury must weigh against any aggravating factors found, not mitigating evidence." (citing *N.J.S.A.* 2C:11–3c(3)(a), (b)). The State's curious position is unsupportable.

In addition, the trial court did not stop after the first instruction, explaining that the expert's reports were "not available." It went on to tell the jury that it was "only to consider their testimony for mitigating factors" because "[t]hat's what they were presented for and that's how you're to consider their testimony for those purposes." That instruction is clearly in error because it improperly limited the use of mitigating evidence.

The prejudice is amplified given the context in which the instruction was given—during deliberations and in response to a specific inquiry by the jury. Thus, the trial court's response to the jury's note established a highly artificial distinction in the manner that mitigating evidence operates because the ultimate decision of the penalty phase is whether death is an appropriate punishment. *Bey* II, *supra*, 112 *N.J.* at 163, 548 *A.*2d 887

(holding that jury instructions serve to make the jury aware "that it is not merely to decide the existence of aggravating and mitigating factors, but to evaluate the evidence supporting those factors in making the 'unique, individualized judgment' regarding the appropriateness of the death penalty"). Mitigating evidence does not invariably or even necessarily have to establish a mitigating factor in order to be the basis for a sentence less than death. Evidence that affects the jury's consideration of the strength of aggravating factors in a way that is favorable to a defendant is just as relevant to the jury's normative judgment of the appropriateness of the penalty.

## IV

The court's failure to charge the jury on the sentencing possibilities also constitutes reversible error. Defendant was convicted of several crimes, including both kidnapping and first degree murder. For the kidnapping conviction, defendant would be sentenced to a term of imprisonment between fifteen and thirty years. *N.J.S.A.* 2C:13–1(c). For the murder conviction, if defendant did not receive a death sentence, he would serve a prison term between thirty years and life, with a minimum period of thirty years to be served before he would become eligible for parole. *N.J.S.A.* 2C:11–3(b). Ultimately, in addition to his death sentence, defendant received the maximum sentence for kidnapping [5] to run consecutive to his sentence for murder.

Prior to the introduction of testimony at the penalty-phase proceeding the trial court failed to inform the jurors that a

---

[5] The trial court mistakenly believed that the maximum term for kidnapping was a life sentence with a parole disqualification period of twenty-five years. It appears that the court improperly relied upon the sentencing range under *N.J.S.A.* 2C:13–1(2). The Court has vacated and remanded the sentence for kidnapping. *Ante* at 324, 619 *A.2d* at 1285. As the State acknowledges, the maximum sentence was thirty years with a parole disqualification period of fifteen years. *See N.J.S.A.* 2C:13–1c(1); *N.J.S.A.* 2C:43–6b.

fifteen to thirty year term of imprisonment would be imposed for the kidnapping conviction. Instead, the court instructed the jury only on the penalty for the homicide conviction, charging the jurors that

> having found defendant guilty of murder, you now have the added responsibility of determining what penalty for that crime is to [be] impose[d] on Mr. Martini. Under the law as enacted by our Legislature the penalty may be either death or a term of imprisonment between thirty years and life, of which thirty years must be served before the defendant is eligible for parole.

The Court stated similarly during the penalty-phase instructions:

> [T]he Legislature of the State of New Jersey has given to you as a jury and to each of you individually the responsibility of deciding whether John Martini, Sr., is to be put to death or be subjected to imprisonment in the New Jersey State Prison for from thirty years to the end of his life, and in any event without any possibility of parole for a minimum of thirty years.

On at least four occasions during the instructions, the trial court referred to the fact that if the jury did not impose a death sentence, the alternative punishment would be imprisonment, which meant "a term of years between thirty years without possibility of parole and life."

Defendant asserts that the court's instruction disaffirmed the notion that defendant never would get out of prison in his lifetime. As a consequence, the jury became more inclined to sentence him to death.

At a minimum, the trial court should have told the jury, as requested by defense counsel, that defendant's parole ineligibility period could range from thirty to forty-five years, depending on whether the court decided to impose concurrent or consecutive sentences.

Recently the Court confronted the issue of how trial courts should instruct juries when the defendant already is under life sentence for a prior, unrelated, murder conviction and the trial court had not determined whether to run the sentences consecutively or concurrently when the penalty phases began and when the sentencing juries were given their final instructions. *State v. Bey,* 129 *N.J.* 557, 610 *A.*2d 814 (1992) *(Bey* III). We there

noted that a death sentence should reflect the "jury's normative judgment that death is the fitting and appropriate punishment, rather than its unwarranted fear of the defendant's premature release from prison." *Id.* at 602, 610 *A.*2d 814. In light of that concern for the reliability of the jury's verdict, we held that the court, either on defendant's request or in the event of a jury inquiry, should instruct the jury that the court will decide whether a sentence is to be served concurrently or consecutively to any prior sentences. *Id.* at 603, 610 *A.*2d 814.

That concern is no less vital when the sentences are to be imposed for contemporaneous convictions. The Court would dismiss this as speculative, because defendant was not yet sentenced for the kidnapping offense. *Ante* at 312, 619 *A.*2d at 1279. Here the trial court failed to inform the jury that a sentence of imprisonment for kidnapping would be imposed, which at the least would involve fifteen years of imprisonment. While the court should not be required to apprise the jury of uncertainties, it is required to inform the jury of those results which are certain, or, indeed, probable, and of the court's power to impose those sentences concurrently or consecutively as an aggregate term. "To hide from the jury the full range of sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence." *State v. Ramseur, supra,* 106 *N.J.* at 311, 524 *A.*2d 188.

The trial court's failure in this case fully to apprise the jury of the probable penal consequences alternative to a death sentence cannot be glossed over by the assumption that the jury acted as though it were fully informed and specifically instructed on those alternatives. The failure irremediably discredits the verdict of the death sentence.

## V

The errors that occurred in the course of the *voir dire* gravely undermined the reliability of the death-qualification of

the jury. Jury death qualification is a critical beginning to a capital-punishment prosecution. Without minimally qualified jurors no confidence can be invested in any ensuing conviction for capital murder and sentence of death.

Other errors permeated the trial. Those errors effectively prevented the jury from appropriately assessing whether the State had met its burden in establishing the existence of aggravating factors. This further prevented the jury from properly evaluating the significance of the aggravating factors in relation to mitigating factors. Moreover, these errors clouded the jury's ability to determine the existence and relative significance of mitigating factors and circumstances. Deliberations on the death sentence that are not fully informed and ventilated by all relevant information that may enable jurors to decide in favor of life cannot be the basis for the decision that death is the appropriate punishment.

Today's decision underscores a painful and ironic anomaly in our criminal jurisprudence. This Court professes in case after case to understand that nothing on the spectrum of criminal punishment is comparable to death, and that this immutable truth mandates the most scrupulous and comprehensive qualification of jurors in capital cases and importunes the fairest and most generous tolerance of evidence by the defendant that his or her life should be spared. And yet, in case after case—and in this case—the Court refuses to apply those principles when the record demonstrates that an objective and reasonable application would not abide the capital conviction and death sentence. This gap between theory and practice is reflective of a capital punishment jurisprudence that is internally inconsistent and of an administration of criminal justice that is markedly uneven. In the context of capital-murder prosecutions these profound defects are magnified.

Everyone loses and the loss for all concerned is immeasurable. The judiciary loses credibility and integrity in failing to apply those safeguards—however unpopular—which it knows

to be essential to the administration of justice in capital cases. In temporizing the application of needed legal safeguards, society loses the salutary and civilizing effect of the rule of law, with its necessary although often difficult restraint on the retributive impulse in human nature. And the defendant, tragically, loses his life, through a failed system of justice.

We are not here to decide as individuals or even collectively that in some moral or intuitive or primal sense that defendant deserves to die for his terrible crime. Rather, we are to decide only that under our system of justice, under scrupulously developed principles of law, the jury fairly determined that the defendant should pay with his life. Respectfully, I do not think the Court has done so.

Justice O'HERN concurs in Point II of this opinion.

## APPENDIX

*PENALTY TRIAL CASES INVOLVING c(5)(g) MITIGATING FACTOR*

The Baldus Report indicates that the c(5)(g) factor has been charged in five cases prior to the defendant in *Martini.*

The summaries of Felix Diaz' and Richard Redden's cases give no indication of why mitigating factor c(5)(g) was submitted to or found by the jury. In the other cases, however, the records clearly indicate that the threshold requirement of mitigating factor c(5)(g) was satisfied on evidence comparable to that present in the case before the Court.

In *State v. Miguel Melendez,* the defendant was convicted of a contract killing. The defendant had been paid $5,000 for the murder. The victim was killed, in midday, in the presence of his ten year old daughter. Baldus Report, *Detailed Narrative Summaries of Death Eligible Cases,* Appendix B at 191.

In April of 1986, the Essex County Prosecutor's Office had a lead on a suspect in the Cruz (Melendez's victim) murder. The Office contacted Investigator Velazquez and it was arranged

for an informant (Luis) to bail out Melendez and engage him in conversation about the murder. Luis was wired to record the conversation. The plan worked and, in conversation with Luis, the defendant incriminated himself. The defendant also provided the first name, ethnicity, and general whereabouts of his partner, Lazaro Trimino.

Immediately upon concluding these incriminating remarks, Melendez was placed arrested and placed in custody. At trial, the defense moved for a suppression of the taped conversation and April 11th confession of the defendant. Had the defense succeeded, the State would have been deprived of an "assistance" the statement provided.

The defendant pled not guilty, but called no witnesses at his trial (nor did he testify for himself). There was some argument over the submission of factor c(5)(g). The defense urged a very liberal reading of substantial assistance—the sort of reading rejected by the Court today—including anything that helped in the arrest or indictment of a co-defendant. The State initially resisted, arguing that *prosecution* was the key to assistance, and Melendez had not assisted in the prosecution of the person who hired him, Trimino.

Eventually a stipulation was made about the extent of Melendez's cooperation.

Based on the information contained in the April 11, 1986 statement made by Miguel Melendez to Investigator William Velezquez, Lazaro Claro Trimino was arrested and indicted.

The defendant, on April 11, 1986, also pointed out to law enforcement officers the apartment building where Mr. Trimino lived in East Orange.

Lazaro Claro Trimino subsequently pled guilty to a criminal offense.

As to the "pointing out" of Trimino's house, there is no evidence, in the record, of what this means.

Melendez had given the full name of his co-defendant. He did not know the address. The police, however, had a photo of Trimino, who had earlier been held in custody on an unrelated matter. Moreover, the tape recorded conversation with the informant had revealed that the man who had been Melendez's

"partner" was a Cuban named Lazaro. Melendez told the informant that Lazaro lived in "East Orange. You know, where unemployment is at.... Up Central Avenue."

During Melendez' formal statement to the police, when asked about Trimino's whereabouts, the following colloquy ensued:

Q What's the number of the house and the block?

A The number, the add ..., I know where he lives, but the number or the name of the street I don't know it.

Q You're telling me that you don't know the number or the street where he lives. Do you know how to get to where he lives?

A Yes.

Presumably, because of the inadequacy of this statement, police thought it necessary to have the defendant "show" them where Trimino lived. One can only speculate that, at some point on the day of his statement, Melendez was driven up Central Avenue and pointed out Trimino's apartment building. But the question remains, given what they already knew, how much more did this actually add to the police efforts to identify where Trimino lived?

The State did not agree, in fact it hotly disputed, the inference that Trimino pled guilty because of the assistance that Melendez had rendered.

The trial court submitted factor c(5)(g) to the jury.

The defense did not make much of the assistance. In its summation during the penalty phase, the defense effectively repeated the terms of the stipulation and argued that, whatever the motive, this constituted substantial assistance.

The prosecutor characterized Melendez's assistance this way:

As for any assistance rendered by Mr. Melendez to the State, the assistance rendered is what you got in the stipulation. When the State had him that night, he told on the man who owed him money. He ratted on him that night because he was mad at him. That's it. That's the extent of it. You want to find that that substantially aided the State? That's up to you. The State submits to you that it's not.

The transcript of the conversation between the defendant and the informant supports this reading. The defendant was

caught red-handed, so angry at Trimino that he was plotting to tie him up and rob him. When caught, he informed on Trimino. Hardly a picture of a compliant defendant aiding the State.

In short, the only assistance Melendez rendered was to break down under questioning and admit to the facts presented by the police. Nevertheless, mitigating factor c(5)(g) was presented to and found by the jury.

In *State v. Michael Rose*, A-4874-84T4 (Dec. 18, 1984), *transcripts microformed* at State Law Library, Box 4551, Reel 6263, the defendant was convicted of the brutal murder of a pregnant woman. Baldus, *supra*, Appendix B at 265-66. The defendant was convicted after a jury trial.

At the penalty phase, the defense argued that Rose had offered substantial assistance to the State in the form of his agreement to aid in the prosecution of another person involved in the crime. That assistance consisted entirely of Rose's confession in which he identified Zoran Cveticanin as the person who had hired him to kill the victim. To the extent that Rose relied on the undue influence of Zoran Cveticanin as an integral part of his defense, the identification of Cveticanin hardly amounted to a major concession on the part of the defendant. Moreover, on the stand, Rose contradicted or retracted much of his confession.

Nevertheless, the trial court in *Rose* permitted a c(5)(g) mitigating factor to go to the jury. In instructing the jury on that factor, the trial court described the relevant inquiry as whether "Michael Rose voluntarily agreed to render assistance to the State to aid in the prosecution of other persons involved in the crime." [A-4874-84T4 (Dec. 18, 1984), *transcripts microformed* at State Law Library, Box 4551, Reel 6263.]

Today, the Court, after asserting that *Rose* "rendered substantially greater cooperation to the State than did Martini" then proceeds to cite from the record several appealing facts about Rose's personal history. (*ante* at 297, 619 *A*.2d at 1271)

These are utterly irrelevant to the issue of cooperation *to the State*, though they do mention Rose being "helpful" to neighbors.

It is important to remember that, in *Rose*, the defendant was convicted of the brutal murder of a female victim. The victim was in an advanced state of pregnancy at the time and had died from a total of eighty-three stab wounds. The defendant had been paid $60 to murder his victim.

How "far different a person" (*Ante* at 298, 619 *A*.2d at 1271) was Michael Rose from John Martini? Regardless of how one answers that question, it is totally irrelevant to the issue of defendant's cooperation to the State under the c(5)(g) factor. A review of the record in *Rose* supports the contention that defendant's assistance in this case was comparable to that provided by Rose.

In *State v. Di Frisco*, 118 *N.J.* 253, 571 *A*.2d 914, the defendant had been arrested, in New York, for various street crimes. While handcuffed to a railing, the defendant asked the arresting officer if there was anything that could be done to avoid jail time. The officer suggested turning over information on other crimes that the defendant might possess. Defendant asked who would be more guilty, "the guy who shoots a guy or the guy who pays him to shoot a guy?" The officer replied, "the guy who pays him to shoot the guy." Defendant then waived his rights and confessed to the murder. DiFrisco pled guilty to murder and waived his right to a jury for the penalty trial. The trial court, finding that aggravating factors outweighed mitigating factors, sentenced the defendant to death.

This Court, in reversing the defendant's death sentence, did so based on the absence of extrinsic evidence corroborating defendant's confession that he had been hired by a third party, and remanded the matter for retrial.

In assessing mitigating factors, the trial court found that the defendant had rendered substantial assistance to the State.

The "assistance" rendered by the defendant consisted of his implicating the person who had paid him (a Mr. Franciotti). The prosecutor suggested that the defendant call Franciotti. Defendant initially agreed but, after speaking with his father, decided not to make the call until defendant spoke with counsel.

The prosecutor told the defendant that this was his "last chance to cooperate" because his arrest would be made public and he would not be given the chance to cooperate. The defendant decided not to cooperate and remained in jail.

At the penalty phase, the State indicated that it had not presented a case against Franciotti to a grand jury. It did not have a pending prosecution against Franciotti and had not sought the cooperation of the defendant in prosecuting Franciotti. The trial court expressed "perplexity" at that, but the prosecutor explained that the evidence was insufficient and that the *defendant had refused to cooperate.*

Although the prosecutor insisted that the defendant had refused further cooperation, although there was no corroborating evidence of the Franciotti's involvement, although no indictment ever issued from the information the defendant had provided, *still* the finder of fact was able to conclude that the threshold for mitigating factor c(5)(g) had been met. Justice O'Hern described the defendant's "cooperation" with the State as a "play[ing] cat and mouse with the police. He would lead them to the bait, then withdraw it." *Di Frisco, supra,* 118 *N.J.* at 280, 571 *A.*2d at 928.

*For affirmance in part; for vacation and remandment in part; for reversal in part*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK, GARIBALDI and STEIN—5.

*For reversal*—Justices HANDLER and O'HERN—2.